# EXHIBIT 18

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 2 of 27

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Agency for Policy Coordination on State
Property, Erdenet Mining Corporation, Erdenes
Oyu Tolgoi LLC,

                              Plaintiffs,

                - and -

Batbold Sukhbaatar, Ganzorig Chimiddorj, Tuul
Ulambayar, Nyamdalai Ochirbat, Cheong Choo
Young, Kim Hak Seon, Kim Yoonjung, Lee Yu
Jeong, Rhee Byung Wook, Kang Eun Joo,
Battushig Batbold, Baloas Inc., Baloas Limited,
Lovitas, Inc., Lovitas Limited, Glowassets
Limited

                              Defendants.

Index No. _____

**AFFIDAVIT OF JULES B.
KROLL**

State of New York    )
                     )    ss:
County of New York   )

Jules B. Kroll, being duly sworn, deposes and says:

1.      I am the chairman and co-founder of K2 Intelligence ("K2"), an investigative
consulting firm that I founded with Jeremy M. Kroll in 2009.  Prior to establishing K2, I founded
Kroll Inc. in 1972.  My past experience includes recovering assets plundered by kleptocrats,
including the Philippines' Ferdinand Marcos, Haiti's Jean-Claude Duvalier, and Peru's Alberto
Fujimori.

2.      K2 has sought to investigate, trace, and recover assets misappropriated from
Mongolia by individuals and entities through sham transactions involving key Mongolian mining
assets.  After an initial review of publicly-available information related to these matters, K2 began
focusing on wrongdoing committed by Defendant Batbold Sukhbaatar ("Batbold"), currently a

Case 1:21-mc-00218-RA-OTW   Document 5-18   Filed 03/09/21   Page 3 of 27

senior politician and a former prime minister of Mongolia, as well as his network of proxies.  The assets which have since been identified include assets whose beneficial ownership has been disguised or hidden through the use of complex corporate structures and which are located in numerous foreign jurisdictions, in addition to Mongolia.  I am duly authorised to make this affidavit on behalf of Plaintiffs.

3.      The facts averred in this affidavit are within my own knowledge unless otherwise stated.  Where they are within my own knowledge, they are true.  Where they are not within my own knowledge, they are based on information and documents supplied to me and are true to the best of my knowledge.

4.      I submit this affidavit in support of Plaintiffs' motion for an order of attachment pursuant to CPLR 6210 in aid of proceedings commenced by Plaintiffs against the Defendants in the Bayanzurkh District Civil Court of First Instance in Mongolia (the "Mongolian Proceedings"), and/or in aid of the New York claims set forth in Plaintiffs' Complaint.

5.      A list of exhibits to this affidavit is available at Ex-1.

## I.      The Parties

6.      Plaintiff Agency for Policy Coordination on State Property (the "Agency") is the 100 percent shareholder of Plaintiff Erdenet Mining Corporation ("Erdenet"),[1] a state-owned mining company that owns Mongolia's mining interests in the Erdenet mine, one of the largest copper and molybdenum mines in the world, located in the Orkhon province of Mongolia.

---

[1] At the time of the events described below, Erdenet was co-owned by the State Property Committee of the Mongolian government (the predecessor of the Agency) (51%) and Russian state-owned entity the State Corporation for Assistance to Development, Production and Export of Advanced Technology Industrial Product ("Rostec").  On January 15, 2018, Erdenet became 100% owned by the Agency.

2

7.    Plaintiff Erdenes Oyu Tolgoi LLC ("EOT") is the 34% shareholder of Oyu Tolgoi LLC, **(Ex-2)** the project company that controls the operation of the Oyu Tolgoi mine, a copper-gold project in Mongolia's Ömnögovi Province in the South Gobi Desert and one of the world's largest new copper-gold mines.  In December 2011, Defendant Batbold created EOT to hold the Mongolian State's share in the Oyu Tolgoi project **(Ex-57; Ex-4)**.

8.    Defendant Batbold is the former Prime Minister of Mongolia, a sitting member of the Mongolian parliament, and a businessman.  Batbold has held several powerful political positions in Mongolia and in the ruling Mongolian People's Party, including Minister of Foreign Affairs (2008-2009), Minister of Industry and Trade (2004-2006), and Member of the Leadership Council of the Mongolian People's Revolutionary Party (the former name of the Mongolian People's Party) (2001-2005).  During Batbold's tenure as Mongolian Prime Minister from 2009 to 2012, he had effective control of Plaintiffs' natural resources, and through his own wrongful actions and those of others acting in concert with him or taken on his behalf, Batbold wrongfully diverted very significant assets owned by Plaintiffs to others on his behalf or under his direction.

9.    Defendant Chimiddorj Ganzorig ("Ganzorig") is a Mongolian citizen who served as Director General of Erdenet during Batbold's tenure as Prime Minister.  Based on the information currently available, it is likely that Batbold controlled Erdenet and/or directed Ganzorig to sign contracts with several companies that Batbold beneficially owned (as described further below).

10.    Defendants Tuul Ulambayar, Nyamdalai Ochirbat, Cheong Choo Young, Kim Hak Seon, Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, Kang Eun Joo, and Battushig Batbold[2] are Mongolian and South Korean citizens, respectively, who assisted and/or acted for the benefit

---

[2] Battushig Batbold is Batbold Sukhbaatar's son.

3

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 5 of 27

of Batbold, including by (i) facilitating the diversion of Plaintiffs' assets; and (ii) holding assets for the ultimate beneficial ownership of Batbold, including funds derived from the sale of Plaintiffs' natural resources and from kickbacks that Batbold received in connection therewith.

11.     Defendants Baloas Inc., Baloas Limited, Lovitas Inc., Lovitas Limited and Glowassets Limited (collectively, the "Entity Defendants") are New York corporations and British Virgin Islands ("BVI") companies established by the Individual Defendants to conceal their ill-gotten gains from the Mongolian government.   Together, these entities own two valuable apartments in New York — Unit 12E, 21 East 61st Street, New York, NY 10065, and Unit 58D, 230 West 56th Street, New York, NY 10019 (collectively, the "Properties") — that were obtained using the proceeds of the Individual Defendants' unlawful actions.  The Entity Defendants are believed to be mere corporate shells used to divert and conceal the Individual Defendants' illegally-obtained proceeds, and are alter egos of the Individual Defendants that control those entities, including but not limited to Batbold, Cheong Choo Young, Kim Hak Seon, and Rhee Byung Wook.

12.     In addition, a BVI company with close connections to Batbold's proxies, Defendant Glowassets Limited, apparently controls a bank account held at HSBC Bank USA, N.A. in New York (the "New York Bank Account").  The funds in the New York Bank Account are believed to have been obtained through the Individual Defendants' illegal transactions.

## II.    Background on K2's Investigation

13.     In early 2018, K2 conducted preliminary research simply to determine the feasibility of tracing assets that had been misappropriated from Mongolia by individuals and entities in connection with transactions involving key Mongolian mining assets.

14.     After identifying several Mongolian politicians and businesspeople (including Batbold) as persons of potential interest, K2 commenced its investigations in September 2018. We

4

began by reviewing the major mining assets in Mongolia, placing particular focus on those of strategic importance, including the Oyu Tolgoi and Erdenet mines.  Our aim was to understand how certain Mongolian public officials and businesspeople had overseen major decisions or obtained contracts relating to these projects, and whether they benefitted from illicit activities.

15.    Through our investigation, we determined that Batbold was likely to hold valuable assets internationally, hidden through offshore companies and a network of proxies.  He did not declare these assets to Mongolian authorities, despite the clear requirements on him to do so as a public official.  Additionally, as described below, we identified clear indications of wrongdoing which we believed would withstand judicial scrutiny.  As such, Batbold became our primary focus.

16.    Thus, K2 engaged in a detailed investigation into assets that Defendants improperly obtained from Plaintiffs.  We conducted a diligent review of publicly available information including corporate and property records, credit and consented information[3] databases, international, national and local media, litigation and arbitration records, and other open sources including social media, websites and domains.  We have carried out research in several languages.

17.    Our investigation identified countless individuals and entities as well as numerous high value assets linked to both Batbold and his family.  In particular, based upon numerous connections to Batbold's family and Mongolia, we suspected that South Korean nationals Cheong Choo Young ("Cheong") and Kim Hak Seon ("Hak Seon") were working on behalf of Batbold as proxies.  Further investigations revealed their involvement in a vast network of foreign entities, including entities registered in the BVI, Hong Kong, Mongolia, Singapore, the UK, the US, and several other jurisdictions.  Several of these companies own or owned valuable properties,

---

[3] "Consented information" is when a person opts in or does not opt out to share their details with third party databases, including marketing services.  Examples might be when you provide your address details on a credit application or mobile phone contract. We legally have access to this information.

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 7 of 27

including in Hong Kong, the UK and the US, and our review of bank statements has revealed that significant funds traceable to Batbold flow between these entities.

18.     Through our review of these assets, we uncovered further evidence of high-value contracts for copper concentrates and molybdenum with Erdenet, and illicit payments and suspicious activity surrounding key events in the commercial life of the Oyu Tolgoi mine.  We found several other proxies who were closely connected to Cheong and Kim, and who were shown to be assisting them in the management of the global asset holding structure.  None of these proxies, including Cheong or Kim, appeared to have the financial resources or expertise to genuinely own the assets that they nominally controlled and/or influenced.

19.     In our investigation, we have been assisted by the Independent Authority Against Corruption ("IAAC"), an investigative agency of the Mongolian Government that works closely with the Prosecutor General of Mongolia.  With the help of the IAAC and Dr. Paul Hunton of Hunton Woods Ltd. (a senior technical investigation specialist and digital forensic consultant),  we have undertaken a forensic imaging of the servers at Erdenet, capturing emails and other relevant documents to identify further evidence relating to the contracts held by proxy companies.

20.     Because Batbold and his proxies have tried and are trying to obscure the true ownership, control and extent of assets that Batbold beneficially owns — and also because of the natural limitations upon an investigator's enquiries — the results of my review are necessarily non-exhaustive, and where certain results are inconclusive, conclusions may also involve deductive reasoning based on the very many years of experience among me and my team.

III.    **The Individual Defendants' Corrupt and Illegal Transactions**

21.     Based on my review of the evidence uncovered by K2, I believe that Batbold has exploited the Erdenet and Oyu Tolgoi mines for personal profit.  With the Erdenet mine, Batbold directed his proxies to engage in a series of fraudulent transactions involving the resources from

6

those mines.  With the Oyu Tolgoi mine, Batbold's proxies have accepted various undisclosed benefits from offshore and onshore companies, benefits which (as far as I am aware) include assuming control or substantial influence over companies and funds, at key points during the life of the Oyu Tolgoi mine.  The Individual Defendants' conduct with respect to the Erdenet and Oyu Tolgoi mines are described in greater detail in the sections below.

22.     After executing these transactions and diverting assets belonging to Plaintiffs to accounts within their own control, the Individual Defendants further transferred, disguised, and concealed the ownership of their ill-gotten gains, using a complex network of offshore and onshore corporate structures and proxies across numerous jurisdictions.  As a result, such funds and assets are effectively now hidden, held for Batbold's ultimate benefit by his proxies.

A.     **The Erdenet Mine Scheme:  The Individual Defendants' Corrupt and Illegal Transactions Relating to the Erdenet Mine**

23.     Beginning in October 2009, Batbold, as Prime Minister, oversaw the State Property Committee, which at the time was the majority owner of Erdenet.  At that time, Ganzorig was the Director General of Erdenet.  Batbold's tenure as Prime Minister ended on August 10, 2012.

24.     In or around 2019, Plaintiffs discovered that the Individual Defendants had concluded illegal transactions with a number of foreign legal entities to unlawfully enrich Batbold. Specifically, Erdenet entered into valuable contracts for the trade of copper and molybdenum concentrate with at least four companies that Batbold's proxies controlled:  newly-formed Catrison Limited ("Catrison"), newly-formed Cliveden Trading AG ("Cliveden"), newly-formed Genetrade Limited ("Genetrade"), and newly-formed Lidex Holdings Limited ("Lidex").  Although Catrison, Cliveden, Genetrade, and Lidex are based in Hong Kong, Switzerland, the BVI, and Hong Kong, respectively, they are chiefly controlled on behalf of Batbold by the Individual Defendants Cheong Choo Young and Kim Hak Seon, who are husband and wife and proxies of Batbold.  These

"insider" transactions allowed Batbold and his proxies to profit directly from these contracts. At no point did Batbold disclose his involvement with or links to these companies, as he was required to do under Mongolian law.

### 1. Erdenet's Contracts with Catrison

25. Catrison is an active Hong Kong company that was formed on February 8, 2011, with Hak Seon as its 100% shareholder and Kim Yoonjung ("Yoonjung") as its sole director.[4] Hak Seon maintained the e-mail address "catrisonlimited@yahoo.com," and used it to communicate with Batbold and his son Battushig Batbold ("Battushig") **(Ex-5)**. Batbold did not use his official parliamentary e-mail address to communicate with Hak Seon, but instead used his personal Yahoo e-mail address. Even though he does not appear to hold any official position in Catrison, Cheong has communicated with Erdenet on behalf of Catrison.

26. On February 14, 2011, less than a week after Catrison came into existence, it secured a contract with Erdenet to purchase 150,000 wet metric tonnes ("WMT") of copper concentrates from Erdenet over a period of three years (the "First Catrison Contract") **(Ex-6)**. Ganzorig signed the contract on behalf of Erdenet, and Yoonjung signed on behalf of Catrison. At the time the First Catrison Contract was executed, Catrison did not have any history of trading in copper concentrates, and neither Catrison's then sole shareholder, Hak Seon, or its then sole director, Yoonjung, had any prior experience or technical expertise in copper concentrates. It is also unclear how Hak Seon, Yoonjung, or Catrison were able to obtain financing to purchase

---

[4] Hak Seon was initially Catrison's 100% shareholder, but transferred her shares to BVI company, Beckenham Holdings Limited, on November 1, 2012. Beckenham Holdings is believed to be a corporate nominee used by Hong Kong-based GDL Corporate Services Limited, the agent of Catrison. In addition, Yoonjung was sole director of Catrison between February 2011 and April 2011, and again between January 1, 2012 and October 3, 2018. At all other times, Hak Seon has been sole director of Catrison.

8

copper concentrates from Erdenet, as there is no indication that either individual then (or now) possessed the personal funds or the creditworthiness to secure such financing.

27.      On December 14, 2011, Catrison concluded a second contract with Erdenet that superseded the First Catrison Contract (the "Second Catrison Contract") **(Ex-7)**.  Ganzorig, again in his capacity of General Director of Erdenet, signed the contract on behalf of Erdenet, and Yoonjung signed on behalf of Catrison.  Under the Second Catrison Contract, Catrison agreed to purchase 240,000 WMT over three years.  All other material terms remained the same as the First Catrison Contract.  The Second Catrison Contract was amended on May 1, 2012 and again on May 29, 2012 **(Ex-8); (Ex-9)**.

28.      In 2011, Erdenet sold 45,027.25 WMT of copper concentrates to Catrison at a total cost of US$ 68,974,595.58 **(Ex-10); (Ex-11)**.  In 2012, Erdenet sold an additional 63,831.91 WMT of copper concentrates at a total cost of US$ 92,935,795.53 **(Ex-10); (Ex-12)**.  Almost immediately after entering into each of these sales contracts, Catrison re-sold some or all of the copper concentrates that it purchased from Erdenet to Ocean Partners UK Limited ("OPUK"), a UK-based commodities trading company.  Before and after contracting with Catrison, Erdenet sold copper concentrates directly to OPUK, one of Erdenet's largest customers **(Ex-13); (Ex-14); (Ex-15); (Ex-16); (Ex-17)**.  The fact that Erdenet suddenly began awarding contracts to Catrison, a new entity controlled by individuals with no experience in the industry, instead of continuing to sell directly to OPUK, as it had done previously, is both unusual and wholly unexplained.  In addition, individuals from OPUK's affiliate in the United States, Ocean Partners USA, were in direct contact with Catrison and, at times, even handled shipments and communications with Erdenet on behalf of Catrison **(Ex-18); (Ex-19)**.  In a cryptic email to Erdenet, one individual from Ocean Partners

USA stated that the Catrison shipments were "not well discussed," and ended her email with the words "I don't wish to cause any problems discussing the 'c' shipments." **(Ex-18)**.

### 2. Erdenet's Contracts with Cliveden

29.     Cliveden is a Swiss company that was established on December 9, 2011 by Mark Forsyth, a commodities trader.  Shortly thereafter, on January 26, 2012, a majority of Cliveden's shares were allocated to Hong Kong entity Ever Global Trading Limited ("Ever Global"), whose sole owner and director since December 13, 2011 has been Batbold proxy Hak Seon **(Ex-20); (Ex-21); (Ex-22)**.  On January 26, 2012, Hak Seon was appointed as director of Cliveden.

30.     Batbold and his family were in contact with the key players at Cliveden.  As discussed above, Hak Seon was in communication with both Batbold and Battushig.  In addition, Mark Forsyth, using the e-mail address "Clivedenmongolia@gmail.com," was in communication with Batbold **(Ex-5)**.  Batbold again did not use his official parliamentary e-mail address to communicate with Hak Seon and Mark Forsyth, but instead used his personal Yahoo e-mail address.

31.     On December 14, 2011, one day after Hak Seon became the sole shareholder of Ever Global, which in turn held 74% of Cliveden, Cliveden was awarded its first contract with Erdenet to purchase 240,000 WMT of copper concentrates over a period of three years (the "First Cliveden Contract") **(Ex-23)**.  Ganzorig signed the contract on behalf of Erdenet, and Mark Forsyth signed on behalf of Cliveden.  The First Cliveden Contract was signed on the same day, and contained substantially the same terms and quantities, as the amendment to the Second Catrison Contract.

32.     Following a dispute over the non-delivery of copper concentrates, Cliveden Trading and Erdenet entered into a second contract on 7 September 2016 (the "Second Cliveden Contract") **(Ex-24)**. Cliveden Trading agreed to buy 86,000 WMT of copper concentrates over a

10

three-year period. Tserevsamba Davaatseren (then General Director of Erdenet) signed the contract on behalf of Erdenet, and Forsyth signed on behalf of Cliveden Trading. Aside from quantity, all material terms were the same as the First Cliveden Trading Contract. The Second Cliveden Trading Contract was later amended three times to reflect changes to the shipping schedule, price mechanism, and treatment and refining charges **(Ex-25); (Ex-26); (Ex-27)**.

33.     Between 2012 and 2019, Erdenet sold 131,517.47 WMT of copper concentrates to Cliveden at a total cost of US$ 163,611,796 million **(Ex-28)**.

### 3.     Erdenet's Contracts with Genetrade

34.     Genetrade is a BVI company that was established on November 19, 2010, and controlled by Batbold proxies, Cheong and Kang Eun Joo ("Kang"). The signatory for Genetrade is Defendant Kang who is, like Cheong, a South Korean citizen, a former employee of Samsung C&T, and a suspected proxy of Batbold **(Ex-29); (Ex-30)**. Genetrade is also believed to be controlled by Cheong. After Genetrade was established, Cheong registered the domain "genetrade.biz" and amended his contact details to include the email address "genetrade@yahoo.com." **(Ex-31); (Ex-32)**. Cheong has used his Genetrade-related e-mail account to communicate with Batbold **(Ex-5)**. Genetrade also has three different physical addresses in Hong Kong and the BVI that Cheong regularly uses.[5]

35.     Not long after it was incorporated, Genetrade was awarded its first sales contract by Erdenet on December 24, 2010 for the purchase of 3,300 WMT of molybdenum flotation concentrates **(Ex-33)**. Ganzorig signed the contract on behalf of Erdenet and Kang signed on behalf of Genetrade. On December 6, 2011, Genetrade obtained a second contract with Erdenet,

---

[5] In contracts with Erdenet, Genetrade has used an address in Hong Kong and the BVI, and on SWIFT transfer documents relating to Genetrade, a Hong Kong address is provided **(Ex-34); (Ex-35)**.

again signed by Ganzorig and Kang, for the purchase of 3,800 WMT of molybdenum flotation concentrates (collectively, the Genetrade Contracts) **(Ex-34)**. Pursuant to the Genetrade Contracts, Erdenet sold 6,967.258 WMT of molybdenum flotation concentrates to Genetrade at a total cost of US$ 68,428,437.56 million **(Ex-36)**. Genetrade is believed to be used by Batbold, Cheong, and Kang to sell shipments of molybdenum concentrate to buyers in Busan and Incheon in South Korea **(Ex-37)**.

### 4. Erdenet's Contracts with Lidex

36. Lidex was a Hong Kong company incorporated on February 23, 2007, around a month after Cheong left his role at Samsung C&T **(Ex-38); (Ex-39)**. Although the initial shareholders of Lidex were Hong Kong entities, Cheong appears to have been involved in the company since at least the second quarter of 2007. On April 10, 2007, Cheong registered the domain "lidex.org" and began using email address "lidexholdings@yahoo.com." **(Ex-40)**. From November 1, 2009 through September 28, 2010, Cheong was director of Lidex **(Ex-41); (Ex-42)**. Subsequently, Cheong was replaced as director by a BVI company, Rowse Holdings Limited ("Rowse"), which then became 100% shareholder of Lidex. Yoonjung was the authorized signatory and representative of Rowse, which remained the 100% shareholder of Lidex until that company's dissolution on October 24, 2014 **(Ex-43); (Ex-44); (Ex-45)**.

37. In early 2007, Lidex concluded a contract with Erdenet for the sale and purchase of 20,000 tons of copper concentrates (the "First Lidex Contract") **(Ex-46)**. On 14 November 2008, Erdenet and Lidex signed contract No. E-2008/01-Cu to supply a total of 150,000 tons of copper concentrates (the "Second Lidex Contract") **(Ex-46)**. However, a dispute arose in 2008 and, in 2011, Lidex and Erdenet agreed to "close[]" the contract **(Ex-46); (Ex-96)**.

38. Lidex signed another contract with Erdenet in 2011, contract No. E-2011/01-Cu (the "Third Lidex Contract"). However, that agreement was annulled and never implemented

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 14 of 27

**(Ex-47)**. This Erdenet contract matches the Erdenet contract number of the First Catrison Contract, suggesting that Catrison replaced Lidex as the counterparty for the contract.  Further, bank statements show that, after obtaining the First Lidex Contract with Erdenet, Lidex made various payments into a joint account held by Cheong and Defendant Nyamdalai Ochirbat ("Ochirbat") at the Trade and Development Bank in Mongolia.  Lidex made transfers of US$ 9,980.50 on March 19, 2008, US$ 19,980.50 on June 19, 2008, and US$ 24,980 on March 1, 2010 to Cheong and Ochirbat's joint account **(Ex-48)**.

39.    Table 1 below shows the timing of the Erdenet contracts and Defendants known to be involved listed in chronological order.

**Table 1**

| Date | Erdenet Counterparty | Proxy Involved in Transaction |
|---|---|---|
| February 23, 2007 | Lidex Established | Cheong, Kim Yoonjung |
| 2007 (Exact date unknown) | Lidex (First Lidex Contract) | Cheong, Kim Yoonjung |
| November 14, 2008 | Lidex (Second Lidex Contract) | Cheong, Kim Yoonjung |
| November 19, 2010 | Genetrade Established | Kang Eun Joo, Cheong |
| December 24, 2010 | Genetrade (First Genetrade Contract) | Kang Eun Joo, Cheong |
| 2011 (Exact date unknown) | Lidex (Third Lidex Contract) | Cheong, Kim Yoonjung |
| February 8, 2011 | Catrison Established | Kim Yoonjung, Hak Seon |
| February 14, 2011 | Catrison (First Catrison Contract) | Kim Yoonjung, Hak Seon |
| April 14, 2011 | First Amendment to First Catrison Contract | Kim Yoonjung |
| December 6, 2011 | Genetrade (Second Genetrade Contract) | Kang Eun Joo, Cheong |

13

| Date | Erdenet Counterparty | Proxy Involved in Transaction |
|---|---|---|
| December 9, 2011 | Cliveden Established | Hak Seon |
| December 14, 2011 | Cliveden (First Cliveden Contract) | Hak Seon |
| December 14, 2011 | Catrison (Second Catrison Contract) | Kim Yoonjung, Hak Seon |
| April 27, 2012 | First Amendment to Second Catrison Contract | Kim Yoonjung |
| April 27, 2012 | First Amendment to First Cliveden Contract | |
| May 29, 2012 | Second Amendment to Second Catrison Contract | Kim Yoonjung |
| September 7, 2016 | Cliveden (Second Cliveden Contract) | Hak Seon |
| October 5, 2016 | First Amendment to Second Cliveden Contract | |
| February 1, 2017 | Second Amendment to Second Cliveden Contract | |
| February 28, 2018 | Third Amendment to Second Cliveden Contract | |

**B.** **The Oyu Tolgoi Mine Scheme: The Individual Defendants Received Undisclosed Illegal Kickbacks in Exchange for Favors from the Government Relating to the Oyu Tolgoi Mine**

40.     The Individual Defendants (on behalf of Batbold) also illegally received, and failed to disclose, assets received from offshore and onshore companies in return for favors granted to the private shareholder and operator of the Oyu Tolgoi mine, Ivanhoe Mines Limited ("Ivanhoe").

41.     On October 6, 2009, the Mongolian government entered into an agreement for the construction and operation of the Oyu Tolgoi mine with Canadian mining company Ivanhoe and Anglo-Australian mining company Rio Tinto plc ("Rio Tinto"), known as the Oyu Tolgoi Investment Agreement. This agreement gave the Mongolian government State-owned entity, Erdenes MGL LLC ("MGL") a 34% interest and Ivanhoe an indirect 66% interest in Ivanhoe Mines Mongolia Inc. LLC (known as Oyu Tolgoi LLC after December 1, 2009), which owned the license to operate the Oyu Tolgoi mine.[6]

---

[6] While Rio Tinto only held a minor, 9.9%, stake in Ivanhoe at the time, Rio Tinto now controls Ivanhoe.

14

42. On October 29, 2009, three weeks after the Oyu Tolgoi Investment Agreement was signed, Batbold assumed the role of Prime Minister, at which time the Mongolian government's three appointed Board members of Oyu Tolgoi LLC began reporting to Batbold.

### 1. May to August 2010 Selection of Oyu Tolgoi LLC Board and Key Site Visit By Batbold to Oyu Tolgoi Project Site

43. On May 5, 2010, the Board of Oyu Tolgoi LLC was selected. Ivanhoe, Rio Tinto, and the Mongolian state-owned entity, MGL, each appointed three directors **(Ex-98)**. MGL's appointees were announced by the State Property Committee, which reported to Batbold at the time **(Ex-98)**. One MGL-appointed member of the board, Chuluun Ganbold ("Chuluun"), had, and continues to maintain, a social relationship with Batbold's wife, Otgontuya Khorloo ("Otgontuya"). Chuluun and Otgontuya are both members of the Development Committee of the Mongolian Arts Council and have also collaborated on charity and cultural events, suggesting a personal friendship **(Ex-49); (Ex-50); (Ex-51); (Ex-52); (Ex-53); (Ex-54)**.

44. On August 25 and August 26, 2010, Batbold made a highly-publicized site visit to the Oyu Tolgoi site. Accompanied by members of the cabinet, parliamentarians, and journalists, Batbold was hosted by Ivanhoe, including its founder, Robert Friedland **(Ex-55)**. The visit included a tour of the construction work and a presentation on the progress of the project **(Ex-55); (Ex-56)**. Batbold also laid the foundation stone of the Oyu Tolgoi-funded Technical and Vocational Education Centre in Dalanzadgad, the capital of Ömnögovi Province **(Ex-57)**. At a press conference, Batbold stated that he was pleased with progress and that the Government should work to ensure that the mine begins production on schedule **(Ex-56)**.

45. Around the time of the Oyu Tolgoi LLC board appointments and Batbold's site visit, offshore companies began taking steps to make payments or transfer interests in offshore

15

entities to four offshore corporate groups controlled by Batbold's proxies, including Cheong, in the BVI and Hong Kong.

### 2. December 2010 Negotiations

46.     In or around December 2010, the Mongolian government entered into key negotiations with the investors of the Oyu Tolgoi mining project, Ivanhoe, and Rio Tinto, regarding the ownership and management of Oyu Tolgoi LLC.  The then Minister of Finance (Sangajav Bayartsogt) and then Minister of Mineral Resources and Energy (Zorigt Dashdorj) participated on behalf of the Government of Mongolia.  However, as reflected in his statements to the public in a December 2010 press conference, Batbold directly managed the negotiations on behalf of the Mongolian government and was closely involved in discussions regarding the key terms of the agreement **(Ex-58)**.

47.     As a result of these negotiations, Rio Tinto secured a substantial increase in its ownership in Ivanhoe from 34.8% to 42.3%, as well as the right to increase its stake to a 49% share — the "maximum ownership" possible at that point in time — and assumed full authority over the remaining construction, mining, production, and management of the project **(Ex-59); (Ex-99)**. Around the time of the negotiations, Ivanhoe-linked individuals and entities transferred assets to Batbold's proxies, primarily through a BVI company, Bophut Investments Limited, an entity believed to be under the control of Batbold through proxies Cheong and Andrew John Mooney ("Mooney").[7] Mooney is an individual affiliated with Ivanhoe who is believed to have facilitated

---

[7] Cheong and Mooney were the initial shareholders of Bophut Investments Limited. Jadepeace Group Limited, a BVI company whose authorised signatory is the Ivanhoe-linked account, Andrew Burgin, was at the time the sole member of Bophut. It is likely that Jadepeace was a corporate nominee and Cheong and Mooney may have still held an interest in Bophut at the time. **(Ex-61) (Ex-62)**.

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 18 of 27

payments and asset transfers to Batbold's proxies in exchange for Batbold's assistance on the Oyu Tolgoi project **(Ex-60)**.

48.     Ivanhoe, Rio Tinto, and the Mongolian government reached an agreement on December 8, 2010 to provide accelerated funding for Oyu Tolgoi and for Rio Tinto to assume direct management of the project.  Shortly before and after the negotiations, Ivanhoe-linked individuals made several transfers of assets to entities controlled by Batbold and his proxies.  This included the transfer of the right to acquire a multi-million dollar copper-gold project, as well as control of a wholly owned Singapore subsidiary, CBM Mongolia Pte Ltd ("CBM Mongolia"), by Ivanhoe to Bophut Investments Limited.   Upon the transfer of CBM Mongolia to Bophut Investments, Ivanhoe's Vice President and Corporate Secretary, Beverly Ann Bartlett, resigned as the Director of CBM Mongolia and Batbold proxies Cheong and Mooney were appointed in her place **(Ex-63)**.

### 3.     June 2011 Negotiations

49.     In early June 2011, Ivanhoe and Rio Tinto were negotiating the financing and ownership structure of the Oyu Tolgoi project with the Mongolian government.  As a result of the negotiations, the parties executed an Amended and Restated Shareholders' Agreement, which granted Rio Tinto several favorable terms, including, *inter alia*, a reduced interest rate on its repayment of the Mongolian government's share of the initial capital costs of the project, as well as a substantial reduction in its Mongolian tax obligations **(Ex-64)**.  Around this time, Ivanhoe-linked individuals made payments to entities controlled by Batbold's proxies, including Cheong.

## IV.     The Individual Defendants' Efforts to Conceal Illegally Diverted Assets

50.     Upon information and belief, Batbold and the other Individual Defendants have established a complex network of offshore holding companies and nominee directors in more than 10 different jurisdictions, and acquired interests in approximately 100 entities and numerous

17

properties and bank accounts in those jurisdictions, in order to hide the proceeds of Batbold's ill-gotten gains and to shield such proceeds from recovery by the Mongolian government.

### A. Cheong, Hak Seon, and Rhee Byung Wook Are Proxies of Batbold

51. Cheong is a South Korean citizen with recent addresses in both Mongolia and Hong Kong, but who is understood currently to be residing in Hong Kong. In 1987, Cheong began work in Seoul for the Samsung C&T Corporation ("Samsung") **(Ex-39)**. In August 1995, Cheong moved to Mongolia to work on a copper joint venture between Samsung and Erdenet, Erdsam, where he managed Samsung's element of the joint venture **(Ex-65)**. The President of the Samsung Corporation himself appointed Cheong to the joint venture, and stated at the time that Cheong would "represent all of [Samsung's] concerns with regard to business activities in Mongolia." **(Ex-66)**. In 2007, Cheong resigned from Samsung as a senior manager, and began working as a proxy for Batbold **(Ex-39)**. Despite his apparently modest personal means, Cheong has acted as a director, shareholder, and has held several other key roles in at least 60 companies in eight jurisdictions that own substantial real estate and other assets. Cheong has facilitated the diversion and holding of funds and other benefits that belong to Plaintiffs.

52. Cheong has numerous connections to Batbold, including, *inter alia*: (1) acting as signatory for the transfer of two properties in London in which Batbold's family are known to have resided **(Ex-67); (Ex-68)**; (2) acting as director (and former shareholder) of Midlink, a company with clear connections to Batbold's family **(Ex-69)**; (3) registering the internet domain, "chinggiskhaan.org," on behalf of Hotel Chinggis Khaan, which is owned by Batbold **(Ex-70); (Ex-71)**; (4) serving as President, Treasurer, Secretary and Director of a company that owned a property in Boston that Batbold's children lived in between 2012 and 2014 **(Ex-72); (Ex-73); (Ex-74)**; (5) serving as Director of companies affiliated with Batbold's family members, including Batbold's sons, brother, nephew, brother-in-law, and ex-wife; and (8) attending Battushig's

18

wedding reception (which comprised only of around fifty guests) **(Ex-75)**.  Cheong is also linked to several bank accounts, companies, and other assets that suggest he is actively involved in holding assets on Batbold's behalf.  In addition, he has acted as director of companies in Hong Kong, Singapore, and Massachusetts; shareholder of companies in the BVI, Hong Kong, and Singapore connected to Batbold; and authorized signatory of, point of contact for, or otherwise connected to companies in the BVI, Canada, and Hong Kong connected to Batbold.  Cheong owns, controls, and/or has material interests in bank accounts in several jurisdictions and owns, controls, and/or has material interests in properties in New York, London and Hong Kong (along with a property in Boston that has since been sold) which are together valued at upwards of US\$ 31 million.  The US and UK properties have been used by Batbold and his family members.[8]

53.     Hak Seon, Cheong's wife, is also a South Korean citizen currently living in Hong Kong.  Hak Seon has a doctorate in ancient and medieval languages, and since 2001, has been a linguistics professor, publishing articles on the Mongolian and Japanese languages **(Ex-76)**; **(Ex-77)**.  Like her husband, Hak Seon is also linked to Batbold, including by acting as a director for companies whose purpose is to hold assets obtained through illegal means, and serving as a link between Batbold's illegitimate and legitimate assets.  Hak Seon is believed to have been operating as a Batbold proxy since at least 2011.  By 2011, Kim had been appointed as a director and/or had become a shareholder in major companies notwithstanding the fact that she appeared to have neither the requisite experience nor the background to perform such roles.  Despite her modest means, and the absence of any current occupation, she is linked to at least 25 companies

---

[8] According to US credit header reports, Battushig is connected to the New York property, and Batbold's daughter, Badamkhand, and Battushig were connected to the Boston property.  According to UK credit header reports, Batbold's wife, Otgontuya, his sons, Battushig and Samadi, his sister-in-law, Sarantuya Khorloo, and her daughter, Lucy Ganbold, are connected to two of the central London properties.

Case 1:21-mc-00218-RA-OTW   Document 5-18   Filed 03/09/21   Page 21 of 27

in eight jurisdictions — and likely many more — whether as shareholder, director, signatory or representative.  In such roles, Hak Seon owns, controls, and/or has material interests in (or did so at one point in time) bank accounts in multiple jurisdictions and properties in Boston, Hong Kong and Thailand, which are together valued at upwards of US$ 14 million.

54.     Rhee Byung Wook ("Rhee") is a South Korean citizen currently living in Hong Kong.  Rhee works for Hong Kong company Minipa (HK) Limited, which was founded in 1988, and is a wholesale distributor of electronic parts **(Ex-78)**.  Since September 16, 1988, Minipa (HK) Limited has been the registered owner of Unit N, 11/F, Summit Building, 30 Man Yue Street, Hung Hom, Kowloon, Hong Kong **(Ex-79)**.  This address has been the registered address for several companies, including Lovitas Limited, a BVI company connected to suspected Batbold proxies, Cheong, Hak Seon, and Yoonjung **(Ex-80)**.  As a result, Rhee is believed to act as a significant administrator of Batbold-related companies.  Cheong and Hak Seon have also used the address of an apartment owned by Rhee's wife for correspondence, further supporting Rhee's role as a proxy for Batbold.[9]

### B.     The Properties Are Beneficially Owned By Batbold

55.     Based on our enquiries, the available evidence, proven connections, and my long experience, I consider it very likely that Batbold currently beneficially owns, controls, and/or exercises material influence over at the very least two properties in Manhattan, and the shares in the two New York companies which directly own these properties, through his proxies.

56.     In particular, Batbold is believed to be the beneficial owner of the Properties, *i.e.*, Unit 12E, 21 East 61st Street, New York, NY 10065, and Unit 58D, 230 West 56th Street, New York, NY 10019 **(Ex-81); (Ex-82)**.  Upon information and belief, the New York corporations

---

[9] Flat 4B, 1/F., Hong Yuen Court, No 1-5 Tak Shing Street, Kowloon, Hong Kong.

Lovitas Inc. and Baloas Inc., which directly own each of the Properties, are in turn held respectively by Lovitas Limited and Baloas Limited, two BVI entities established on May 9, 2012 and controlled by Batbold's proxies. Lovitas Limited is controlled by Hak Seon and Rhee Byung Wook, and the officers of Baloas Limited are currently unknown **(Ex-83); (Ex-84)**. Lovitas Inc. and Baloas Inc. were both established in New York on May 14, 2012, five days after entities with the same names were formed simultaneously in the BVI **(Ex-85); (Ex-86); (Ex-87); (Ex-88)**.

57.     The first property, Unit 12E, 21 East 61st Street, New York, NY 10065 ("Unit 12E"), was acquired by Lovitas Inc. on March 10, 2015 for US$ 10,083,925 with no mortgage. As stated above, Lovitas Inc. was incorporated five days after Lovitas Limited (BVI), of which Hak Seon is the sole director. Lovitas Limited is also the registered owner of a property in Hong Kong **(Ex-89)**, for which it obtained a mortgage on 26 June 2020 with Hak Seon listed as the "borrower." **(Ex-83)**. In 2015 and 2016, US credit header records also linked Cheong to Unit 12E **(Ex-90)**. Social media evidence from April 2016 further shows Batbold's daughter, Badamkhand, and her boyfriend, Baysaa Chuluun, visiting Unit 12E in April 2016 **(Ex-97)**. We therefore have good reason to believe that Lovitas Limited is controlled by Batbold's proxies and is a holding company for Lovitas Inc., enabling Batbold to control Lovitas, Inc. and therefore Unit 12E.

58.     The second property, Unit 58D, 230 West 56th Street, New York, NY 10019 ("Unit 58D"), was acquired by Baloas Inc. on November 7, 2012 for US$ 3.9 million with no mortgage **(Ex-82)**. Batbold's son, Battushig, has been connected to this address in US credit header records since May 2015 **(Ex-74)**. Although Hak Seon's name does not appear on the ownership documents, in light of (i) the use of nominee agents and addresses, (ii) the timing of the incorporation of Baloas Inc. in New York, and Baloas Limited in the BVI, (iii) the fact that the "Baloas" entities were set up ostensibly for the same purpose as Lovitas Inc. and Lovitas Limited

21

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 23 of 27

(*i.e.*, to hold property used by Batbold's children in New York),[10] and (iv) the use of the same lawyer to facilitate both property purchases, there are strong indications that Batbold proxies likely control Unit 58D as well.

59.     Public property records show that both property purchases by Lovitas Inc. and Baloas Inc. were facilitated by the same attorney, Jeffrey Levin, who is affiliated with the law firm Squire Sanders LLP **(Ex-81); (Ex-82)**.

60.     Figure 1 below illustrates the connections between the Individual Defendants, Entity Defendants and the Properties.

### Figure 1



<hr />

[10] The timing of the purchases of Unit 58D in November 2012 and Unit 12E in March 2015 should be seen in the context of: (i) Battushig's enrollment in an MBA program at Harvard University in 2012, and Battushig's employment at The Blackstone Group in 2014; (ii) Batbold's daughter Badamkhan's enrollment at Boston University in 2012 or 2013, and at New York University in 2017; and (iii) Batbold's daughter Tserendulam's enrollment at New York University in 2017. **(Ex-100)**.

61.     Although the Properties are listed not in Batbold's name, but are rather held in the name of his proxies, it is extremely unlikely that his proxies acquired them independently or legitimately.   As discussed above, there is no indication that any of Batbold's proxies independently own or operate successful businesses, or have other means of purchasing the assets they allegedly hold.  It remains unclear why Hak Seon, a linguistics academic, or Cheong, a former Samsung employee with a modest salary, might have the means or need to purchase expensive properties in cities with which they have no personal connection, particularly using offshore entities to do so, and which properties are used by members of Batbold's immediate family.

62.     Rather than holding these Properties directly, the Individual Defendants have structured their ownership such that the Properties are held by offshore entities, the shares of which are held by the Individual Defendants, and which are believed ultimately to be controlled by Batbold.  As a result, Batbold's ownership interests in the Properties are extremely liquid assets that can be transferred to the control of individuals or entities outside the jurisdiction at any time.

### C.     The New York Bank Account Is Beneficially Owned By Batbold

63.     Based on K2's investigations to date, we believe that Batbold is connected to at least one account in New York.

64.     The account, which is affiliated with a Batbold-connected entity, Glowassets Limited, is believed to be beneficially owned by Batbold and/or his proxies.  Glowassets Limited and its subsidiary, Glowassets LLC, have several known connections to Batbold and his proxies. In particular: (i) Kuemjong Yu, a friend of Cheong,[11] is believed to be the authorized signatory (*i.e.*, the authorized representative) of Glowassets LLC, the Mongolian subsidiary of Glowassets

---

[11] Kuemjong is one of fourteen Facebook friends of Cheong, who uses the pseudonym 'Nicholas Kolbe' on Facebook.

23

Case 1:21-mc-00218-RA-OTW Document 5-18 Filed 03/09/21 Page 25 of 27

Limited **(Ex-91)**; **(Ex-92)**; (ii) the sole director of Glowassets LLC since its incorporation is another Batbold proxy named Mongolmaa Jambaldorj **(Ex-93)**; (iii) Glowassets Limited's correspondence address in Mongolian banking records was the address of a corporate service provider used by Cheong, Hak Seon, Yoonjung, and other proxies to administer properties;[12] (iv) Glowassets Limited's correspondence address listed in some banking records is a Hong Kong address indirectly owned by Rhee;[13] and (v) Glowassets LLC owns a 30% stake in Selengeminerals LLC, along with fellow shareholders, Batbold's brother, sister, and brother-in-law **(Ex-94)**.

65.     Our analysis of bank account statements has identified that Glowassets Limited made three payments totalling US$ 451,979 to its subsidiary, Glowassets LLC, between September 13, 2012 and February 12, 2016.  Glowassets LLC has also received US$ 300,000 from an unknown source **(Ex-95)**.

66.     The reference for a US$ 201,933 payment to Glowassets LLC on February 12, 2016 contains the notation:  "HSBC Bank USA, N.A., New York." **(Ex-95)**. We therefore have good reason to believe that Glowassets Limited has a US$ bank account with HSBC in New York.

67.     Further, according to the second amendment to the Second Catrison Contract, JP Morgan Chase NA, 1 Chase Manhattan Plaza, New York, NY 10081, was used as an intermediary bank for payments made by Erdenet Mining Corporation LLC to Catrison Limited **(Ex-9)**.

---

[12] Suite 1, 8th Floor, New Henry House, 10 (Ice House Street, Central, Hong Kong). This is the address of GDL Corporate Services Limited.

[13] Unit N, 11/F, The Summit Building in Hong Kong.

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 26 of 27

Jules B. Kroll

Sworn to before me this
18th day of November 2020

Notary Public

**Tracey Gabel**
**Notary Public State of New York**
**No. 01GA6075118**
**Qualified in Nassau County**
**Commission Expires 06/03/22**



25

Case 1:21-mc-00218-RA-OTW    Document 5-18    Filed 03/09/21    Page 27 of 27

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

The preceding Affidavit of Jules B. Kroll in support of Plaintiffs' motion for an order of attachment pursuant to CPLR 6210 complies with the word limit as set by Commercial Division Rule 17. The preceding affidavit contains 6,990 words, as measured by the word-processing system used to prepare the memorandum, Microsoft Word.

Dated: New York, New York
November 19, 2020

_/s/ James E. Berger_
James E. Berger
Charlene C. Sun
Joshua S. Wan

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 556-2202
Fax: (212) 556-2222
_jberger@kslaw.com_
_csun@kslaw.com_
_jwan@kslaw.com_

_Attorneys for Plaintiffs Agency for Policy Coordination on State Property, Erdenet Mining Corporation, Erdenes Oyu Tolgoi LLC_