**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE APPLICATION OF SUKHBAATAR BATBOLD FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782, *Petitioner*. |

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF SUKHBAATAR BATBOLD'S *EX PARTE*
APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 5

    I.    Secret Actors Initiate Legal Proceedings Across the Globe Against Mr.
Batbold, A Mongolian Statesman And Member Of Parliament ..................................... 5

    II.   The Political Disinformation Campaign Advanced Against Mr. Batbold At
Home Proves The Litigations Filed Against Him Are Improper Abuses Of
Judicial Process. ........................................................................................................ 10

ARGUMENT ........................................................................................................................... 13

    I.    Petitioner's Application Satisfies The Statutory Requirements For Granting
Discovery Pursuant To 28 U.S.C. § 1782 .................................................................... 15

    II.   The *Intel* Discretionary Factors Weigh In Favor Of Granting Petitioner's
Application For Discovery Pursuant To 28 U.S.C. § 1782............................................. 17

    III.  It Is Routine And Proper To Grant Mr. Batbold's Application *Ex Parte* ..................... 24

CONCLUSION......................................................................................................................... 25

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Accent Delight Int'l Ltd.*,
   791 F. App'x 247 (2d Cir. 2019) .........................................................................................21

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017)...............................................................................16, 17, 18, 19

*Agency for Policy Coordination on State Property v. Batbold*,
   Index No. 656507/2020 (N.Y. Sup. Ct. N.Y. Cty. 2020) ........................................................7

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
   785 F. Supp. 2d 434 (S.D.N.Y. 2011).............................................................................15, 18

*Allied Irish Banks v. Bank of Am., N.A.*,
   240 F.R.D. 96 (S.D.N.Y. 2007) ...........................................................................................24

*In re Application of the Coal. to Protect Clifton Bay & Louis Bacon for an Order
   Pursuant to 28 U.S.C. Section 1782 to Conduct Discovery for Use in Foreign
   Proceedings*,
   2014 WL 5454823 (S.D.N.Y. Oct. 28, 2014) .......................................................................18

*In re Application of Consellior Sas*,
   2017 WL 449770 (S.D.N.Y. Feb. 2, 2017)...........................................................................18

*In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Order Pursuant
   to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*,
   2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014) ................................................................19, 20

*In re Application of Grains and Industrial Products Trading Pte Ltd and Bunge
   S.A. for an Order Directing Discovery from Daniel Rudolph Pursuant to 28
   U.S.C. § 1782*, Misc. Action No. 7:19-mc-00006 (S.D.N.Y. Jan. 15, 2019)........................19

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
   208 F.R.D. 92 (S.D.N.Y. 2002) ...........................................................................................22

*Bank Brussells Lambert v. Credit Lyonnais (Suisse)*,
   220 F. Supp. 2d 283 (S.D.N.Y. 2002)...................................................................................22

*In re Bank of Cyprus Pub. Co. Ltd.*,
   2011 WL 223168 (S.D.N.Y. Jan. 21, 2011) .........................................................................15

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998)..........................................................................13, 14, 15, 21

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012)..................................................................................16, 20

*In re Del Valle Ruiz*,
   342 F. Supp. 3d 448 (S.D.N.Y. Oct. 19, 2018), *aff'd sub nom. In re Del Valle
   Ruiz*, 939 F.3d 520 (2d Cir. 2019) ......................................................................13

*E. Profit Corp. Ltd. v. Strategic Vision US, LLC*,
   2020 WL 7490107 (S.D.N.Y. Dec. 18, 2020) .......................................................23

*In Re Edelman*,
   295 F.3d 171 (2d Cir. 2002)..................................................................................22

*Euromepa S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995)..................................................................................19

*Matter of Gov't of Mongolia v. Itera Int'l Energy, L.L.C.*,
   2009 WL 10712603 (M.D. Fla. Nov. 10, 2009) ...................................................20

*Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*,
   215 F.R.D. 466 (S.D.N.Y. 2003) ..........................................................................23

*Gushlak v. Gushlak*,
   486 F. App'x 215 (2d Cir. 2012) .....................................................................24, 25

*In re Hornbeam Corp.*,
   722 F. App'x 7, 10 (2d Cir. 2018) ........................................................................25

*In re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28 U.S.C.
   §1782 to Conduct Discovery for Use in Foreign Proceedings*,
   2018 WL 895675 (S.D.N.Y. Feb. 14, 2018)....................................................19, 20

*Intel Corp v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004)...................................................................................... *passim*

*In re Kreke Immobilien*,
   2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013)..........................................................20

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
   62 F. Supp. 3d 358 (S.D.N.Y. 2014)......................................................................19

*In re Levy*,
   249 F.R.D. 96 (S.D.N.Y. 2008) .............................................................................20

*Mangouras v. Squire Patton Boggs*,
   980 F.3d 88 (2d Cir. 2020)....................................................................................22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Mariani*,
2020 WL 1887855 (S.D.N.Y. Apr. 16, 2020)..........................................................................15

*Mees v. Buiter*,
793 F. 3d 291 (2d Cir. 2015).................................................................................16, 17, 18, 21

*Minatec Fin. S.A.R.L. v. SI Grp. Inc.*,
2008 WL 3884374 (N.D.N.Y Aug. 18, 2008) ......................................................................20

*Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
2017 WL 2305398 (S.D.N.Y. May 18, 2017) .......................................................................23

*Nat'l Broadcasting Co. v. Bear Stearns & Co., Inc.*,
165 F.3d 184 (2d Cir. 1999)..................................................................................................24

*In re O'Keeffe*,
646 F. App'x 263 (3d Cir. 2016) ..........................................................................................19

*OneBeacon Ins. Co. v. Forman Int'l, Ltd.*,
2006 WL 3771010 (S.D.N.Y. Dec. 15, 2006) ......................................................................24

*Parneros v. Barnes & Noble, Inc.*,
332 F.R.D. 482 (S.D.N.Y. 2019) ..........................................................................................23

*Pfaff v. Deutsche Bank AG*,
2020 WL 3994824 (S.D.N.Y. July 15, 2020) .......................................................................24

*In re Polymer Sols. Int'l, Inc.*,
2018 WL 11226113 (D. Md. June 27, 2018).........................................................................19

*In re Sampedro*,
2018 WL 5630586 (D. Conn. Oct. 30, 2018) ........................................................................18

*SR Int'l. Bus. Ins. Co. Ltd. v. World Trade Center Properties LLC*,
2002 WL 1455346 (S.D.N.Y. July 3, 2002) .........................................................................23

*In re Top Matrix Holdings Ltd.*,
2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .........................................................................18

*United States v. Petit*,
438 F. Supp. 3d 212 (S.D.N.Y. Feb. 6, 2020).......................................................................23

*In re Welspun Lit.*,
2018 WL 4693587 (S.D.N.Y. Sept. 21, 2018).......................................................................23

## TABLE OF AUTHORITIES
(continued)

Page(s)

**Statutes**

28 U.S.C. § 1782 ................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................23

v

## TABLE OF AUTHORITIES
(continued)

Page(s)

**Statutes**

28 U.S.C. § 1782 ................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................23

## INTRODUCTION

Petitioner Sukhbaatar Batbold is the former Prime Minister of Mongolia (from 2009-2012) and a current member of the Mongolian Great Khural (parliament).  He is well-known as a steadfast advocate of democracy and the market economy in Mongolia, a nascent democracy that broke free from communist domination in the 1990 Mongolian Revolution.  Mr. Batbold brings this application for discovery in aid of foreign proceedings pursuant to 28 U.S.C. § 1782.

Over the past several months, shadowy figures have filed a number of abusive lawsuits against Mr. Batbold around the globe.  These foreign cases are being directed by individuals and entities whose true identities are cloaked in secrecy.  The man who appears to be orchestrating these proceedings is the current Mongolian President, Khaltmaagiin Battulga—an autocratic strongman who undermines democratic institutions at every turn.  Under Battulga's grip, Mongolia's young democracy is in jeopardy as it slides toward authoritarian rule.  To consolidate his power, Battulga, acting through the National Security Council he chairs, has seized control of the courts and the prosecutors.  Outside observers say that Battulga poses a grave danger to all of the forward progress Mongolia has made over the past thirty years as he erodes the judicial system and liberal democracy to create an authoritarian regime.  In June 2021, Mongolia will hold its presidential election.  One of his likely opponents is Mr. Batbold.

In advance of the upcoming election, Battulga has used the litigation process in Mongolia and around the world to further a disinformation campaign against Mr. Batbold.  Acting through proxies, Battulga appears to have brought lawsuits against Mr. Batbold in London, Singapore, Hong Kong, Jersey, New York and Mongolia.  This application is brought to obtain critical evidence located in New York to identify the parties behind and help fight off the sham lawsuits brought on three continents.

The named plaintiffs in all of these foreign proceedings purport to be a Mongolian state agency and two state-owned mining companies.  Each litigation contains the same false allegation—that during his time as Prime Minister, Mr. Batbold engaged in acts of corruption that enriched himself to the detriment of these public agencies.  The Mongolian proceeding, a civil action, asserts numerous claims against Mr. Batbold and others alleged to be his proxies, seeking to disgorge some $250 million.  The foreign proceedings seek to attach properties located in foreign countries that plaintiffs (falsely) allege Mr. Batbold owns in violation of Mongolian law.  These foreign attachment proceedings are central to the President's disinformation campaign, and he has been using false claims of Mr. Batbold's alleged ownership of foreign property in an attempt to discredit Mr. Batbold's candidacy with the Mongolian public.

Mr. Batbold denies the allegations in these cases.  In fact, during proceedings in New York against Mr. Batbold before Supreme Court Justice Barry Ostrager, counsel for the plaintiffs (King & Spalding LLP) admitted that their case is based on nothing more than "an awfully big chain of coincidences."  Even worse, it became apparent during these proceedings that the named plaintiffs had not authorized the claims against Mr. Batbold.  During oral argument before Justice Ostrager, counsel for the putative named plaintiffs, when confronted with these disturbing facts, found himself unable to explain his position—instead, he represented to the court that he was retained by the "Mongolian state."  Tellingly, once this fraud on the court was exposed, the "plaintiffs" in the New York State action discontinued the case against Mr. Batbold entirely—a total surrender confirming that the claims filed in New York—just like those that remain pending abroad—are hollow, illegitimate, and an abuse of judicial process.  Declaration of Orin Snyder ("Snyder Decl.") Ex. 3.

The hook for these global asset attachment proceedings is a civil lawsuit filed in Mongolia against Mr. Batbold brought by the same putative plaintiffs.  But the Mongolian action has been shrouded in secrecy, and Mr. Batbold has been denied even the right to mount a defense.  In fact, the action appears to have been designed to thwart his ability to do so.  Neither Mr. Batbold nor his Mongolian counsel have ever been permitted to access the full set of case filings, as until days ago this purportedly civil case has been mysteriously and illegally designated "top secret,"  despite the fact that plaintiffs and their counsel parrot the allegations across the globe so that President Battulga can score political points at home.  The Mongolian action is apparently so "top secret," that Mr. Batbold was denied even the right to see the Mongolian court's case initiating order, depriving him of the most basic and fundamental due process.  The Mongolian courts have been going along with this ploy as a result of a constitutional crisis engineered by President Battulga just over a year ago that has eroded the independence of the judiciary.  During that crisis, President Battulga seized the authority, through Mongolia's National Security Council he chairs, to dismiss Mongolia's judges, its prosecutor general, and the head of the Anti-Corruption agency and their deputies at will.  The President wielded that power for two years in pursuit of wholly illegitimate and antidemocratic ends.  *See* Snyder Decl. Exs. 4–10.

The broader disinformation campaign against Mr. Batbold began earlier, when New York-based investigative firm K2 Intelligence or K2 Integrity (collectively "K2") started an "investigation" designed to take down Mr. Batbold—President Battulga's primary political rival.  But the K2 "investigation" was a frame-job and hit-job from the start.  To cover its tracks, K2 has never revealed who retained and directed its private services for an investigation probing Mongolian public officials, who referred K2 to the parties that retained and directed it, or how

K2 communicated with those parties.  The source of funding for K2's investigation is an even greater mystery that would expose the larger forces driving Mr. Batbold's persecution.  Nor has Mr. Batbold been able to obtain from K2 the exculpatory information K2 certainly has in its possession confirming that its "investigation" is a politically motivated sham.

Accordingly, this Section 1782 proceeding seeks to rectify a critical information deficit and obtain discovery essential to Mr. Batbold's defense of numerous foreign lawsuits in order to demonstrate that these cases are nothing more than unauthorized, illegitimate, political attacks that lack any legal or factual merit and, more broadly, threaten Mongolia's democratic future. Mr. Batbold respectfully requests that the Court enter an order pursuant to 28 U.S.C. § 1782 permitting him to serve upon K2 discovery requests in the form of that appended to the Declaration of Orin Snyder filed in support of this application, allowing both document discovery and a tailored Rule 30(b)(6) deposition.  *See* Snyder Decl. Exs. 1–2.

This is a paradigmatic case for Section 1782.  Section 1782 authorizes discovery from persons within the United States in aid of a contemplated foreign proceeding, provided that the target "resides" or may be "found . . . in" this district, and provided that the parties seeking the discovery are "interested person[s]" in that proceeding.  28 U.S.C. § 1782(a).  Each of these requirements is easily met here:  Mr. Batbold is a party to numerous foreign proceedings and seeks documents and testimony in aid of those proceedings from entities that "reside" or are "found . . . in" this judicial district.  *Id.*

Similarly, each of the four factors the Supreme Court established in *Intel Corp. v. Advanced Micro Devices, Inc.*, to guide this Court's discretion in considering applications pursuant to Section 1782, weighs strongly in favor of awarding discovery here, including that: (1) the discovery is not sought from a "participant" to the foreign proceedings, (2) the foreign

jurisdictions are receptive to discovery obtained through Section 1782, (3) the discovery does not

circumvent any restrictions to proof-gathering in those forums, and (4) the discovery is not

unduly burdensome and is appropriately tailored to specific topics relevant to Mr. Batbold's

defenses in the foreign cases.  542 U.S. 241, 264–65 (2004).

Mr. Batbold therefore respectfully requests that this Court grant the application

authorizing service of the proposed discovery subpoenas to procure information that is urgently

needed to aid his defense in the numerous foreign proceedings filed against him.

## FACTUAL BACKGROUND

I.     **Secret Actors Initiate Legal Proceedings Across the Globe Against Mr. Batbold, A Mongolian Statesman And Member Of Parliament**

Sukhbaatar Batbold is a Mongolian public servant who has long championed Mongolian

democracy.  *See* Snyder Decl. Ex. 11.  After the collapse of the communist regime and

Mongolia's transition to democracy, he helped trailblaze the country's path toward a market

economy by establishing and growing one of the most successful companies in the country,

turning a small cashmere trading outpost into a successful conglomerate called Altai Holdings,

LLC, which invests in everything from telecom to hospitality.  *See* Snyder Decl. Ex. 12–13.

After establishing himself as a pillar of Mongolia's burgeoning economy, Mr. Batbold left his

business and entered public service, serving as a member of Parliament for five consecutive

terms and as Mongolian Prime Minister from 2009 to 2012.  *See* Snyder Decl. Ex. 14.  Mr.

Batbold remains a member of Parliament and one of the senior and most respected members of

one of Mongolia's two main political parties, the pro-social democracy Mongolian People's

Party.  *See* Snyder Decl. Ex. 15.  He is also the vice president of a London-based international

organization composed of pro-social democratic parties from around the globe.  Mr. Batbold has

maintained a sterling national and international reputation and is one of the senior public servants

under consideration to serve as his party's candidate for President in the upcoming Mongolian election to be held in June 2021. *Id.*; *See* Snyder Decl. Ex. 17.

On October 14, 2020, with the presidential election drawing near, a lawsuit was commenced in a Mongolian civil trial court purportedly on behalf of three plaintiffs: two Mongolian state-owned mining corporations and the government agency that owns those entities. Declaration of Z. Sukhbaatar ("Sukhbaatar Decl.") ¶ 4. The Mongolian lawsuit named Mr. Batbold as one of multiple defendants, but Mr. Batbold's ability to learn the basis of the lawsuit has been hamstrung. *Id.* ¶ 5. In apparent violation of Mongolian law, the case was designated "top secret," and that designation was used to deny Mr. Batbold access to the case filings, including the civil case initiating order in that case. *Id.* To the best of Mr. Batbold's knowledge, the Mongolian lawsuit accuses him of having used the power of the office of Prime Minister and a vast, ill-defined web of "proxies" to illegally divert money from Mongolia to himself. *See* Snyder Decl. Ex. 17.[1]

In the succeeding weeks, Mr. Batbold learned that the Mongolian lawsuit was just the opening salvo in an onslaught of international litigations. These litigations, filed in New York, London, Jersey, Singapore, and Hong Kong seek to attach property or freeze assets that Mr. Batbold or his "proxies" allegedly acquired using the funds at issue in the Mongolian lawsuit. *See* Declaration of Patrick Doris ("Doris Decl.") ¶ 3 & Ex. A; Declaration of Brian William Gilchrist ("Gilchrist Decl.") ¶ 3 & Ex. A; Declaration of John Kelleher ("Kelleher Decl.") ¶ 3 & Ex. A; Declaration of Yufei Wang ("Wang Decl.") ¶ 3 & Ex. A.[2] These attachment proceedings

---

[1] The case was recently de-designated, though the circumstances surrounding both the "top secret" designation and the retraction remain murky. Nonetheless, Mr. Batbold still has not been able to access all case filings.

[2] Had the named plaintiffs truly believed that Mr. Batbold wrongfully possessed such property and might dispose of it, their first and natural recourse would have been to seek injunctive relief against Mr. Batbold in Mongolia. Notably, despite their supposed need for emergency relief, the named plaintiffs did not do so. This seemingly

are identical in three key respects.  *First*, each was filed in the name of the same three entities

that purportedly brought the Mongolian lawsuit against Mr. Batbold:  the two Mongolian state-

owned mining corporations and the government agency.  Doris Decl. ¶ 3 & Ex. A; Gilchrist

Decl. ¶ 3 & Ex. A; Kelleher Decl. ¶ 3 & Ex. A; Wang Decl. ¶ 3 & Ex. A.  *Second*, each seeks to

attach property in which Mr. Batbold has specifically (and, in many instances, under penalty of

perjury) disclaimed any interest.  *See* Doris Decl. ¶ 4; Gilchrist Decl. ¶ 6; Kelleher Decl. ¶ 4;

Wang Decl. ¶ 4.  And *third*, each of the attachment proceedings is premised on facts presented in

affidavits offered by Jules Kroll, the chairman and founder of K2, that purport to relay the

findings of an investigation K2 conducted into Mr. Batbold.  *See* Snyder Decl. Ex. 18.[3]

In his affidavits, Kroll states that K2's investigation was a years-long endeavor, with

research beginning in "early 2018" with the full-scale investigation launching in September

2018.  *Id.*  Ex. 18 at ¶¶ 13–14.  The affidavits further describe the central goal of K2's

investigation: "to investigate, trace, and recover assets misappropriated from Mongolia by

individuals and entities through sham transactions involving key Mongolian mining assets."  *Id.*

Ex. 18 at ¶ 2.  The affidavits declare that K2 succeeded in that effort, having identified

"wrongdoing" by Mr. Batbold and his "network of proxies," who "disguised or hid[] [certain

Mongolian assets] through the use of complex corporate structures … located in numerous

foreign jurisdictions."[4]  *Id.*  Kroll attaches thousands of pages of to his affidavits, including

---

illogical choice sheds light on the true motives behind the foreign proceedings:  they were not designed to secure needed legal relief, but to build a false political narrative that Mr. Batbold held illegal offshore assets.

[3]  Though Mr. Batbold has been denied access to the case filings in the Mongolian lawsuit, the text of the Mongolian complaint suggests that the Mongolian lawsuit similarly relies on the conclusions reached by K2's investigation.  *Agency for Policy Coordination on State Property v. Batbold*, Index No. 656507/2020 (N.Y. Sup. Ct. N.Y. Cty. 2020).

[4]  The irony of this allegation is palpable, given that public filings establish that President Battulga, the architect of the allegations against Mr. Batbold, illegally held offshore property in Singapore as recently as November 2020.  *See, e.g.*, Snyder Decl. Ex. 19.

dozens of irrelevant contractual documents and social media postings, making clear that the exhibits are designed to overwhelm with the quantity of information, rather than its quality. *See* Snyder Decl. Ex. 20 at Dkt. Nos. 28–48, 58–162.

The New York litigation was the first proceeding in which Mr. Batbold had the opportunity to participate, as the other proceedings were either sealed, *ex parte*, or were developing slowly. In late November 2020, the named plaintiffs swept into New York Supreme Court with thousands of pages of exhibits to make their case against Mr. Batbold. *See* Snyder Decl. Ex. 21 at Tr. 16:16–19. Although they identified no emergency or impending harm, Ex. 21 at Tr. 31:25–33:1, the named plaintiffs sought an emergency *ex parte* temporary restraining order to freeze two apartments and a bank account located in New York in which Mr. Batbold lacked any interest. *Id*. at Tr. 31:25–33:1.

While the New York Supreme Court duty judge granted the plaintiffs' TRO on November 25, 2020, *Id*. at Tr. 3:3–20—presumably to preserve the status quo until the presiding judge returned from his Thanksgiving vacation—Mr. Batbold moved to vacate, and the purported plaintiffs made a series of troubling representations at the hearing that revealed the illegitimacy of the action. *First*, plaintiffs' counsel conceded that K2's investigation had failed to prove that Mr. Batbold engaged in any wrongdoing when he admitted that K2's investigation amounted to nothing more than a "chain of coincidence[]." *Id*. at Tr. 18:22–23. *Second*, counsel conceded at oral argument that it did not take instructions from *any* of the named plaintiffs, but rather from unidentified officials in the Mongolian government directly. *Id*. at Tr. 27:2–17. This prompted the Court to note that counsel had failed to offer any evidence that the "State of Mongolia has authorized [it] to act on their behalf." *Id*. at Tr. 27:18–24. In the face of these obvious deficiencies, the Court dissolved the temporary restraining order against Mr. Batbold,

and counsel voluntarily discontinued the case against him entirely.  *See* Snyder Decl. Ex. 3;

Snyder Decl. Ex. 22.

Unfortunately, other foreign lawsuits against Mr. Batbold around the globe remain

pending.  Until recently, the Mongolian case against Mr. Batbold was stayed pending the

Mongolian court's alleged review of the "top secret" designation.  Sukhbaatar Decl. ¶¶ 5–7.

Even now, some of the filings remain unlawfully designated as "top secret," and Mr. Batbold and

his counsel have been unable to access them.  Once the case proceeds in earnest and Mr. Batbold

is able to review the case files to which he has previously been denied access, Mr. Batbold will

receive the opportunity to present his own evidence in defense in the Mongolian court.  *Id.* ¶¶ 5–

7, 14.  Of the derivative attachment proceedings in London, Jersey, Singapore, and Hong Kong,

currently the London, Jersey, and Singapore actions are stayed pending resolution of the

Mongolian action.  Doris Decl. ¶ 4 & Ex. B; Kelleher Decl. ¶ 4 & Ex. B; Wang Decl. ¶ 5.

Because Mr. Batbold has no assets in those jurisdictions (and the same is true of Hong Kong,

New York, and other jurisdictions), he has consented to the continuation of the injunction, yet

has expressly reserved the right to restart those actions and to move to vacate the injunctions

imposed and to dismiss the case.  Doris Decl. ¶ 4 & Ex. B; Kelleher Decl. ¶ 4 & Ex. B; Wang

Decl. ¶ 5.  Finally, the action against him in Hong Kong is currently pending and awaiting

further action from the parties.  Gilchrist Decl. ¶ 7.  As in all other jurisdictions, Mr. Batbold has

the right in Hong Kong to put evidence into the record to defend against the case.  *Id.* ¶ 12.

Accordingly, Mr. Batbold urgently needs to obtain evidence to defend this flurry of spurious

suits.

II.    **The Political Disinformation Campaign Advanced Against Mr. Batbold At Home Proves The Litigations Filed Against Him Are Improper Abuses Of Judicial Process.**

The revelations in the New York case made clear that the named plaintiffs in that case and all the others are not, in fact, the entities that authorized and are at the helm of the global litigation onslaught.  In fact, although the plaintiffs' counsel dismissed the New York proceeding swiftly after the court denied them relief, Mr. Batbold had obtained and planned to introduce as part of his defense signed and certified letters from the leaders of the agency, the mining companies, and the Cabinet Secretariat that runs the Mongolian government stating that these "plaintiffs" did not authorize the actions against Mr. Batbold, and hardly knew they existed at all. The General Director of Erdenet Mining Corporation wrote, for instance, that the company "has not filed any claims or inquiries related to Mr. Batbold Sukhbaatar."  Snyder Decl. Ex. 23. Similarly, the Executive Director of Erdenes Oyu Tolgoi LLC stated in writing that this company, too, "has not filed any inquiries or claims with any law enforcement agency regarding Mr. Batbold Sukhbaatar."  Snyder Decl. Ex. 24.  The Chairman of the Government Agency for Policy Coordination on State Property also attested that "[a]n inquiry . . . has not been submitted by" the agency.  Snyder Decl. Ex. 25.  And the Cabinet Secretariat—the State organ that runs the government—said the same, explaining that the it had received information from the "Government Agency for Policy Coordination on State Property, 'Erdenes-Oyu Tolgoi' LLC, and 'Erdenet Mining Cooperation' State-Owned Enterprises … and [they] have not filed a claim with the Prosecutor's Office of the Capital City or filed any other independent claims."  Snyder Decl. Ex. 26.

Revelation of these letters led Plaintiffs' counsel to concede that they do not take orders from *any* of these entities but rather from the Mongolian "State" or Mongolian Capitol City

Prosecutor's office—both entities in direct control of Mongolia's President himself.[5]  The current President is a would-be autocrat and in 2019 secured new powers over the judiciary and law enforcement to "prosecute his enemies at will."  Snyder Decl. Ex. 4.  President Battulga, who has been described as the "Trump of East Asia," (Snyder Decl. Ex. 33), has used the power of his office to "slic[e] away" at Mongolia's "hard-won democracy," rendering that democracy "in peril," in a troubling authoritarian manner, (Snyder Decl. Ex. 4).  In 2019, President Battulga provoked unprecedented constitutional crises in Mongolia, spearheading legislation that granted him authority to fire judges and prosecutors on a whim.  *See* Snyder Decl. Exs. 4–8.  A United Nations Special Rapporteur letter expressed concern that this legislation "fall[s] short of international standards relating to the independence of the judiciary, the autonomy of the prosecution service and the separation of powers," Snyder Decl. Ex. 34 p. 3, and that the

> overly broad discretionary power entrusted to the President is likely to have far-reaching adverse consequences on the autonomy and independence of the whole prosecution service, since the General and Deputy Prosecutor may feel compelled in politically sensitive cases to follow the instructions received from the executive branch of power in order to avoid, or minimize, the risk of being dismissed.

*Id*. p. 8.  This ill-advised and dangerous law, which drew international condemnation, obliterated the independence Mongolia's judges and prosecutors had enjoyed, and presented them with a simple choice:  obey the President's dictates, or lose their jobs.  *See* Snyder Decl. Exs. 4–10.[6]  It

---

[5]   The prosecutor's office originally conceded that it needed consent from the named plaintiffs—the State agency and the State-owned mining companies—to bring cases on their behalf.  The prosecutor even offered a letter purporting to provide that consent.  It was only after the letter was shown to be insufficient to authorize cases against Mr. Batbold that the prosecutor claimed that he could bring cases on his whim even without the named plaintiffs' consent, notwithstanding Article 31.1 of the Mongolian Civil Procedure Law to the contrary.  And although the Singapore High Court recently concluded that Mongolia's *prosecutor* law, standing on its own, permitted the prosecutors to levy the claims against Mr. Batbold, that Court did not consider (or have before it) the relevant provisions of the Mongolian civil procedure law, which control over the prosecutor's law.

[6]   Beginning in March 2021, a new Mongolian law takes effect that limits President Battulga's authority over judges.  President Battulga vetoed the law, but Mongolia's Parliament overrode that veto with a two-thirds majority vote.  *See* Snyder Decl. Ex. 35 (noting that at least one member of Parliament received pressure from President Battulga to reject the new law).

appears that President Battulga deployed this corrupt power in launching the improper global litigations against Mr. Batbold. *See id*.; Snyder Decl. Ex. 16 (reporting that the Mongolian lawsuit appears "deliberately political" and "designed to weaken his rival Batbold's national and international standing").[7]

Proof that the litigations deployed against Mr. Batbold are nothing more than an abusive political ploy is critical to each of the foreign cases, to Mr. Batbold, and to the future of Mongolia itself.  If, as the facts indicate, these proceedings are being directed not by the agency and companies in whose names they are being litigated but rather by other government actors or foreign interests at the direction of the President, the cases filed against Mr. Batbold would be blatantly illegitimate and potentially even void altogether.  Evidence uncovering the background of how the K2 investigation commenced, its goals, its funding—including whether it was on contingency—and the exculpatory evidence K2 collected but has decided to suppress would be pivotal to confirming the illegitimacy of each of these cases.  And proof that these litigations were brought merely as political ploys and abuses of judicial process would serve as an independent means of defense.  Doris Decl. ¶ 6; Gilchrist Decl. ¶ 9; Kelleher Decl. ¶ 6; Sukhbaatar Decl. ¶ 10; Wang Decl. ¶ 7.[8]  The freezing injunctions imposed on Mr. Batbold are

---

[7]  President Battulga has not shied away from using these lawsuits to try to score political points against Mr. Batbold in the media.  When the current prime minister of Mongolia unexpectedly resigned in January 2021, for instance, President Battulga took the opportunity to bake a conspiracy theory into his public statements:  he claimed that resignation had been the result of "monied interests within the Mongolian People's Party [i.e., Mr. Batbold's party] pushing [the prime minister] out in order to stymie investigations into alleged corruption in Mongolia's crucial mining industry."(Snyder Decl. Ex. 27), and that Mr. Batbold was the "main defendant" in those investigations, (Snyder Decl. Ex. 37).  Further, President Battulga recently introduced a resolution to provide every Mongolian household with 1,000,000 MNT (approximately $350), to be financed through "money withdrawn through offshore accounts," an apparent attempt to bolster President Battulga's political fortunes even as he tries to sink Mr. Batbold's by causing Mongolians to believe that money recovered from Mr. Batbold in the Mongolian lawsuit will be paid directly to them.  Snyder Decl. Ex. 28.  President Battulga, in short, is attempting to buy votes and subvert the democratic process.

[8]  As further evidence that the litigations are nothing more than baseless political ploys, Plaintiffs have also abandoned certain core allegations they previously raised—including that Mr. Batbold provided tax and interest rate reductions benefiting foreign companies over Mongolia.  *Compare* Snyder Decl. Ex. 18, ¶ 49, *with* Snyder

also all subject to the equitable judicial discretion.  Proving that the plaintiffs in these cases acted

with unclean hands in pursuing abusive litigations to create political disinformation would

provide just cause for these foreign courts to lift the injunctions on Mr. Batbold.  Doris Decl. ¶ 6;

Gilchrist Decl. ¶ 9; Kelleher Decl. ¶ 6; Sukhbaatar Decl. ¶ 10; Wang Decl. ¶ 7.  And needless to

say, where each of the litigations brought against Mr. Batbold are based on the K2 investigation,

evidence proving the fraudulent and politicized nature of that investigation is critical to the

defense of those litigations.[9]

The time has come to get to the bottom of these foreign litigations so that Mr. Batbold

may effectively defeat them and prove them to be the hollow political attacks they clearly are.

To that end, Mr. Batbold now seeks immediate *ex parte* relief, and asks this Court for assistance

in obtaining evidence he can use in these foreign litigations to combat the litigation-based

political persecution deployed against him.

## ARGUMENT

Section 1782(a) provides that a federal district court may order discovery for use in a

foreign or international tribunal from persons residing or found in the court's judicial district.

Section 1782 was designed "to liberalize the assistance given to foreign and international

tribunals."  *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 453 (S.D.N.Y. Oct. 19, 2018), *aff'd sub*

*nom. In re Del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019).  Where the information sought is

relevant, it is "presumptively discoverable under § 1782."  *In re Bayer AG*, 146 F.3d 188, 196

---

Decl. Ex. 36.  These allegations were entirely false.  The public record demonstrated that Mr. Batbold actually adopted tax and interest rate policies that were more favorable to Mongolia as compared to foreign companies. Consequently, the Plaintiffs were forced to drop these allegations entirely.

[9]  That K2 was retained speaks volumes about the abnormality in this case.  Mr. Batbold is allegedly being sued by agencies of the Mongolian government, yet those agencies decided not to deploy the normal apparatuses of Mongolian law enforcement, but rather retained hired mercenaries—not public servants—to build a case against Mr. Batbold.

(3d Cir. 1998).  "Consistent with the statute's modest *prima facie* elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application."  *Id.* at 195.

Section 1782(a) has three statutory requirements in order for the Court to award discovery.  *First*, the applicant must be an "interested person" in the foreign proceeding.  *Intel Corp v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004).  *Second*, the person from whom discovery is sought must reside in or be found in this district.  *Id.* at 241.  *Third*, the discovery must be for use in a proceeding in a foreign tribunal.  *Id.*  When all three requirements are met, the decision to grant the request rests with the district court, whose discretion is guided by four factors the Supreme Court has identified.  *Id.* at 260–61.  Specifically, in considering whether to grant the requested discovery, this Court should consider: (i) whether the person from whom discovery is requested is a party to the foreign proceeding; (ii) the nature of the foreign tribunal, the character of the foreign proceeding and the tribunal's receptivity to the federal court's assistance; (iii) whether the applicant is attempting to circumvent discovery restrictions or policies of the foreign tribunal; and (iv) whether the discovery sought is unduly intrusive or burdensome.  *Id.* at 264–65.

Here, Mr. Batbold seeks discovery from K2 relating to the identities of the parties that introduced, authorized it or retained it, that funded the investigation into Mr. Batbold—including whether the investigation was conducted on contingency and therefore biased to begin with—and documents relating to K2's investigation itself.  *See* Snyder Decl. Exs. 1–2.  The discovery sought satisfies each statutory requirement, and the discretionary factors outlined by the Supreme

Court in *Intel* all weigh heavily in favor of granting the requested discovery.  This Court should

grant Mr. Batbold's application in full.

I.      **Petitioner's Application Satisfies The Statutory Requirements For Granting Discovery Pursuant To 28 U.S.C. § 1782**

This application easily meets the "*prima facie*" statutory requirements set forth in Section

1782.  *See In re Bayer*, 146 F.3d at 193.  We take each in turn.

*1. Petitioner Is An Interested Person In Multiple Foreign Proceedings.*  Mr. Batbold is

a defendant in multiple foreign proceedings including in Mongolia, the United Kingdom, the

Bailiwick of Jersey, the Republic of Singapore, and the Hong Kong Special Administrative

Region of the People's Republic of China.  *See* Doris Decl. ¶ 3; Gilchrist Decl. ¶ 3; Kelleher

Decl. ¶ 3; Sukhbaatar Decl. ¶ 4; Wang Decl. ¶ 3.  As the U.S. Supreme Court explained in *Intel*,

"[n]o doubt litigants are included among, and may be the most common example of, the 'interest

person[s]' who may invoke § 1782."  542 U.S. at 256.  As a defendant in all of the these actions,

Mr. Batbold is undisputedly an "interested person" who can seek discovery.

*2. The Discovery Target Resides Or Is Found In This District.*  Second, the discovery

target resides in or is found within the Southern District of New York.  A party whose principal

place of business is in Manhattan is found in this district, *see In re Mariani*, 2020 WL 1887855,

at *1 (S.D.N.Y. Apr. 16, 2020), and businesses with offices in Manhattan are also considered to

reside or be found here for purposes of Section 1782.  *See In re Bank of Cyprus Pub. Co. Ltd.*,

2011 WL 223168, at *2 (S.D.N.Y. Jan. 21, 2011); *Ahmad Hamad Algosaibi & Bros. Co. v.

Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011).  Here, K2 is

registered to do business in and operates out of 845 3rd Avenue, New York, NY 10022.  Snyder

Decl. Exs. 29–30.  Petitioner, therefore, has plainly established the second statutory factor:  that

the entities from whom he seeks discovery are found within this district.

**3.   *The Discovery Sought Is For Use In A Foreign Proceeding.***   Mr. Batbold meets

Section 1782's final factor as well, as the discovery he seeks is for use in multiple foreign

proceedings.  To meet the "for use in a foreign tribunal" requirement, the applicant must

demonstrate the "ability to inject the requested information into a foreign proceeding" and that

the "requested discovery is something that will be employed with some advantage or serve some

use in the proceeding."  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017)

(internal quotations omitted).  There is no requirement that the discovery sought be strictly

necessary for the Petitioner's case, so long as the materials can "increase her chances of

success."  *Mees v. Buiter*, 793 F. 3d 291, 299 (2d Cir. 2015).  Discovery that can be used to

"some advantage" meets the "for use" requirement even if it is not ultimately admissible in the

foreign proceeding.  *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d

Cir. 2012) (noting that within *Intel*'s "for use" requirement, "there is no statutory basis for any

admissibility requirement").

The actions brought against Mr. Batbold in Mongolia, London, Jersey, Singapore, and

Hong Kong are all ongoing civil proceedings before foreign tribunals.  All of the proceedings are

in their early stages, and Petitioner will be within his rights to submit evidence to substantiate his

claims under the relevant laws of each jurisdiction.  Doris Decl. ¶ 8; Kelleher Decl. ¶ 9; Gilchrist

Decl. ¶ 12; Sukhbaatar Decl. ¶ 14; Wang Decl. ¶ 10.  The sought discovery also plainly can

"increase" Mr. Batbold's "chances of success" in these proceedings, irrespective of an ultimate

determination on admissibility.  *See Mees*, 793 F.3d at 299.  The global litigations against Mr.

Batbold all arise out of allegations that Mr. Batbold engaged in official corruption and

expropriated Mongolian government property through a network of his proxies.  Each litigation

arises from the same K2 investigation that allegedly commenced in early 2018.  Determining the

nature of who commenced and directed the K2 investigation and who paid for the expensive

investigation is not only evidence Mr. Batbold can *use* in the foreign proceedings—but it's

evidence that may well be dispositive there. *See* Doris Decl. ¶ 6; Gilchrist Decl. ¶ 9; Kelleher

Decl. ¶ 6; Sukhbaatar Decl. ¶ 10; Wang Decl. ¶ 7. Similarly, allowing discovery into K2's

investigation and the documents underlying it—particularly the exculpatory information K2

likely uncovered yet declined to make public—could be critical in opposing and rebutting the K2

investigation. *Id.* ¶ 11.

* * *

In sum, Mr. Batbold has clearly met his *prima facie* statutory burden. He is an interested

person in *multiple* foreign proceedings, and the discovery target both resides and is found in New

York City. Similarly, all of the documents and testimony Mr. Batbold seeks is for use in these

foreign proceedings. This evidence addresses two fundamental questions: who brought and

funded the investigation against him and what evidentiary support exists for its slanderous

claims. The discovery sought could not be more relevant. Petitioner has easily met his burden

of showing that the discovery sought comports with the statutory requirements of Section 1782.

## II. The *Intel* Discretionary Factors Weigh In Favor Of Granting Petitioner's Application For Discovery Pursuant To 28 U.S.C. § 1782

The four discretionary factors the Supreme Court identified in *Intel* also weigh strongly

in favor of granting Mr. Batbold's Section 1782 application. *See Intel*, 542 U.S. at 264–65;

*Mees*, 793 F.3d at 298. And although each of the factors tilts in favor of awarding discovery

relating to all of the foreign proceedings against Mr. Batbold, this Court need not analyze each

case in order to award discovery. If the *Intel* factors tilt toward awarding discovery relating to

even *one* of the foreign actions against Mr. Batbold, this Court can (and should) grant it. *See In

re Accent Delight*, 869 F.3d 121 at 133–35 (upholding Section 1782 discovery for use in

17

Singapore even though district court had not conducted its analysis with respect to that jurisdiction); *In re Sampedro*, 2018 WL 5630586, at *2 (D. Conn. Oct. 30, 2018) ("Where a district court authorizes Section 1782 discovery for use in one foreign proceeding, it need not analyze every foreign proceeding in which the petitioner is involved under the [Section] 1782 and Intel framework.").

  *1. The Discovery Target Is Not A "Participant" In the Foreign Actions.* The first *Intel* factor, which considers whether "the person from whom discovery is sought is a participant in the foreign proceeding," weighs in favor of granting discovery. *Intel*, 542 U.S. at 244. K2 is not a party to any of the foreign cases against Mr. Batbold. *Ahmad Hamad Algosaibi & Bros. Co.* 785 F. Supp. 2d at 439. Nor is K2 a witness in these proceedings, and even if it was that fact would "not weigh so strongly as to end the analysis." *In re Application of the Coal. to Protect Clifton Bay & Louis Bacon for an Order Pursuant to 28 U.S.C. Section 1782 to Conduct Discovery for Use in Foreign Proceedings*, 2014 WL 5454823, at *3 (S.D.N.Y. Oct. 28, 2014). As such, this factor weighs in favor of granting Mr. Batbold's application.[10]

  *2. Receptivity.* The second *Intel* factor assesses "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or

---

[10]  That Jules Kroll is an affiant in many of the litigations does not immunize K2—a separate legal entity—from discovery here. The focus of this Court's assessment is on "the person from whom discovery is sought," not whether evidence may be accessible elsewhere. *See Intel Corp.*, 542 U.S. at 264; *accord In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020). Similarly, the Second Circuit has held unequivocally that an applicant in a Section 1782 petition has no obligation to exhaust discovery remedies abroad before initiating a Section 1782 application here. *See, e.g., Mees*, 793 F.3d at 303; *see also In re Application of Consellior Sas*, 2017 WL 449770, at *2 (S.D.N.Y. Feb. 2, 2017) ("[Respondent's] motion relies heavily on the argument that any testimony they could offer would be duplicative of the evidence available to the magistrate in the French Proceeding. Further, Respondents argue that Consellior has not yet attempted to obtain this discovery of directors from the French court[, but] [t]his attempt to impose an exhaustion or necessity requirement on Consellior's § 1782 application is unavailing."). Finally, there is no evidence that Mr. Kroll is an affiant subject to the court's jurisdiction in the Mongolian case. Consequently, at the very least the first *Intel* factor weighs in favor of Mr. Batbold vis-à-vis the Mongolian litigation. *See In re Accent Delight*, 869 F.3d at 133; *In re Sampedro*, 2018 WL 5630586, at *2.

the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.

"Absent specific directions to the contrary from a foreign forum, the statute's underlying policy

should generally prompt district courts to provide some form of discovery assistance."

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). Receptivity is therefore

presumed: "only upon '*authoritative proof* that [the] foreign tribunal would reject evidence

obtained with the aid of section 1782,' should a district court refrain from granting the assistance

offered by the act." *In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Order*

*Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, 2014 WL

7232262, at *7 (S.D.N.Y. Dec. 10, 2014) (internal citations and quotation marks omitted).

Here, this factor weighs strongly in favor of granting this application. Federal courts

almost universally hold that the United Kingdom, Jersey, Singapore, and Hong Kong—all sister

systems based on the English model—are receptive to Section 1782 discovery. *See, e.g., La*

*Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 362 (S.D.N.Y. 2014)

(United Kingdom), Jersey, *In re Polymer Sols. Int'l, Inc.*, 2018 WL 11226113, at *1 (D. Md.

June 27, 2018) (Jersey); *In re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28*

*U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings*, 2018 WL 895675, at *3

(S.D.N.Y. Feb. 14, 2018) (Jersey); *In re O'Keeffe*, 646 F. App'x 263, 267 (3d Cir. 2016) (Hong

Kong); *In re Application of Grains and Industrial Products Trading Pte Ltd and Bunge S.A. for*

*an Order Directing Discovery from Daniel Rudolph Pursuant to 28 U.S.C. § 1782*, Misc. Action

No. 7:19-mc-00006 (S.D.N.Y. Jan. 15, 2019) (Singapore); *In re Accent Delight Int'l Ltd.*, 869

F.3d at 133 (noting that the district court granted discovery in relation to a Singapore action); *see*

*also* Doris Decl. ¶ 9; Gilchrist Decl. ¶ 13; Kelleher Decl. ¶ 10; Wang Decl. ¶ 10. Mongolia, too,

can be considered receptive to American discovery aid given that Mongolia *itself* has sought—

and received—discovery pursuant to Section 1782. *Matter of Gov't of Mongolia v. Itera Int'l Energy, L.L.C.*, 2009 WL 10712603, at *11 (M.D. Fla. Nov. 10, 2009); Sukhbaatar Decl. ¶¶ 13–16. In fact, King & Spalding in recent 1782 proceedings relating to Mr. Batbold has *conceded* that Mongolian courts are receptive to American discovery. Snyder Decl. Ex. 31 at 18–19; Snyder Decl. Ex. 32 at ¶ 7.

Accordingly, this factor weighs in favor of Mr. Batbold's application. *See Gorsoan*, 2014 WL 7232262, at *7; *In re Levy*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008).

**3. No Attempt to Circumvent Foreign Proof-Gathering Restrictions.** The third *Intel* factor, which examines "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," similarly weighs in favor of granting the discovery. *Intel*, 542 U.S. at 265. Importantly, "[c]ourts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . . or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding." *BNP Paribas Jersey Tr. Corp.*, 2018 WL 895675, at *3; *see also In re Kreke Immobilien*, 2013 WL 5966916, at *6 (S.D.N.Y. Nov. 8, 2013) (stating that the third factor is "not the same as a foreign discoverability requirement"). Moreover, the discovery sought need not be admissible abroad. *See Brandi-Dohrn*, 673 F.3d at 82. Rather, in deciding whether an application attempts to circumvent foreign proof-gathering restrictions, courts consider whether the discovery is being sought in bad faith. *Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, 2008 WL 3884374, at *8 (N.D.N.Y Aug. 18, 2008).

Here, Mr. Batbold's has plainly made his application in good faith. Mr. Batbold simply seeks non-privileged information located in this district regarding the identities of the plaintiffs in each of the foreign proceedings brought against him, the sources of funding for that raft of

expensive litigation, and the documents underlying the purported investigation of him conducted by an investigative firm headquartered in New York.  The relevant foreign jurisdictions do not have any laws or policies that would bar such relevant evidence.  *See* Doris Decl. ¶ 9–10; Gilchrist Decl. ¶¶ 13–14; Kelleher Decl. ¶¶ 11–12; Sukhbaatar Decl. ¶ 15; Wang Decl. ¶ 10; *see also* Snyder Decl. Ex. 31 at 18–20.  To the contrary, the foreign jurisdictions may welcome this discovery in order to afford Mr. Batbold due process to prepare his defense and to further ensure that the litigations are not—as Mr. Batbold believes—pure abuses of judicial process by his political opponent.  *See* Doris Decl. ¶ 6; Gilchrist Decl. ¶ 9; Kelleher Decl. ¶ 6; Sukhbaatar Decl. ¶¶ 10, 14; Wang Decl. ¶ 7.  Even if this discovery were totally unavailable in any of the foreign jurisdictions—and here there's no evidence that's the case—this factor would still be met because "'there is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use.'"  542 U.S. at 261 (citing *In re Bayer*, 146 F.3d at 194); *In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d Cir. 2019).[11]

Mr. Batbold's discovery requests therefore represent his good faith effort to obtain essential and non-privileged information from a respondent located in this district for use in the foreign proceedings.  The third *Intel* factor weighs in his favor.

**4. The Requested Discovery is Relevant and Not Unduly Burdensome.**  The fourth *Intel* factor, which examines whether the request is "unduly intrusive or burdensome," also weighs in favor of granting Mr. Batbold's application.  *Intel Corp.*, 542 U.S. at 265.  Section 1782

---

[11]   To the extent K2 contends that Mr. Batbold's application seeks to circumvent the "top secret" designation of the case in Mongolia, K2 would be wrong.  That the Mongolian proceeding reeks of due process violations does not provide any basis for this Court to deprive Mr. Batbold of otherwise available discovery.  In fact, that the purported plaintiffs have *themselves* sought Section 1782 discovery makes clear that the "top secret" designation stands in no impediment to granting this Petition.  *See* Snyder Decl. Ex. 31.  In any event, the "top secret" designation was recently lifted, at least in part.  Sukhbaatar Decl. ¶ 7.  And even if the application *did* serve to circumvent limitations on proof-gathering in Mongolia, this third *Intel* factor would cut strongly in Mr. Batbold's favor regarding the litigations in the United Kingdom, Jersey, Singapore, and Hong Kong.

discovery may be as liberal and broad as the Federal Rules allow.  *See Mees*, 793 F.3d at 302

(citing *In Re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002)) (courts evaluate whether discovery

pursuant to Section 1782 is overbroad or burdensome "by applying familiar standards" of the

Federal Rules).

Here, Mr. Batbold seeks non-privileged information, including the identity of the parties

to the foreign proceedings, information regarding the genesis and controlling parties of the

investigation that underlies all of the proceedings brought against Mr. Batbold, the sources of

funding for the investigation and litigation, and the documents underlying K2's investigation.

All of this information—critical to Mr. Batbold's global defense—is easily accessible to the

respondent.  It is also tailored to reveal something that should not be a mystery at all:  the

identity of the parties funding and pursuing specious and frivolous litigation against Mr. Batbold

worldwide and the details of the investigation that purportedly led to that litigation.  These

discovery requests are plainly cognizable under the federal rules.  They are not only relevant but

also proportionate to the grave issues at play.

To the extent K2 argues Mr. Batbold seeks privileged information, K2 would be wrong

under hornbook New York law.[12]  "It is well-established in the Second Circuit that

a client's identity is not protected by the attorney-client privilege."  *Bank Brussells Lambert v.*

*Credit Lyonnais (Suisse)*, 220 F. Supp. 2d 283, 288 (S.D.N.Y. 2002).  Moreover, the "identity of

---

[12] Given that the respondent is located in New York and that plaintiffs' counsel in New York, King & Spalding, initiated a lawsuit against Mr. Batbold in New York, Mr. Batbold assumes that New York privilege law governs under New York's "touch-base" test.  *See, e.g.*, *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 99 (2d Cir. 2020).  But even if the privilege laws of the United Kingdom, Mongolia, Jersey, Singapore, and/or Hong Kong govern, the information sought would not be privileged and the outcome would be the same. Doris Decl. ¶ 10; Gilchrist Decl. ¶ 14; Kelleher Decl. ¶ 12; Sukhbaatar Decl. ¶ 15; Wang Decl. ¶ 10.  In the event K2 claims that Mongolian privilege law applies and somehow bars discovery here, New York law would also govern in any event, as New York courts generally apply this State's own privilege law rather than examine the complexities of civil law systems like Mongolia.  *See Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 100, 102 (S.D.N.Y. 2002) (applying New York law rather than addressing possible privilege law in foreign civil law system).

a person providing litigation funding"—let alone investigation funding—"whether a private individual or a corporation or an insurance company—is not protected by the attorney-client privilege or attorney work product doctrine." *See, e.g.*, *E. Profit Corp. Ltd. v. Strategic Vision US, LLC*, 2020 WL 7490107, at *8 (S.D.N.Y. Dec. 18, 2020).

Nor does the work-product doctrine justify withholding the factual documents underlying the K2 investigation that Mr. Batbold seeks for no less than two reasons. *First*, "neither the attorney-client privilege nor the work product privilege protects underlying facts." *Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017) (quoting *SR Int'l. Bus. Ins. Co. Ltd. v. World Trade Center Properties LLC*, 2002 WL 1455346, at *4 (S.D.N.Y. July 3, 2002)). Consequently, any underlying factual documents relating to Mr. Batbold in K2's possession are not privileged. *Second*, the work-product doctrine applies only where documents were created "in anticipation of litigation or for trial by or for another party or its representative." *United States v. Petit*, 438 F. Supp. 3d 212, 214 (S.D.N.Y. Feb. 6, 2020) (quoting Fed. R. Civ. P. 26(b)(3)). "[A] mere potential for a future dispute is insufficient to show that a party acted in 'anticipation of litigation.' Instead a 'substantial probability' of litigation must exist and the concern that litigation may occur must be real, not speculative." *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc*., 215 F.R.D. 466, 476 (S.D.N.Y. 2003). No such showing can be made here, where the "investigation" appears to have been started as a pure fishing expedition—rather than with any specific and tangible litigatory aim in mind. *See Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 498 (S.D.N.Y. 2019) (holding that notes taken during meeting were not protected by work product privilege where they were not prepared in anticipation of litigation); *In re Welspun Lit.*, 2018 WL 4693587, at *2 (S.D.N.Y. Sept. 21, 2018) (denying work product privilege where the defendant "asserts, without

providing support, that the Grand ISS investigation was wholly shaped by the anticipation of litigation."); *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106–07 (S.D.N.Y. 2007) (denying work product privilege to investigative materials that were prepared in anticipation of litigation, where substantially similar investigation would have been carried out without threat of litigation); *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, 2006 WL 3771010, at *5–6 (S.D.N.Y. Dec. 15, 2006) ("Investigatory reports and materials are not protected by the attorney-client privilege or the work-product doctrine merely because they are provided to, or prepared by, counsel.").

Accordingly, there is no sound basis for arguing the discovery sought here is overbroad or intrusive.  This factor weighs in favor of granting Mr. Batbold's application.

## III.   It Is Routine And Proper To Grant Mr. Batbold's Application *Ex Parte*

Section 1782 specifically contemplates and authorizes *ex parte* proceedings.  As an alternative to a noticed motion, a party may move *ex parte* for an order directing a third party to produce documents and to testify at a deposition.  Following the entry of the order, the third party may respond.  *See, e.g.*, *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash."); *Pfaff v. Deutsche Bank AG*, 2020 WL 3994824, at *14 (S.D.N.Y. July 15, 2020) (granting *ex parte* application in part and ordering that after petitioners amended their discovery requests pursuant to the Order, "[r]espondents must note any objections to the revised requests within 14 days of their receipt").

Applications pursuant to Section 1782 are frequently made and granted on an *ex parte* basis, in which case notice even to the discovery target itself is provided after the court has already considered and ruled upon the application.  *See Nat'l Broadcasting Co. v. Bear Stearns & Co., Inc.*, 165 F.3d 184, 186 (2d Cir. 1999) (describing the procedural history of the court's granting of the *ex parte* application, the serving of subpoenas, and the respondents' motion to

quash).  At that point, the target has an opportunity to file objections.  *See, e.g.*, *In re Hornbeam Corp.*, 722 F. App'x 7, 10 (2d Cir. 2018) ("[T]his court has decided appeals from motions to quash *ex parte* § 1782 subpoenas without identifying any impropriety in the *ex parte* nature of the § 1782 application."); *Gushlak*, 486 F. App'x at 217 ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").  This Court should grant *ex parte* relief here.

## CONCLUSION

For the foregoing reasons, Petitioner Sukhbaatar Batbold respectfully requests that the Court grant this *ex parte* Application in its entirety.

Dated:   March 9, 2021                             Respectfully submitted,

                                                   GIBSON, DUNN & CRUTCHER LLP


                                                   */s/*  Orin Snyder
                                                   Orin Snyder
                                                   Karin Portlock
                                                   Lee R. Crain
                                                   Mark Cherry (*pro hac vice forthcoming*)
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   200 Park Avenue, 47th Floor
                                                   New York, NY 10166-0193
                                                   Telephone: (212) 351-3883
                                                   Facsimile:  (212) 351-5303


                                                   *Counsel for Petitioner SUKHBAATAR BATBOLD*