# EXHIBIT A

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S          / 2020

Between

1. **THE AGENCY FOR POLICY COORDINATION ON STATE PROPERTY OF MONGOLIA**
   (Mongolian Registration No. 6098169)
2. **ERDENET MINING CORPORATION LLC**
   (Mongolian Registration No. 2074192)
3. **ERDENES OYU TOLGOI LLC**
   (Mongolian Registration No. 5548721)

…Plaintiffs

And

1. **BATBOLD SUKHBAATAR**
   (Identification No. Unknown)
2. **CHEONG CHOO YOUNG**
   (South Korean Passport No.  M73526521)
3. **KIM HAK SEON**
   (South Korean Passport No.  M00023279)
4. **CLIVEDEN TRADING AG**
   (Swiss Registration No. CHE-320.434.509)
5. **EOIN BARRY SAADIEN**
   (NRIC No. S7169540I)
6. **EVEREST VC PTE. LTD.**
   (UEN No. 201601292G)
7. **PONDUVER PTE. LIMITED**
   (UEN No. 201316971C)

…Defendants

## STATEMENT OF CLAIM

### A.   THE PARTIES

#### The Plaintiffs

1.   The First Plaintiff, the Agency for Policy Coordination on State Property (the

   "***Agency***") is the 100% shareholder of the Second Plaintiff, Erdenet Mining

Corporation LLC ("***Erdenet***"). Its principal address is at Building-IX, Peace Avenue-16, Bayanzurkh District, Ulaanbaatar-210349, Mongolia.

2.    Erdenet is a State-Owned Enterprise with its address at Friendship Square, Bayan-Undur soum, Orkhon province, 61027, Mongolia. At all material times, Erdenet controlled the Erdenet copper mine ("***Erdenet mine***") in the Northern Mongolian province of Orkhon.

3.    The Third Plaintiff, Erdenes Oyu Tolgoi LLC ("***EOT***") holds the Mongolian State's interest in the Oyu Tolgoi copper-gold mining project ("***Oyu Tolgoi mine***"). EOT is a 34% shareholder in the project company, Oyu Tolgoi LLC, with its principal address at Baga Toiruu 14200, Amar Street 22, Building 10A Suite 9, Sukhbaatar District, Ulaanbaatar, Mongolia.

**The Defendants**

4.    The First Defendant, Batbold Sukhbaatar ("***Batbold***"), is a Mongolian citizen understood to be residing in Mongolia at No. 13, Bella Vista Building, 11th Khoroo, Khan-Uul District, Ulaanbaatar. Batbold is the former Prime Minister of Mongolia who continues to hold office as a high-ranking Mongolian politician and as a businessman. The Plaintiffs believe that very significant funds have been diverted to Batbold for his ultimate benefit through his wrongful conduct and by the wrongful conduct of others acting on his instructions and on his behalf (each a "***Batbold Proxy***" and together the "***Batbold Proxies***").

2

5.    Batbold was Prime Minister of Mongolia from October 2009 to August 2012 and Chairman of the Mongolian People's Party ("*MPP*") from April 2010 to July 2012. Prior to this he held a series of powerful political positions in Mongolia and the MPP, including Minister of Foreign Affairs (2008-2009), Minister of Industry and Trade (2004-2006), Member of the Leadership Council of the Mongolian People's Revolutionary Party (the former name of the MPP) (2001- 2005) and Deputy Minister of Foreign Affairs  (2000-2004).

6.    Batbold is currently a Member of the State Great Khural (Parliament) of Mongolia, Member of the MPP Chamber of Advisers, Member of the MPP Leadership Council, and Chairman of the State Great Khural Subcommittee on Special Control.

7.    During Batbold's time as Prime Minister between 2009 and 2012, he had practical oversight and control of Mongolia's natural resources. He oversaw the State Property Committee of the Mongolian Government (the precursor to the Agency) which was, at the relevant time, the majority owner of Erdenet.

8.    The Second Defendant, Cheong Choo Young ("*Cheong*") is a South Korean national. Cheong began operating as a Batbold Proxy in or around 2007.

9.   The Third Defendant, Kim Hak Seon ("***Kim***"), is a South Korean national and the wife of Cheong. Kim began operating as a Batbold Proxy since at least 2011. On 10 January 2012, Kim was appointed as director of the Fourth Defendant Cliveden Trading AG ("***Cliveden***"), a Swiss company which entered into valuable contracts with Erdenet for the purchase of copper concentrates. Kim is also a director and, since 13 December 2011, the sole shareholder of Ever Global Trading Limited ("***Ever Global***"), a company incorporated in Hong Kong. Ever Global owns 56% of Cliveden.

10.  The Fourth Defendant, Cliveden, is a company incorporated in Switzerland on 9 December 2011. As set out below, Cliveden is a company controlled by or connected to Batbold which was used by the First to Third and Fifth Defendants as an intermediary vehicle between Erdenet (as seller of copper concentrates extracted from the Erdenet mine) and the ultimate buyer of those copper concentrates, thereby allowing Batbold to control both the buyer and seller and facilitating the unlawful extraction of profits from Erdenet.

11.  The Fifth Defendant, Eoin Barry Saadien ("***Saadien***"), is a Canadian national residing in Singapore at 9 Balmoral Park, #08-01, Balmoral Hills, Singapore, 259844. Saadien began operating as a Batbold Proxy since at least 2013. Saadien is a former director of Cliveden, serving for over five years between 14 February 2013 and 28 June 2018, and a current director of Ever Global.

12.    The Sixth Defendant, Everest VC Pte Ltd ("***Everest***"), is a Singapore company incorporated on 18 January 2016 with a registered address of c/o Contactone Professional Services Pte Ltd, 1 Coleman Street, #10-06, The Adelphi, Singapore, 179803. Until February 2020, the shareholders of Everest were Cheong and Saadien. On 15 February 2020, Cheong's shares in Everest were transferred to an individual named Lee Changho, a South Korean citizen who is believed to be a close associate of Cheong.

13.    The Seventh Defendant, Ponduver Pte Limited ("***Ponduver***"), is a Singapore company incorporated on 24 June 2013 with a registered address of c/o Kaiden Corporate Services Pte Ltd, 203 Hougang Street 21, #03-73, Singapore, 530203. Cheong is the sole shareholder and director of Ponduver.

**B.    THE PLAINTIFFS' CLAIMS AGAINST THE DEFENDANTS**

14.    The First to Fifth Defendants have engaged individually or in concert in a wrongful scheme  in respect of two of Mongolia's most prized natural resources, the Erdenet mine and the Oyu Tolgoi mine, which have caused the Plaintiffs loss and damage. As part of this wrongful scheme, these Defendants created, oversaw and operated a complex global web of companies which enabled them to operate in breach of fiduciary duties (or duties akin to fiduciary duties), disguise and hide their material interests in the fruit of their wrongdoing, unjustly enrich themselves at the expense of the Plaintiffs, and conceal that enrichment via the use of proxies and offshore structures

which were used to hold the illicit proceeds of their wrongful scheme. Such conduct has prejudiced the Plaintiffs' rights and interests including by improperly diverting and depriving them of revenue that they would otherwise have enjoyed arising from the legitimate sale of their valuable natural resources (the "***Scheme***").

15.    The Scheme involved *inter alia*:

    a.    the introduction of intermediary companies interposed between Erdenet and the ultimate buyers of its mineral resources (the "***Erdenet Mine Scheme***"); and

    b.    the procurement of secret profits via *inter alia* gratuities deriving from the development of the Oyu Tolgoi mine (the "***Oyu Tolgoi Scheme***").

### The Erdenet Mine Scheme

16.    The Erdenet mine is one of the largest copper and molybdenum mines in the world. As of 2017, Erdenet produced roughly half of Mongolia's copper concentrates, 28% of Mongolia's industrial output, and 11% of export products. The Agency now holds an interest in the Erdenet mine through a 100% stake in Erdenet which in turn controls the mining operations. At all material times, the Erdenet mine was operated as a joint venture between the State Property Committee of the Mongolian Government (51%) and a Russian state-owned entity the State Corporation for Assistance to Development, Production and Export of Advanced Technology Industrial Product. As Prime Minister, Batbold oversaw the State Property

Committee of the Mongolian Government and therefore had de-facto control over the majority owner of Erdenet and over Erdenet itself.

17.    Pursuant to the Erdenet Mine Scheme, Batbold, with the assistance of his proxies, granted the award of contracts, with unfavourable terms and conditions, for the sale of copper and molybdenum concentrate from the Erdenet mine by Erdenet to companies that Batbold and/or his proxies had a material interest or influence in. One of these companies was Cliveden. The contracts with Cliveden were awarded at a significant undervalue and/or the First to Fifth Defendants obtained unauthorised secret profits for the onward sale of the natural resources.

18.    On 9 December 2011, Cliveden was incorporated in Switzerland. Mark Anthony Forsyth, an experienced metals trader, was initially the 100% shareholder of the company and a founding director although other experienced metals traders later joined the company's board. On 26 January 2012, Kim (a Batbold Proxy) was appointed as director of Cliveden. Less than a year later, Singapore based Saadien (another Batbold Proxy) became a board member on 14 February 2013.

19.    On the same date she became a director of Cliveden, Kim also became the company's majority shareholder via a Hong Kong entity, Ever Global which Kim had owned since its incorporation on 28 July 2011 and which had since purchased a majority of Cliveden's shares. The directors of Ever Global were Kim and (from 1 January 2013) Saadien.

20.   On 14 December 2011, the day after Kim became the sole shareholder of Ever Global, Cliveden obtained its first contract with Erdenet to purchase 240,000 wet metric tonnes ("**WMT**") of copper concentrates from Erdenet over a three-year period ("***First Cliveden Contract***"). The First Cliveden Contract was signed on behalf of Erdenet by Ganzorig Chimiddorj who was then the Director General of Erdenet, while a director of Cliveden signed on its behalf.

21.   On 7 September 2016, the parties entered into a new agreement ("***Second Cliveden Contract***") under which Cliveden agreed to purchase 86,000 WMT of copper concentrates over a three year period. Tserevsamba Davaatseren (then Director General of Erdenet) signed the contract on behalf of Erdenet, while a director of Cliveden signed on its behalf. Aside from quantity, all material terms in the Second Cliveden Contract were the same as the First Cliveden Contract.

22.   The Second Cliveden Contract was later amended three times to reflect changes to the shipping schedule, price mechanism, and treatment and refining charges.

23.   Between 2012 and 2019, Erdenet made total deliveries to Cliveden of 131,517.47 WMT of copper concentrates, at a total cost of USD 163,611,796 under the First Cliveden Contract and the Second Cliveden Contract (collectively, the "***Cliveden Contracts***").

24.   The First Cliveden Contract was entered into less than one week after Cliveden had been incorporated. Cliveden had no track record in trading minerals and no obvious source of

funding. Cliveden was merely an intermediary company, controlled by or connected to Batbold Proxies, which was interposed between Erdenet and the ultimate purchaser of copper concentrates in order to extract profits via a resale margin.

25.  It is to be inferred that Cliveden in turn sold those resources to an end buyer so that an unlawful profit would be made by (amongst others) Batbold and/or Cheong although the identity of the ultimate purchaser, the amount paid and the manner in which it was paid are not currently known. The deliberate obscuring of these details was itself a fundamental part of the Scheme.

26.  As Prime Minister and via his oversight of the State Property Committee of the Mongolian Government, Batbold directly and/or indirectly controlled both the seller and the buyer in the transactions under the Cliveden Contracts. By reason of his position, Batbold was required under applicable Mongolian laws to disclose his interest in the transactions under the Cliveden Contracts. He failed to do so, in breach of the said Mongolian laws.

**<u>Particulars of applicable Mongolian laws</u>**

(1)  The applicable Mongolian laws are the Company Law dated 6 October 2011 ("***Mongolian Company Law***"), which applies to acts or omissions on or after 21 November 2011, and the Law on the Regulation of Public and Private Interests and the Prevention of Conflict of Interest in Public Service 2012 (as amended) ("***Mongolian Conflict of Interest Law***"), which applies to acts and omissions on or after 1 May 2012.

(2)    As State-owned companies, the Plaintiffs are regulated by the Mongolian Company Law.

(3)    Batbold was a governing person of the Plaintiffs as defined under the Mongolian Company Law.

(4)    Article 84.4 of the Mongolian Company Law states that the governing person of a Mongolian company has the following duties:

> "84.4.1 To work and execute its power within the scope of his authorities specified in a law, the company's charter and regulations;
>
> *84.4.2* To follow the principle to respect the interest of the company in its activities, and to completely execute its duties specified in this law and a company's charter;
>
> *84.4.3* To make decisions in compliance with the interest of a company;
>
> *84.4.4* To avoid conflict of interest when making decisions and to notify about the conflict of interest in cases there is conflict of interest;
>
> *84.4.5* Must not receive any gift or remuneration when implementing its duties/function;
>
> *84.4.6* Must not disclose information included in the confidential information of a company to others or use such information for the purpose of his personal interests."

(5)    A governing person may exceed the scope of his authorities under Article 84.4.1 if, amongst other things, he acts contrary to the Mongolian Conflict of Interest Law.

(6)    Article 6.3 of the Mongolian Conflict of Interest Law states that "[a]n official shall not use his/her public office for own personal gain or personal gain of a related person and shall avoid relationships that may influence his/her official duties", while Article 11.1 states ""[a]n official shall be prohibited from issuing administrative acts, perform functions of supervision, audit and inquiry, take punitive measures and participate in the preparation, negotiation and approval of contracts with regard to a common interest person for two years after the termination of for-profit activities established with this person."

*Claims with respect to the Cliveden Contracts*

27.    As a public official, Batbold owed fiduciary duties or duties akin to fiduciary duties to the Mongolian people generally and in his role as Prime Minister, he also owed such duties to the Plaintiffs. These duties included:

a.    A duty to act in good faith and in the best interests of the Plaintiffs;

b.    A duty not to act so as to place himself in a position in which his personal interests would conflict with the interests of the Plaintiffs; and

     c.    A duty not to make any secret profit or receive any secret payment from any third party with whom he was dealing.

28.    Further, Batbold also owed duties to the Plaintiffs under Article 84.4 of the Mongolian Company Law as set out in paragraph 26 above.

29.    The interposition of Cliveden in order to make secret profits was arranged by Batbold through his proxies. The said interposition of Cliveden involved and constituted breaches of the duties owed by Batbold as set out in paragraphs 27 and 28 above.

30.    The First to Fifth Defendants combined to use unlawful means (namely the breach of duties owed by Batbold and/or the payment of secret profits to Cliveden) which injured the First and/or Second Plaintiffs. Accordingly, the First to Fifth Defendants are liable to the First and/or Second Plaintiffs as conspirators in the tort of unlawful means conspiracy.

31.    The wrongs committed by First to Fifth Defendants as conspirators are also actionable in Mongolia. Pursuant to Article 497.3 of the Civil Code of Mongolia ("***Mongolian Civil Code***"), if more than one body participated in inflicting damage on others, both will be jointly liable for the damage.

32.    At all material times, Cheong, Kim and Saadien (operating on behalf of Batbold and also Cliveden) knew of the duties owed by Batbold to the Mongolian people and the First and/or Second Plaintiffs as set out in paragraphs 27 and 28 above. Alternatively, Cheong, Kim and

Saadien knew of the said duties, and such knowledge in the circumstances falls to be attributed to Cliveden.

## **Particulars of Knowledge**

(1)    The interposition of Cliveden into the corporate matrix was orchestrated to secure improper secret profits.

(2)    Such profits were paid to Cliveden for the ultimate benefit of Batbold.

(3)    In making arrangements for the interposition of Cliveden so that it could receive the secret profits, Batbold was acting in breach of the duties which he owed as set out in paragraphs 27 and 28 above.

(4)    In causing Cliveden to receive the improper secret profits, Batbold was acting in breach of the duties which he owed as set out in paragraphs 27 and 28 above.

(5)    Erdenet was likely to suffer loss as a result of the interposition of Cliveden and its receipt of secret profits.

(6)    Erdenet did not know of the secret profits and had not sanctioned or approved their receipt.

33.  Cliveden received the secret profits with this knowledge. Accordingly, it holds or held the monies received on constructive trust for Erdenet by reason of this knowing receipt and it would be unconscionable for it to retain those monies.

34.  Further or alternatively, in making arrangements to receive the secret profits and/or receiving them and/or retaining them and/or distributing them, Cliveden, Cheong, Kim and/or Saadien provided assistance to Batbold acting in breach of the duties he owed as set out in paragraphs 27 and 28 above. That assistance was rendered dishonestly and in full knowledge of Batbold's duties and breaches thereof.

### *Relief claimed with respect to the Cliveden Contracts*

35.  By reason of the matters set out above, the First and/or Second Plaintiffs have suffered loss and damage.

36.  In the premises, the First and/or Second Plaintiffs are entitled to and claim damages from each and all of the First to Fifth Defendants in respect of the loss and damage pleaded above. Those damages fall to be assessed by the Court at trial either:

a.  By reference to the actual loss suffered by the First and/or Second Plaintiffs as a result of any secret profits being paid and received, further particulars of which will be provided in due course.

b.     By reference to the loss of opportunity caused by the way in which the said Defendants deprived the First and/or Second Plaintiffs of the right to achieve the best price for the minerals extracted from the Erdenet mine by selling them on the open market.

37.     Further or alternatively, the First and/or Second Plaintiffs are entitled to and claim equitable compensation as against the First to Fifth Defendants.

38.     Batbold is liable to account to the First and/or Second Plaintiffs as constructive trustee for each and all of the sums received by him or for his benefit by way of the secret profits together with any interest earned or any further profits made by the use of such sums.

39.     Further or alternatively, the First and/or Second Plaintiffs are entitled to trace into any assets or monies held by or on behalf of Batbold which assets or monies were derived from the secret profits.

40.     Further or in the further alternative, the First and/or Second Plaintiffs are entitled as against Batbold to an account of profits.

41.     Cliveden is liable to account to the First and/or Second Plaintiffs as constructive trustee for each and all of the sums received by way of the secret profits together with any interest earned or any further profits made by the use of such sums.

42.   Further or alternatively, the First and/or Second Plaintiffs are entitled to trace into any assets or monies held by or on behalf of Cliveden which assets were derived from the secret profits.

### The Oyu Tolgoi Scheme

43.   The Oyu Tolgoi mine is located in the Ömnögovi Province in the south Gobi Desert. In the second element of the Scheme, the First to Fifth Defendants used the development and renegotiation of the Oyu Tolgoi mine project to procure the unjust enrichment of Batbold and his proxies via the payment of illegal commissions, secret profits and unlawful gratuities.

44.   The Oyu Tolgoi mine is one of the world's largest new copper-gold mines with construction costs of approximately U$11 billion in capital expenditure since 2010. The licence to operate the Oyu Tolgoi mine is owned by Oyu Tolgoi LLC which in turn is owned by the Third Plaintiff, EOT, on behalf of the Government of Mongolia (34%) and Turquoise Hill Resources Limited (formerly Ivanhoe Mines Limited) ("***Ivanhoe***") (66%). At the time of the events described below, Rio Tinto held a small stake in Ivanhoe but is now the majority shareholder in that company.

45.   The Oyu Tolgoi Scheme involved a conspiracy between Batbold and his proxies who together obtained various undisclosed secret commissions from individuals and offshore and onshore companies linked to Ivanhoe. At various key moments during the commercial life of the Oyu Tolgoi mine, including contract negotiations and site visits, individuals and entities connected to Ivanhoe and related venture capital company Ivanhoe Capital

Corporation transferred assets to Batbold via his proxies. The secret commissions obtained by Batbold and his proxies from Ivanhoe-linked parties included lucrative investment opportunities, substantial payments, shares and board positions in companies. Batbold has never made proper public disclosure of any interest in these assets.

46. These secret commissions included (i) the granting of an option to Bophut Investments Limited ("*Bophut*") (a BVI company in which Cheong was a shareholder) to become the largest single shareholder in a mining project known as Kharmagtai (the "*Kharmagtai Gratuity*") and (ii) the transfer of equity in a Singapore company CBM Mongolia Pte Ltd ("*CBM*") to Bophut (the "*CBM Gratuity*"). As set out in more detail below, the Kharmagtai and CBM Gratuities were granted at key points in the timeline of the Oyu Tolgoi mine project at which Batbold facilitated the grant to Ivanhoe/Rio Tinto of various benefits related to the Oyu Tolgoi mine including favourable ownership, tax and investment opportunities. The inference to be drawn is that the Kharmagtai and CBM Gratuities were provided as consideration for illicit transactions which unjustly enriched Batbold.

### *The Kharmagtai Gratuity*

47. Bophut was incorporated in the BVI on 19 May 2010 with Cheong and Andrew Mooney ("*Mooney*") as shareholders. Mooney is and was a former director of certain Ivanhoe group companies.

48. In early December 2010, important negotiations over the ownership and management of the Oyu Tolgoi mine took place between the Mongolian Government, Ivanhoe and Rio Tinto. The then Mongolian Minister of Finance (Bayartsogt Sangajav) and then Minister of Mineral

Resources and Energy (Zorigt Dashdorj) participated on behalf of the Government of Mongolia, and Batbold oversaw negotiations.

49.  Two weeks prior to those negotiations, on 26 November 2010, a Singapore company Ivanhoe Ulaan Pte Ltd ("***Ivanhoe Ulaan***") entered into a shareholders' agreement with Bophut (an entity in which Cheong was shareholder) that gave Bophut the right to acquire 54.45% of Ivanhoe Ulaan LLC, a subsidiary of Ivanhoe Ulaan which in turn owned 90% of Oyut Ulaan LLC ("***Oyut Ulaan***"). Oyut Ulaan in turn owned the licence to the Kharmagtai mine. The price to be paid by Bophut for the exercise of its option was US $20 million.

50.  By the end of negotiations, on 8 December 2010, Ivanhoe and Rio Tinto concluded a "*Heads of Agreement*" pursuant to which Rio Tinto secured a substantial increase in its ownership in Ivanhoe from 34.8% to 42.3%; the right to further increase its ownership to a 49% share (the maximum ownership possible at that point in time); and (subject to the approval of the reconstituted Oyu Tolgoi board, on which representatives from the State Property Committee – the precursor to the Agency - sat) a primary role in the management of the building and operation of the Oyu Tolgoi complex. In particular, Rio Tinto would have full authority over the remaining construction, mining, production of concentrate and future smelting/refining, including the nomination of senior management to be appointed by the Oyu Tolgoi LLC board. These appear to be very favourable commercial terms for Rio Tinto.

51.    In effect, immediately prior to important commercial negotiations between the Government of Mongolia and Ivanhoe, Ivanhoe appeared to have granted the Mongolian Prime Minister the right to acquire indirectly a 49% interest in a potentially highly lucrative mining project for US $20 million (in 2019 the Kharmagtai project was independently valued at US $173.6 million), and at the conclusion of those negotiations, Ivanhoe and Rio Tinto secured what appeared to be very favourable commercial terms.

*The CBM Gratuity*

52.    Further, on 24 December 2010, approximately two weeks after the conclusion of negotiations which had resulted in what appeared to be very favourable commercial terms for Rio Tinto as described in the preceding paragraphs, Ivanhoe transferred the equity in the Singapore company CBM to Bophut.  Cheong and Mooney, the two shareholders of Bophut at the time, were appointed as directors of CBM.

*Claims with respect to the Kharmagtai and CBM Gratuities*

53.    The Kharmagtai and CBM Gratuities were agreed and arranged between Ivanhoe, Batbold and Cheong on Batbold's behalf. The Kharmagtai and CBM Gratuities were in effect improper secret commissions which were given and received dishonestly. They involved and constituted breaches of the duties owed by Batbold as set out in paragraphs 27 and 28 above.

54.    Batbold and Cheong combined to use unlawful means (namely the breach of duties owed by Batbold and the payment of secret commissions) which injured the First and/or Second

Plaintiffs. Accordingly, Batbold and Cheong are liable to the First and/or Third Plaintiffs as conspirators in the tort of unlawful means conspiracy. The wrongs committed by Batbold and Cheong as conspirators are also actionable in Mongolia pursuant to Article 497.3 of the Mongolian Civil Code.

55.    Further or alternatively, Batbold acted in breach of the duties which he owed as set out in paragraphs 27 and 28 above by soliciting, agreeing, and/or making arrangements for the giving and receipt of the Kharmagtai and CBM Gratuities.

56.    In making arrangements to receive the Kharmagtai and CBM Gratuities as set out above and/or in making arrangements to receive them and/or retain them, Cheong provided assistance to Batbold in him acting in breach of the duties he owed as set out in paragraphs 27 and 28 above. That assistance was rendered dishonestly and in full knowledge of Batbold's duties and breaches thereof.

_Relief claimed with respect to the Kharmagtai and CBM Gratuities_

57.    As a result of the Kharmagtai and CBM Gratuities, the First and/or Third Plaintiffs have suffered loss or damage.

58.    In the premises, the First and/or Third Plaintiffs are entitled to and claim damages from Batbold and Cheong in respect of the loss and damage pleaded at paragraph 57 above.

59.    Further or alternatively, the First and/or Third Plaintiffs are entitled to and claim equitable compensation as against Batbold and Cheong.

60.   Batbold is liable to account to the First and/or Third Plaintiffs as constructive trustee for each and all of the sums received by him or for his benefit by way of the Kharmagtai and CBM Gratuities.

61.   Further or alternatively, the First and/or Third Plaintiffs are entitled to trace into any assets or monies held by or on behalf of Batbold which assets or monies were derived from the Kharmagtai and CBM Gratuities.

62.   Further or in the further alternative, the First and/or Third Plaintiffs are entitled as against Batbold to an account of profits.

**C.    THE SIXTH AND SEVENTH DEFENDANTS**

63.   The Plaintiffs do not presently assert any substantive cause of action against the Sixth and Seventh Defendants. Nevertheless, these Defendants are necessary and proper parties to this action as they are proxies and/or nominees of, and hold assets for and on behalf of, the First to Fifth Defendants. Such assets ought to be available to satisfy any judgment in this action against the First to Fifth Defendants.

64.   Accordingly, as between the Plaintiffs and the Sixth and Seventh Defendants, there exists a question or issue arising out of or relating to or connected with any relief or remedy claimed in this action which it would be just and convenient to determine as between the Sixth and Seventh Defendants and the Plaintiffs as well as between the First to Fifth Defendants.

**AND THE PLAINTIFFS CLAIM:**

(1)    The foregoing accounts and enquiries;

(2)    Damages to be assessed;

(3)    Equitable compensation;

(4)    Interest; and

(5)    Such further or other relief as the Court thinks fit.


Dated this 26th day of November 2020


*RevLaw*
_____

**SOLICITORS FOR THE PLAINTIFFS**
**REV LAW LLC**