UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE APPLICATION OF SUKHBAATAR     :
BATBOLD FOR AN ORDER PURSUANT
TO 28 U.S.C. § 1782                 :        21-mc-000218-RA-OTW

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - X

**K2 INTEGRITY'S MEMORANDUM OF LAW IN OPPOSITION TO SUKHBAATAR
BATBOLD'S APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

*Attorneys for K2 Integrity*

12656358

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

      A.    K2's Investigation of Mr. Batbold's Corruption ...................................... 4

      B.    The Foreign Litigation Against Mr. Batbold .......................................... 6

      C.    Mr. Batbold Had the Ability to Challenge the K2 Investigation in the Foreign Proceedings But Chose Not to Do So ..................................... 7

      D.    Mr. Batbold's Misleading Application ................................................... 8

      E.    The Proposed Fishing Expedition ......................................................... 10

ARGUMENT ..................................................................................................................... 11

I.    The Application Fails to Meet the Statutory Requirements of Section 1782 .................. 11

      A.    The Requested Discovery is Not "For Use" in a Foreign "Proceeding" .............. 12

            1.    The Foreign Attachment Proceedings Are Not "Adjudicative" and Are Stayed ................................................................................ 13

            2.    The Requested Discovery Is Irrelevant to the Mongolian Proceedings ............................................................................... 14

      B.    The Requested Discovery Is Privileged .................................................. 15

II.    The Court Should Exercise Its Discretion to Deny the Application .................................. 18

      A.    Mr. Batbold Should Be Required to Seek Information About the Mongolian Investigation from the Mongolian Claimants ...................................... 19

      B.    The Application is an Improper Effort to Circumvent Foreign Discovery Limitations ............................................................................... 20

      C.    The Application is Unduly Intrusive and Burdensome ........................... 22

      D.    Mr. Batbold Should Be Required to Provide Reciprocal Discovery .................... 24

CONCLUSION ................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aboeid v. Saudi Arabian Airlines, Inc.*,
   No. 10-cv-2518 (SJ) (VVP), 2012 WL 3637430 (E.D.N.Y. Aug. 22, 2012) .........................17

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017)...................................................................................................13

*In re Application of Elvis Presley Enters. LLC for an Ord. to Take Discovery
   Pursuant to 28 U.S.C. § 1782*,
   No. 15-mc-386 (DLC), 2016 WL 843380 (S.D.N.Y. Mar. 1, 2016)......................................21

*In re Atvos Agroindustrial Investimentos S.A.*,
   481 F. Supp. 3d 166 (S.D.N.Y. 2020)...................................................................................21

*Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015)..............................................................................................12, 14

*In re China Petrochem. Dev. Corp.*,
   No. 17-cv-2138 (SRU), 2018 WL 1320665 (D. Conn. Mar. 14, 2018)..................................15

*Consorcio Minero, S.A. v. Renco Grp., Inc.*,
   No. 11-mc-354, 2012 WL 1059916 (S.D.N.Y. Mar. 29, 2012)..............................................25

*Donovan v. Red Ball Interior Demolition Corp.*,
   No. 81-cv-1302, 1982 WL 2052 (S.D.N.Y. Sept. 21, 1982) ..................................................18

*In re Escallon*,
   323 F. Supp. 3d 552 60 (S.D.N.Y. 2018) ..............................................................................15

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   154 F.3d 24 (2d Cir. 1998)................................................................................................12, 13

*In re financialright GmbH*,
   No. 17-mc-105, 2017 WL 2879696 (S.D.N.Y. June 22, 2017)..............................................15

*Henry v. Morgan's Hotel Grp., Inc.*,
   No. 15-cv-789 (ER) (JLC), 2016 WL 303114 (S.D.N.Y. Jan. 25, 2016)..............................23

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 65 (2004)................................................................................... *passim*

*Jiangsu Steamship Co. v. Success Superior Ltd.*,
   No. 14-cv-9997 (CM), 2015 WL 3439220 (S.D.N.Y. Feb. 5, 2015)......................................13

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
  895 F.3d 238 (2d Cir. 2018)..................................................................................11, 18, 19

*In re Kreke Immobilien KG*,
  No. 13-mc-110 (NRB), 2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013)..............................20, 21

*La Belle v. Barclays Capital Inc.*,
  No. 19-cv-3800 (JPO) (GWG), 2020 WL 1879115 (S.D.N.Y. Apr. 15, 2020)......................22

*Mangouras v. Squire Patton Boggs*,
  980 F.3d 88 (2d Cir. 2020)...................................................................................11, 16, 18

*In re Mare Shipping Inc.*,
  No. 13-mc-238, 2013 WL 5761104 (S.D.N.Y. Oct. 23, 2013), *aff'd sub nom.*
  *Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6 (2d Cir.
  2014) ....................................................................................................................19

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015)...................................................................................22

*In re Metallgesellschaft*,
  121 F.3d 77 (2d Cir. 1997)....................................................................................19

*Minatec Fin. S.A.R.L. v. SI Group, Inc.*,
  No. 08-cv-269 (LEK) (RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) . ...............24, 25

*Morelli v. Alters*,
  No. 19-cv-10707 (GHW), 2020 WL 6508858 (S.D.N.Y. Nov. 5, 2020) ...............................23

*In re Okean B.V. & Logistic Sol. Int'l*,
  60 F. Supp. 3d 419 (S.D.N.Y. 2014)......................................................................24

*In re OOO Promnefstroy*,
  No. 19–mc-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009).......................................19

*In re Pishevar*,
  No. 19-mc-503 (JGK) (SDA), 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020) .......................15

*Sampedro v. Silver Point Capital, L.P.*,
  958 F.3d 140 (2d Cir. 2020)...................................................................................24

*In re Schlich*,
  893 F.3d 40 (1st Cir. 2018)...................................................................................14

*Schmitz v. Bernstein Leibhard & Lifshitz LLP*,
  376 F.3d 79 (2d Cir. 2004)....................................................................................19

*In re Shervin Pishevar*,
    439 F. Supp. 3d 290 (S.D.N.Y. 2020).....................................................24

*Stinson v. City of New York*,
    No. 10-cv-4228 (RWS), 2015 WL 4610422 (S.D.N.Y. July 23, 2015) .................................23

*In re Tiberius Grp. AG*,
    No. 19-mc-467 (VSB), 2020 WL 5535272 (S.D.N.Y. Sept. 14, 2020)..................................23

*United States v. Adlman*,
    68 F.3d 1495 (2d Cir. 1995)..................................................................16

*In re Vale S.A.*,
    No. 20-mc-199 (JGK) (OTW), 2021 WL 311236 (S.D.N.Y. Jan. 29, 2021) ........................22

*In re WinNet R CJSC*,
    No. 16-mc-484 (DLC), 2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017) .................................1, 8

*Wultz v. Bank of China Ltd.*,
    304 F.R.D. 384 (S.D.N.Y. 2015) .............................................................16

*Wultz v. Bank of China Ltd.*,
    32 F. Supp. 3d 486 (S.D.N.Y. 2014)..........................................................22

**Statutes**

28 U.S.C. § 1782................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 26..............................................................................16, 22

Fed. R. Civ. P. 45..............................................................................22

*Director of the Serious Fraud Office v Eurasian Natural Resources Corporation
    Limited*
    [2018] EWCA (Civ) 2006 (Eng.)..........................................................17

*Here's How an Unpopular Ruling Party Swept Mongolia's June Elections*,
    WASH. POST (July 7, 2020),
    https://www.washingtonpost.com/politics/2020/07/07/heres-how-an-
    unpopular-ruling-party-swept-mongolias-june-elections/ ........................................2

*If You are Honest, the Tortoise Always Beats the Hare*, News.mn (Jan. 8, 2021)
    https://news.mn/en/795025/ ..............................................................6, 14

iv

*Mongolia Anti-Graft Agency Arrests Two Prime Ministers Amid Mine Probe*,
     REUTERS, Apr. 11, 2018,
     https://www.reuters.com/article/mongolia-oyutolgoi/mongolia-anti-graft-
     agency-arrests-two-prime-ministers-amid-mine-probe-idUSL3N1RO3OP ............................5

*The English Law of Legal Professional Privilege: A Guide for American
     Attorneys*, 4 Loy. U. Chi. Int'l L. Rev. 51, 59 (2006).............................................................17

12656358

K2 Integrity Holdings, Inc. (together with its affiliates, "K2") respectfully submits this memorandum of law in opposition to the application for an order pursuant to 28 U.S.C. § 1782 (the "Application") filed by Sukhbaatar Batbold ("Mr. Batbold").

## PRELIMINARY STATEMENT

Attorneys have a heightened duty of candor when they seek *ex parte* relief from the Court.  *E.g., In re WinNet R CJSC*, No. 16-mc-484 (DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017).  Yet Mr. Batbold's *ex parte* Application distorts the relevant facts beyond any semblance of fairness.  According to Mr. Batbold, he needs United States discovery of K2, a preeminent investigations firm whose founder, Jules Kroll, has successfully traced the foreign assets of such corrupt heads of state as Imelda and Ferdinand Marcos, Saddam Hussein, Jean-Claude "Baby Doc" Duvalier, Albert Fujimori, and Fernando Collor De Mello, in order to defend against a series of "abusive" and "sham lawsuits" filed in various foreign jurisdictions by "shadowy figures" that retained K2 to trace Mr. Batbold's assets.  Doc. 2 at 1.  Mr. Batbold fails to make clear that (1) in these foreign proceedings (filed in England, Singapore, Hong Kong, and Jersey), the foreign courts ***granted*** asset-freezing injunctions in reasoned decisions based on evidentiary submissions by K2; (2) Mr. Batbold had the right and the opportunity to challenge K2's purportedly "sham" evidence in these proceedings, including by applying to cross-examine Mr. Kroll; but (3) instead of exercising these rights, Mr. Batbold consented to the injunctions ordered by the foreign courts. These facts are impossible to square with Mr. Batbold's argument that he needs United States discovery in order to defend himself in these foreign proceedings, much less with his shrill pronouncement that the proceedings, in which he has declined to challenge the claimants' allegations, are a "sham."

Mr. Batbold's lack of candor is even more striking with respect to his argument

1

that the Mongolian government entities that filed lawsuits against him were not authorized to do so.  Doc. 2 at 2, 10–11.  Despite developing this argument at length in his Application (and submitting a sworn declaration from Singapore counsel), Mr. Batbold fails to disclose that this very argument was litigated before and rejected by the High Court of the Republic of Singapore.  Declaration of Chua Sui Tong ("Tong Decl.") ¶¶ 6–7, Ex. C.[1]  The Singapore High Court, after hearing briefing and arguments, concluded that the Prosecutor General of Mongolia has the authority under Mongolian law to bring corruption proceedings against Mr. Batbold on behalf of the affected Mongolian state agencies.  *Id.*  Indeed, in the underlying Mongolian litigation, Mr. Batbold has not even ***attempted*** to challenge the Prosecutor General's authority to bring proceedings against him.[2]  Mr. Batbold's failure to properly disclose the Singapore court's consideration and rejection of this argument was improper in an *ex parte* application that prominently asserted the very argument rejected by the Singapore court.[3]

Any fair-minded review of the record quickly reveals that – as four neutral foreign courts have found – K2's corruption allegations against Mr. Batbold are well supported by the facts and anything but a "sham."  Declaration of Aron Fischer ("Fischer Decl.") Ex. C. But although they are groundless, the insults that Mr. Batbold hurls at K2 are not gratuitous.

---

[1] Mr. Batbold buries in a footnote an oblique reference to the Singapore High Court's interpretation of the Mongolian law, but he nowhere discloses that the Singapore High Court arrived at that interpretation after hearing and rejecting the very challenge to the Mongolian claimants' authority that Mr. Batbold raises here, nor does he cite or attach the Singapore court's decision in his Application.  Doc. 2 at 11 n. 5.

[2] First Declaration of Nasanbat Tseepil ("Tsteepil Decl.") ¶ 5.

[3] Mr. Batbold also fails to mention that despite his assertion that Mongolian President Khaltmaagiin Battulga is an "autocratic strongman" who purportedly holds "Mongolia's young democracy" in his "grip" (Doc. 2 at 1), Mr. Battulga's "grip" on Mongolia does not include control of the Mongolian government, which is in the hands of Mr. Batbold's political party, the Mongolian People's Party.  *See* Boldsaikhan Sambuu, *Here's How an Unpopular Ruling Party Swept Mongolia's June Elections*, WASH. POST (July 7, 2020), https://www.washingtonpost.com/politics/2020/07/07/heres-how-an-unpopular-ruling-party-swept-mongolias-june-elections/.  Presumably, Mr. Batbold's party's control of the Mongolian government is what explains his ability to obtain declarations from Mongolian government agencies disclaiming any role in the corruption proceedings against Mr. Batbold.  *See* Docs. 16-23–16-26.

2

Rather, Mr. Batbold recognizes that without slandering K2 and the Mongolian prosecution, he cannot articulate a legitimate basis to obtain the discovery he seeks under 28 U.S.C. § 1782.  By Mr. Batbold's own account, he wants to pore over K2's internal documents in order to "rectify" a purportedly "critical information deficit" regarding the motivations behind the corruption proceedings against him, which he believes to be orchestrated by his political opponents.  Doc. 2 at 4.  But even indulging the dubious premise that the motivations for well-founded corruption proceedings require explanation,[4] information about the reasons for the Mongolian corruption proceedings against Mr. Batbold is plainly available *in Mongolia*.  There is no legitimate reason that Mr. Batbold is pursuing this discovery in the United States rather than in Mongolia, or in the other foreign jurisdictions where litigation is pending against him.

As described below, K2 has conducted its investigation of Mongolian corruption on behalf of the General Prosecutor of Mongolia, which is prosecuting the Mongolian proceedings against Mr. Batbold.  Under long established Second Circuit case law, it is inappropriate for applicants to seek discovery from the U.S. agents of foreign litigants in 1782 proceedings rather than directly from the foreign litigants.  That is particularly true where, as here, the application represents a transparent ploy to take advantage of liberal American discovery rules rather than a good-faith attempt to obtain discovery that is beyond the jurisdictional reach of the foreign courts.  Furthermore, Mr. Batbold's proposed subpoenas seek privileged information and are vastly overbroad in relation to their supposed relevance; indeed, Mr. Batbold openly admits that the purpose of the subpoenas is to conduct opposition research on K2's supposed involvement in a "politically motivated sham" rather than to discover any particular facts relevant to the foreign proceedings.  Doc. 2 at 4.  Finally, the Court should not

---

[4] The allegations against Mr. Batbold are extraordinarily detailed and well-documented, yet Mr. Batbold has yet to respond to them.  Fischer Ex. C.

3

award Mr. Batbold broad discovery of his foreign adversaries' case against him without requiring that he provide reciprocal discovery, which is a common condition on section 1782 applications.  K2 believes, however, that a reciprocity condition would be tantamount to denying Mr. Batbold's Application, as he has no intention of subjecting himself to discovery despite his eagerness to disparage the allegations against him in overheated rhetoric.

## STATEMENT OF FACTS

### A.     K2's Investigation of Mr. Batbold's Corruption

K2 is a preeminent risk, compliance, investigations, and monitoring firm, with offices in New York, London, Washington D.C., Geneva, Los Angeles, and Chicago.  Declaration of Jules B. Kroll ("Kroll Decl.") ¶ 2.  K2 was co-founded by Jules Kroll, who has been credited with inventing the modern investigations, intelligence, and corporate security industry.  *Id.*; Fischer Exs. F and G.  During his career, Mr. Kroll has frequently been retained by foreign governments to assist them in recovering assets plundered by corrupt officials, including heads of state such as the Philippines' Ferdinand Marcos, Haiti's Jean-Claude Duvalier, Iraq's Saddam Hussein, Peru's Alberto Fujimori, and Brazil's Fernando Collor De Mello.  Kroll Decl. ¶ 3.

In 2018, K2's English subsidiary, K2 Intelligence Ltd. ("K2 Intelligence"), was retained by the General Prosecutor's Office of Mongolia to assist with tracing and recovering assets misappropriated from the state of Mongolia through corrupt transactions in connection with mining assets belonging to the state of Mongolia (the "Mongolia Investigation").  *Id*. ¶ 4. At the time, Mongolia's Independent Agency Against Corruption ("IAAC"), an investigative agency of the Mongolian government that works closely with the General Prosecutor's Office, was actively investigating corruption at two state-owned mining companies, the Erdenet Mining Corporation ("Erdenet") and Erdenes Oyu Tolgoi LLC ("EOT").  *Id.* ¶ 5.  A number of current

and former Mongolian officials had been caught up in the probe, including former prime ministers from each of Mongolia's two largest political parties, the Democratic Party and the Mongolian People's Party.[5]  *Id.*

In Mongolia, the investigation into Erdenet and EOT corruption has been run by career prosecutors at the General Prosecutor's office in the Mongolian capital city of Ulaanbaatar.  *Id.*  The Mongolian lead prosecutor has 18 years of prosecutorial experience spanning multiple presidential and parliamentary administrations.  Fischer Ex. A ¶¶ 1, 6–7.  On K2's end, the Mongolia Investigation has been run out of K2 Intelligence's London offices and supervised by the London office of the international firm King & Spalding LLP ("King & Spalding").  Kroll Decl. ¶ 6.  From the beginning, K2 and King & Spalding anticipated that the Mongolia Investigation would lead to litigation.  *Id.*; Declaration of Sarah Yasmin Walker ("Walker Decl.") ¶ 12.

During the course of its Mongolia Investigation, K2 uncovered copious evidence that Mr. Batbold, a former Prime Minister of Mongolia, had engaged in corrupt transactions during the time he controlled the Mongolian government and thereby the state-owned mining companies Erdenet and EOT.  Kroll Decl. ¶¶ 8–12; *see* Fischer Ex. C.  For example, during the time that Mr. Batbold was Prime Minister, Erdenet sold hundreds of millions of dollars' worth of copper concentrates to recently created shell companies owned by a South Korean husband and wife, Cheong Choo Young ("Cheong") and Kim Hak Seon ("Hak Seon"), with no experience in the mining industry or known sources of financing.  Kroll Dec. ¶ 12. Cheong and Hak Seon immediately resold the copper to a commodities trading firm that could have purchased the

---

[5] *Mongolia Anti-Graft Agency Arrests Two Prime Ministers Amid Mine Probe*, REUTERS, Apr. 11, 2018, https://www.reuters.com/article/mongolia-oyutolgoi/mongolia-anti-graft-agency-arrests-two-prime-ministers-amid-mine-probe-idUSL3N1RO3OP

minerals directly from Erdenet but for unknown reasons did not do so. *Id.* Cheong and Hak Seon have numerous documented financial ties to Mr. Batbold and his family, including acting as signatories, directors, or shareholders of entities that nominally own luxury real estate occupied by Mr. Batbold's family members in London, New York, Boston, and Hong Kong. *Id.* Mr. Batbold has never addressed or offered any explanation for any of these transactions or of his relationship with Cheong and Hak Seon.

### B.   The Foreign Litigation Against Mr. Batbold

On October 14, 2020, The Agency for Policy Coordination on State Property of Mongolia, Erdenet, and EOT (collectively, the "Mongolian Claimants"), represented by the General Prosecutor of Mongolia, filed claims in Mongolia against Mr. Batbold and several other defendants alleging that Mr. Batbold corruptly misappropriated for his personal benefit funds rightfully belonging to two state-owned mines (the "Mongolian Proceedings"). Fischer Ex. A ¶¶ 21–25. On October 28, 2020, the Mongolian court, having reviewed the claims, accepted them and initiated the case. *Id.* ¶ 26. The Mongolian Claimants have not submitted any statements by K2 to the Mongolian courts. Tsteepil Decl. ¶ 14; Kroll Decl. ¶ 13. Although Mr. Batbold represents in his *ex parte* Application that the Mongolian Proceedings have been "shrouded in secrecy" and that he has been "denied even the right to mount a defense" (Doc. 2 at 3), Mr. Batbold has in fact received all the pleadings in the Mongolian Proceedings. Tsteepil Decl. ¶¶ 6–11. Mr. Batbold himself recently told the press that "I respect the work of the [Mongolian] judiciary" and "am confident that our court will determine who is right and who is wrong."[6]

In support of the Mongolian Proceedings, the Mongolian Claimants filed *ex parte* prejudgment attachment applications in England, Hong Kong, Singapore, and Jersey (the

---

[6] *If You are Honest, the Tortoise Always Beats the Hare*, News.mn (Jan. 8, 2021) https://news.mn/en/795025/

12656358

"Foreign Attachment Proceedings") and in New York State Supreme Court in November 2020 (discussed *infra* at pp. 8-9).  Walker Decl. ¶ 2; Declaration of Hui Cheuk Kit Frederick ("Hui Decl.) ¶ 2;  Tong Decl. ¶ 2; Declaration of Jeremy Garrood ("Garrood Decl.") ¶¶ 3–6; Fischer Ex. D.  The Foreign Attachment Proceedings were coordinated by attorneys in King & Spalding's London office.  Walker Decl. ¶ 1.  In support of each of these applications, the Mongolian Claimants submitted affidavits from Jules Kroll of K2.  Walker Decl. ¶ 3; Hui Decl. ¶ 3; Tong Decl. ¶ 3; Garrood Decl. ¶ 8.  These affidavits detailed and attached extensive documentary evidence of both Mr. Batbold's corrupt acts and his beneficial ownership of assets located in that jurisdiction.  *Id.*

All the foreign applications were successful.  After the foreign tribunals reviewed the evidence, each issued freezing injunctions attaching Mr. Batbold's assets.  Walker Decl. ¶ 4; Hui Decl. ¶ 4, Ex. A;  Tong Decl. ¶ 4, Ex. A; Garrood Decl. ¶ 9, Ex. C.

### C.   Mr. Batbold Had the Ability to Challenge the K2 Investigation in the Foreign Proceedings But Chose Not to Do So

In each of the Foreign Attachment Proceedings, Mr. Batbold received notice of the freezing injunctions, retained counsel, and entered his appearance.  Walker Decl. ¶ 5; Hui Decl. ¶ 5;  Tong Decl. ¶ 5; Garrood Decl. ¶¶ 10–15.  At that point, Mr. Batbold had a full and fair opportunity to challenge the factual basis for the freezing injunctions, including by disputing K2's evidence and applying to cross-examine Mr. Kroll.  *Id.*  But Mr. Batbold chose not to challenge or attempt to lift the injunctions in *any* of the Foreign Attachment Proceedings.  *Id.* Instead, Mr. Batbold entered into stipulations consenting to the continuation of the injunctions until the conclusion of the Mongolian Proceedings.  Walker Decl. ¶ 5, Ex. C; Hui Decl. ¶ 6, Ex. B; Tong Decl. ¶ 5, Ex. B; Garrood Decl. ¶¶ 12–14, Ex. E.  As a result, no further action against Mr. Batbold is currently contemplated in any of the Foreign Attachment Proceedings until the

12656358

Mongolian Proceedings conclude.  Walker Decl. ¶ 6; Hui Decl. ¶ 7;  Tong Decl. ¶ 9; Garrood

Decl. ¶¶ 14, 16.[7]

Mr. Batbold contends he needs discovery to present certain defenses in the

Foreign Attachment Proceedings, including arguments about whether the freezing injunctions are

"equitable" given what he speculates are improper motives by K2 and the Mongolian

government.  *See* Doc. 17 ¶¶ 6–7; Doc. 18 ¶¶ 5–6; Doc. 19 ¶¶ 8–9; Doc. 20 ¶¶ 5–6.  But these

supposed defenses were already available to Mr. Batbold in the Foreign Attachment Proceedings,

and he declined to pursue them.  Walker Decl. ¶ 8; Hui Decl. ¶ 8;  Tong Decl. ¶ 10; Garrood

Decl. ¶ 17.  The Mongolian Claimants—as applicants—and K2—as an affiant—were subject to

the jurisdiction of the foreign tribunals and their civil adjudication and disclosure mechanisms.

Walker Decl. ¶¶ 8–10; Hui Decl. ¶¶ 8–10;  Tong Decl. ¶¶ 10–12; Garrood Decl. ¶¶ 19–22.

Nonetheless, Mr. Batbold did not attempt to cross-examine K2 in any of the Foreign Attachment

Proceedings or challenge the claimants' evidence in any way.  Walker Decl. ¶¶ 6–9; Hui Decl. ¶¶

6–9; Tong Decl. ¶¶ 5, 9–11; Garrood Decl. ¶¶ 16–18.

### D.   Mr. Batbold's Misleading Application

On March 9, 2021, Mr. Batbold filed his Application on an *ex parte* basis without

providing notice to K2.  Although attorneys' duties of candor are heightened when they appear

*ex parte*, *e.g., In re WinNet R CJSC*, 2017 WL 1373918, at *9, the Application filed by Mr.

Batbold's local counsel contains numerous misleading statements.  As noted above, for example,

Mr. Batbold states that the Foreign Attachment Proceedings were filed by "shadowy figures"

---

[7] In the Singapore proceeding, certain of Mr. Batbold's co-defendants – but not Mr. Batbold, Cheong, or
Hak Seon – challenged the freezing injunction.  Tong Dec. ¶ 8.  On April 16, the Singapore court found
that there was a "good arguable case" on the merits, but lifted the injunction against these defendants
because there was insufficient risk that they would dissipate their assets.  *Id.*  However, the Singaporean
freezing injunction against Mr. Batbold remains in "full force and effect."  *Id.* The Singapore court noted
that it had "reviewed the evidence showing the pattern of conduct" by Mr. Batbold and his associates and
concluded that "there is much to answer and explain."  Tong Dec. Ex. D ¶ 21.

who were not authorized to bring the proceedings, going so far as to accuse counsel for the Mongolian Claimants of "fraud on the court" for representing that they had authority to filed the New York state proceeding.  Doc. 2 at 1–2; *see id*. at 9–10.  Nowhere in his voluminous submissions does Mr. Batbold disclose that his co-defendants raised this very argument in Singapore, and it was rejected, with the High Court of Singapore expressly holding that the General Prosecutor's Office of Mongolia had the legal authority to authorize the Foreign Attachment Proceedings on behalf of the Mongolian Claimants.  Tong. Decl. ¶¶ 6–7, Ex. C.[8]

Mr. Batbold's description of the prejudgment attachment proceedings in New York State Supreme Court displays a similar lack of candor.  Mr. Batbold contends that the Mongolian Claimants "total[ly] surrender[ed]" in the New York proceedings when they "discontinued the case against Mr. Batbold entirely."  Doc. 2 at 2, 8–9.  Mr. Batbold fails to disclose that his co-defendants in the New York proceeding, including Cheong and Hak Seon, the South Korean couple at the center of the corruption allegations against him, entered into a stipulation agreeing not to sell or transfer any of the assets in dispute without 60 days' advance notice to the Mongolian Claimants (and to produce documents to the Mongolian Claimants).  Fischer Ex. E.  In other words, the New York proceeding was resolved similarly to the Foreign Attachment Proceedings: with the assets in question being encumbered and discovery being ordered.  Mr. Batbold's description of the New York proceeding as a "total surrender," without informing the Court of this outcome, was misleading.

Mr. Batbold similarly fails to provide a complete and accurate description of the Foreign Attachment Proceedings.  Mr. Batbold states that the Foreign Attachment Proceedings

---

[8] As noted above, Mr. Batbold obliquely refers to the Singapore court's interpretation of Mongolian law in a footnote, but fails to disclose that the Singapore High Court expressly rejected the argument that the Foreign Proceedings were unauthorized, and fails to cite or attach the decision.  Doc. 2 at 11 n.5.

have been "stayed pending resolution of the Mongolian action" and refers in passing to "injunctions" that are in place (Doc. 2 at 9), but he avoids explaining why the injunctions are in place: each of the foreign courts **granted** freezing injunctions based on evidence presented by the Mongolian Claimants, including the affidavits of Jules Kroll.  Walker Decl. ¶ 4; Hui Decl. ¶ 4, Ex. A;  Tong Decl. ¶ 4, Ex. A; Garrood Decl. ¶ 9.  In the English proceeding, for example, the High Court issued a nine-page decision explaining why the Mongolian Claimants had satisfied the requirements of English law.  Walker Ex. B.  Mr. Batbold does not mention this written decision in his brief, and although the declaration of Mr. Batbold's English counsel attaches a number of case filings as exhibits, it conspicuously omits that one.  *See* Doc. 18.

### E.      The Proposed Fishing Expedition

In connection with his Application, Mr. Batbold submitted two subpoenas he seeks this Court's permission to serve on K2.  *See* Docs. 16-1 (the "Proposed Subpoena") and 16-2.[9]  The Proposed Subpoena contains twenty-three document requests, twenty of which ask for "[a]ll documents and communications" concerning certain topics or persons.  Proposed Subpoena at 12–14.  The "Document Requests are not limited in any way by geography." *Id.* Instruction No. 11.  Nor are they limited in any meaningful way by time, purporting to request all documents "from January 1, 2000 through present." *Id.* Relevant Time Period.

Mr. Batbold's document requests comprise an exhaustive fishing expedition into K2's Mongolia Investigation.  Eight of the requests are entirely or partially about funding of and payments to K2 and vendors it worked with in the course of the investigation.  *See id.* Document

---

[9] Both subpoenas make identical document demands on K2.  *See* Doc. 16-1 Attachment B; Doc. 16-2 Attachment A.  They differ only in that the Proposed Subpoena also requests testimony on the same set of topics covered by the document demands.  *See* Doc. 16-1 at Attachment A.  Because one subpoena (Doc. 16-2) is completely subsumed within the other subpoena (the Proposed Subpoena), we refer only to the Proposed Subpoena for the sake of convenience though the arguments herein apply equally to both.

Request Nos. 11, 13–17, 22, and 23.  Four requests ask for "all documents and communications" pertaining to the Mongolian government entities involved in the investigation and a Mongolian attorney assisting counsel for the Mongolian Claimants (*id.* Document Request Nos. 7–10), while another four ask for "all documents and communications" concerning the current President of Mongolia and three other Mongolian individuals (*id.* Document Request Nos. 3–6).  Another eight requests seek documents concerning who initiated, directed, and/or instructed K2 during the Mongolia Investigation.  *Id.* Document Request Nos. 11, 12, 15, 16, and 18–21.  Mr. Batbold also requests all of K2's "work product" in connection with the Mongolian investigation (Document Request No. 11) and all documents and communications "concerning" Mr. Batbold or his son (Document Requests 1 and 2).

## **ARGUMENT**

As Mr. Batbold acknowledges, to obtain discovery under 28 U.S.C. § 1782 an applicant must show that all the mandatory requirements of the statute are met and, if these requirements are satisfied, that the application is worthy of being granted at the district court's discretion.  Doc. 2 at 14;  *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 242 (2d Cir. 2018).  Mr. Batbold's Application fails on both counts.

## I.  **The Application Fails to Meet the Statutory Requirements of Section 1782**

Under section 1782, an order for discovery may be issued where: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [] tribunal, . . . (3) the application is made by a foreign or international tribunal or any interested person," and (4) "the discovery [is] not [] in violation of any legally applicable privilege." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 97–98 (2d Cir. 2020) (internal citations and

quotation marks omitted).  Here, although K2's English subsidiary led the investigation (Kroll Decl. ¶ 6), K2 does not dispute that it has access to the requested discovery in New York and that the first statutory requirement is therefore met.  K2 also acknowledges that Mr. Batbold is an "interested person" in connection with the Mongolian Proceedings against him, thereby meeting the third statutory requirement.  Mr. Batbold fails, however, to satisfy the second and fourth requirements of section 1782.  The requested discovery is not "for use" in a foreign "proceeding" under the meaning of the statute, and the discovery would be in violation of the English litigation privilege governing documents and communications in anticipation of litigation.

> **A.    The Requested Discovery is Not "For Use" in a Foreign "Proceeding"**

The Application does not comport with the statutory requirements of section 1782 because it does not seek information "for use in a proceeding in a foreign or international tribunal."  28 U.S.C. § 1782(a).  To meet this requirement of the statute, the foreign proceeding must be "adjudicative in nature."  *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998).  Furthermore, information that is "plainly irrelevant" to a proceeding cannot be "said to be 'for use' in that proceeding."  *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 n. 7 (2d Cir. 2015).  Here, the Foreign Attachment Proceedings in England, Hong Kong, Singapore, and Jersey are not "adjudicative in nature" because they concern prejudgment attachment rather than any underlying causes of action, and because they have been stayed.  And while the Mongolian Proceedings are adjudicative in nature, K2 has not submitted a witness statement in Mongolia, making Mr. Batbold's proposed fishing expedition into K2's motivations and funding irrelevant to that proceeding.

1.      **The Foreign Attachment Proceedings Are Not "Adjudicative" and Are Stayed**

To be "adjudicative" as required by section 1782, a proceeding must be one in which the "merits of the dispute" will be heard. *Euromepa*, 154 F.3d at 28 (holding that a French bankruptcy proceeding to enforce a judgment did not meet the requirements of the statute because the "merits of the dispute . . . will not be considered"). For this reason, "neither pre-judgment attachment nor post-judgment enforcement proceedings are 'adjudicative' in nature." *Jiangsu Steamship Co. v. Success Superior Ltd.*, No. 14-cv-9997 (CM), 2015 WL 3439220, at *4 (S.D.N.Y. Feb. 5, 2015) (denying section 1782 application where petitioner sought discovery for use in a prejudgment attachment proceeding). Here, as Mr. Batbold acknowledges (Doc. 2 at 6), the Foreign Attachment Proceedings are prejudgment attachment proceedings intended to preserve assets to satisfy a potential judgment from the court in Mongolia, which is where the merits of the dispute will be heard. Walker Decl. ¶ 2; Declaration of Hui Decl. ¶ 2;  Tong Decl. ¶ 2; Garrood Decl. ¶¶ 3–6. Accordingly, the Foreign Attachment Proceedings do not meet the requirements of section 1782 and cannot support Mr. Batbold's Application.

The Foreign Attachment Proceedings also do not satisfy the statute because they have been stayed. Walker Decl. ¶ 5, Ex. C; Hui Decl. ¶ 6, Ex. B; Tong Decl. ¶ 5, Ex. B; Garrood Decl. ¶¶ 11–14. *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017) (holding that petitioner's section 1782 application for use of discovery in a Singaporean proceeding was mooted by "the indefinite stay of the Singaporean litigation"). Notably, although Mr. Batbold's foreign attorneys declare that he ***could*** apply to lift the stay, they do not expressly state that will actually do so if his request is granted. *See* Doc. 17 ¶¶ 5, 10; Doc. 18 ¶¶ 4, 8; Doc. 19 ¶ 7; Doc. 20 ¶¶ 4, 9. Indeed, having chosen not to challenge the extensive documentary evidence presented by K2, and having consented to the asset-freezing injunctions pending the outcome of

13

the Mongolian Proceeding (purportedly because he has no assets to freeze, *see* Doc. 2 at 9), it would not make sense for Mr. Batbold apply to reopen the Foreign Attachment Proceedings based on new discovery regarding K2's funding and motivations.  Unless, as appears to be the case, Mr. Batbold's true motivation is to conduct opposition research on K2 for political purposes. Doc. 2 at 4.  Whatever his motivation, Mr. Batbold's stated desire to use discovery from K2 in connection with an application to reopen the Foreign Attachment Proceedings does not meet the requirements of section 1782.  *See Certain Funds*, 798 at 123–24 (affirming denial of section 1782 application where applicant had only "subjective intent" to undertake legal action and no "objective" evidence that "action is being contemplated").

### 2.  The Requested Discovery Is Irrelevant to the Mongolian Proceedings

Unlike the Foreign Attachment Proceedings, the Mongolian Proceedings are adjudicative in nature.  However, K2 is not a witness in the Mongolian Proceedings, so Mr. Batbold's request for a fishing expedition into K2's investigation is irrelevant and therefore cannot be "said to be 'for use' in that proceeding" under the meaning of section 1782.  *Certain Funds*, 798 F.3d at 120 n. 7 (2d Cir. 2015); *In re Schlich*, 893 F.3d 40, 52 (1st Cir. 2018) ("[T]he Second Circuit has stated that the statutory requirement prescribing that information be 'for use' in a foreign proceeding incorporates a relevance requirement.").

Mr. Batbold contends that discovery from K2 is necessary to "discredit[]" K2 and to uncover "exculpatory" information that may be within K2's possession.  *E.g.*, Doc. 21 ¶¶ 10–12.  But in the Mongolian Proceedings, Mr. Batbold stands accused by the General Prosecutor of Mongolia, not by K2.  Accordingly, while it is clear from his Application and his statements to the press that Mr. Batbold is interested in attacking K2 as a public relations strategy,[10] K2's

---

[10] *If You are Honest, the Tortoise Always Beats the Hare*, News.mn (Jan. 8, 2021) https://news.mn/en/795025/

motivations and funding are irrelevant to the Mongolian Proceedings.  Tseepil Decl. ¶¶ 12–14, 18.  Furthermore, Mr. Batbold's suggestion that there "may be exculpatory information" in K2's files (Doc. 21 ¶ 11) is purely speculative.  Mr. Batbold is in possession of better information about his own affairs than is K2 (or the Mongolian prosecutor).  If specific facts existed that would contradict the allegations of corruption in the Mongolian Proceedings, Mr. Batbold should be able to identify and establish these facts.  Mr. Batbold's inability to identify any specific exculpatory facts that he believes are in K2's possession (let alone uniquely in K2's possession) defeats his argument that the discovery he seeks from K2 is relevant.  The Application should be denied on this basis.  *See In re Escallon*, 323 F. Supp. 3d 552, 559–60 (S.D.N.Y. 2018) (denying section 1782 petition on statutory grounds because petitioner "failed to show that the requested discovery is 'for use' in foreign proceedings" where "Petitioner's discovery request appears to be little more than a fishing expedition to acquire documents and information that have at best limited relevance to the [foreign proceeding]"); *In re China Petrochem. Dev. Corp.*, No. 17-cv-2138 (SRU), 2018 WL 1320665, at *5 (D. Conn. Mar. 14, 2018) (quashing subpoena issued pursuant to section 1782 because subpoena sought testimony that "is not relevant to the [foreign proceeding], and thus, is also not 'for use' in that proceeding.").

B.     **The Requested Discovery Is Privileged**

Section 1782 specifies that a person "may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."  28 U.S.C. § 1782(a).  Accordingly, section 1782 applications must be denied to the extent they seek privileged documents. *See, e.g., In re Pishevar*, No. 19-mc-503 (JGK) (SDA), 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020) (denying section 1782 application because applicant sought information protected by the reporter's privilege); *In re financialright GmbH,*

15

No. 17-mc-105 (DAB), 2017 WL 2879696, at *7 (S.D.N.Y. June 22, 2017) (denying section 1782 application because of attorney-client and work-product privileges); *Mangouras*, 980 F.3d at 100 (remanding section 1782 application to district court to determine whether granting application would violate applicable foreign legal privileges).  Here, Mr. Batbold's Application should be denied because his proposed subpoenas to K2 are directed to documents protected by English litigation privilege.  Walker Decl. ¶ 12.

As the Second Circuit recently clarified, the "touch base test" is used to determine which jurisdiction supplies the "legally applicable" privileges in 1782 proceedings.  *Mangouras*, 980 F.3d at 99.  "Under the touch base test, a court applies the law of the country that has the 'predominant' or 'the most direct and compelling interest' in whether communications should remain confidential, unless that foreign law is contrary to the public policy of this forum."  *Id.* (internal citation, quotation marks, and ellipsis omitted).  Here, the touch base test points to England as the country with the predominant interest in privilege.  K2 Intelligence, K2's English affiliate, was retained to conduct the Mongolia Investigation, the majority of its work has been done by its English employees, and the effort has been supervised by English counsel at King & Spalding LLP.  Kroll Decl. ¶ 6; Walker Decl. ¶ 12.  Although Mr. Batbold contends that New York privilege law applies (Doc. 2 at 22), he acknowledges that this is based on the "assumption" that most of the relevant activity has taken place in New York.  In fact, K2's investigation is based in England and has primarily taken place there.[11]

---

[11] Even if New York privilege law applied, the requested documents would be work-product privileged.  "The work-product rule shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need . . . The purpose of the doctrine is to establish a zone of privacy for strategic litigation planning and to prevent one party from piggybacking on the adversary's preparation."  *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995) (citing Fed. R. Civ. P. 26(b)(3)).  This protection extends to investigations conducted by a party's consultant or agent.  Fed. R. Civ. P. 26(b)(3)(A); *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015) (noting that "it is not in fact necessary that the material be prepared by or at the direction

16

As Mr. Batbold's English counsel acknowledges, English litigation privilege applies to "communications between parties or their attorneys and third parties made for the purpose of obtaining information" in "connection with existing or contemplated litigation." Doris Decl. ¶ 10; *accord* Walker Decl. ¶ 12.  *See* Richard S. Pike, *The English Law of Legal Professional Privilege: A Guide for American Attorneys*, 4 Loy. U. Chi. Int'l L. Rev. 51, 59 (2006) ("English law has tended . . . to afford privilege to factual investigations much more readily than U.S. courts.").  As a recent English High Court decision held, this privilege protected an investigation of corruption allegations against a Kazakh mine conducted by a forensic accounting firm years before litigation was commenced.  *Director of the Serious Fraud Office v Eurasian Natural Resources Corporation Limited* [2018] EWCA (Civ) 2006, ¶¶ 46, 122. Here, K2's Mongolia Investigation was in "reasonable contemplation" of litigation and undertaken for the dominant purpose of supplying evidence for the contemplated litigation. Kroll Decl. ¶ 6; Walker Decl. ¶ 12.  And Mr. Batbold's subpoenas are expressly directed to documents created and communications undertaken in connection with the investigation.  *See supra* at pp. 10–11.  Accordingly, the subpoenas are prohibited requests for privileged information.

Mr. Batbold contends that snippets of information from the Mongolia Investigation, such as the identity of K2's client[12] and underlying factual documents concerning Mr. Batbold, may not be privileged.  Doc. 2 at 22–23.  But because Mr. Batbold's subpoenas are

---

of an attorney" in order to be protected by the work product privilege).  Here, K2's investigation was undertaken in anticipation of litigation.  Kroll Decl. ¶ 6; Walker Decl. ¶ 12.  Documents and communications comprising the investigation would be privileged under New York law.  *See, e.g., Aboeid v. Saudi Arabian Airlines, Inc.*, No. 10-cv-2518 (SJ) (VVP), 2012 WL 3637430, at *3 (E.D.N.Y. Aug. 22, 2012) ("Generally speaking, reports of investigations undertaken by a private investigator hired by a party in connection with an ongoing litigation are work-product.").

[12] K2 Intelligence was retained by the General Prosecutor's Office of Mongolia.  Kroll Decl. ¶ 4.

directed primarily at privileged work product and communications, the application should be denied.  "There is nothing to stop [Mr. Batbold] from conducting an investigation in the same manner" as K2.  *Donovan v. Red Ball Interior Demolition Corp.*, No. 81-cv-1302, 1982 WL 2052, at *1 (S.D.N.Y. Sept. 21, 1982).  Batbold's desire to "assess and, presumably, attack, the quality of the [K2] investigation" is not sufficiently compelling to overcome the privilege because the outcome of the Mongolian Proceedings "will depend on the evidence adduced a trial, not on the evidence uncovered or not uncovered during the course of the investigation."  *Id.*

## II.   The Court Should Exercise Its Discretion to Deny the Application

Even if the statutory requirements were met, that would only mean that the Court has discretion to grant the Application, not that it should do so.  *Mangouras*, 980 F.3d at 98. Here, if the Court finds the statute satisfied, it should exercise its discretion to deny the Application. Four non-exclusive "*Intel* factors" guide whether the court should exercise its discretion in favor of granting an application: "(1) whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for § 1782(a) aid generally is not as apparent; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is unduly intrusive or burdensome."  *Id.* at 97– 98 (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004)) (internal quotation marks and ellipsis omitted).  The *Intel* factors "are not to be applied mechanically" and the "district court should also take into account any other pertinent issues arising from the facts of the particular dispute."  *Kiobel*, 895 F.3d at 245.

18

A.     **Mr. Batbold Should Be Required to Seek Information About the Mongolian Investigation from the Mongolian Claimants**

Section 1782 applications are disfavored where "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264.  This *Intel* factor "asks if the information is within the foreign tribunal's jurisdictional reach" rather than looking at the "nominal target" of the application.  *In re OOO Promnefstroy*, No. 19–mc-99 (RJS), 2009 WL 3335608, at *5–6 (S.D.N.Y. Oct. 15, 2009) (Sullivan, J.).  If it is "clear that discovery [is] equally available in both foreign and domestic jurisdictions, a district court might rely on this evidence" to deny the application.  *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997).

Here, although K2, the nominal target of Mr. Batbold's Application, is not a participant in the Mongolian Proceedings, K2 is acting on behalf of the General Prosecutor's Office of Mongolia, which is prosecuting that action.  Kroll Decl. ¶¶ 4–5; Fischer Ex. A ¶¶ 21–25.  When a section 1782 application seeks documents from an agent of a litigant in the foreign proceedings, the litigant is the "real party" from whom documents are sought and this factor weighs against granting the application.  *See, e.g., Kiobel*, 895 F.3d at 245 ("[W]hen the real party from whom documents are sought (here, Shell) is involved in foreign proceedings, the first *Intel* factor counsels against granting a Section 1782 petition . . . ."); *Schmitz v. Bernstein Leibhard & Lifshitz LLP*, 376 F.3d 79, 85 (2d Cir. 2004) (finding that the first *Intel* factor weighed against petitioner when "[a]lthough technically the respondent was . . . [their opponent's American counsel], for all intents and purposes . . . [Petitioners] seek[] discovery from . . . their opponent in the German litigation."); *In re Mare Shipping Inc.*, No. 13-mc-238, 2013 WL 5761104, at *4 (S.D.N.Y. Oct. 23, 2013), *aff'd sub nom. Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6 (2d Cir. 2014) ("Although the named Respondents are not party to a foreign action, Spain, respondent's client, is a participant in the foreign proceeding.").

19

Any information about K2's Mongolia Investigation that is relevant to the Mongolian Proceedings is within the Mongolian court's "jurisdictional reach." *Intel*, 542 U.S. at 264. As the Mongolian senior prosecutor explains in his accompanying declaration, the fact that K2 is located outside of Mongolia is not an impediment to Mr. Batbold's access to information because any information that Mr. Batbold is entitled to under Mongolian law can be obtained from the Mongolian Claimants. Tseepil Decl. ¶¶ 15–17. Any limitations on Mr. Batbold's access to information about the investigation underlying the Mongolian Proceedings derive from Mongolian civil procedure, not from the fact that K2 is located outside of Mongolia. *Id.*[13] Because there is no ***jurisdictional*** impediment to Mr. Batbold's ability to obtain the requested discovery in Mongolia, granting Mr. Batbold's Application would be tantamount to replacing Mongolia's discovery rules with American ones. This would not be an appropriate use of the Court's discretion. *See In re Kreke Immobilien KG*, No. 13-mc-110 (NRB), 2013 WL 5966916, at *6 (S.D.N.Y. Nov. 8, 2013) ("It would create a perverse system of incentives—one counter to the efficiency and comity goals of § 1782—to encourage foreign litigants to scurry to U.S. courts to preempt discovery decisions from tribunals with clear jurisdictional authority. But that is precisely the sort of encouragement that the petitioner asks this Court to give.").

**B.** **The Application is an Improper Effort to Circumvent Foreign Discovery Limitations**

Mr. Batbold's Application should also be denied because it amounts to "an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country." *Intel*, 542 U.S. at 264. Although, as Mr. Batbold points out (Doc. 2 at 20–21) there are no bright-line rules requiring discoverability in foreign courts, courts have frequently exercised their

---

[13] The same is true of the Foreign Attachment Proceedings (*see* Walker Decl. ¶¶ 10–11; Hui Decl. ¶¶ 10–11; Tong Decl. ¶¶ 12–13; Garrood Decl. ¶ 21), although for the reasons given above, the Foreign Attachment Proceedings are not relevant to Mr. Batbold's Application. *See supra* I(A)(1).

discretion to deny applications where, as here, generally applicable limitations on foreign

discovery, not the jurisdictional reach of the foreign tribunals, appear to be the reason for the

petitioner's resort to section 1782.

Mr. Batbold has not sought discovery of K2 in any of the foreign proceedings.

Walker Decl. ¶¶ 6–9; Hui Decl. ¶¶ 6–9; Tong Decl. ¶¶ 5, 9–11; Garrood Decl. ¶¶ 15–18.  This

decision cannot be explained by jurisdictional limitations, since Mr. Kroll of K2 was an affiant in

the Foreign Attachment Proceedings, and K2 was retained by the prosecutor in the Mongolian

Proceedings.  Rather, Mr. Batbold is attempting to use section 1782 to broaden the **scope** of

discovery– not to reach parties beyond the foreign courts' jurisdiction.  This is an improper use

of section 1782.  *See, e.g., In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166,

177 (S.D.N.Y. 2020) ("It appears that Applicant may be trying to do an end run around proof-

gathering restrictions in Brazil.  Thus . . . the Court finds, in its discretion, that the third *Intel*

factor weighs against granting the Application."); *In re Kreke Immobilien KG*, 2013 WL

5966916, at *6 ("Because the locus of this action is so clearly in Germany and there is no

suggestion that any documents sought are outside the jurisdictional reach of the German courts,

this Court is concerned that Kreke's application is an attempt to circumvent foreign discovery

procedures."); *In re Application of Elvis Presley Enters. LLC for an Ord. to Take Discovery*

*Pursuant to 28 U.S.C. § 1782*, No. 15-mc-386 (DLC), 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1,

2016) ("Although it is not required that EPE exhaust its remedies under German law, the fact

that it has not done so here—when the information in SME's possession is fully accessible to

Arista—weighs against granting the § 1782 application.").[14]

---

[14] In addition, the Jersey Court has held that seeking accelerated discovery for use in a Jersey proceeding through a section 1782 application interferes with Jersey judicial process.  Garrood Decl. ¶¶ 23–24, Ex. F.

### C.      The Application is Unduly Intrusive and Burdensome

Mr. Batbold's Proposed Subpoena is "unduly intrusive or burdensome," which weighs against granting the Application.  *Intel*, 542 U.S. at 265.  Courts apply the "familiar standards" of the Federal Rules to "assess whether the discovery sought is overbroad or unduly burdensome."  *Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015); *In re Vale S.A.*, No. 20-mc-199 (JGK) (OTW), 2021 WL 311236, at *2–5 (S.D.N.Y. Jan. 29, 2021) (Wang, M.J.) (examining the fourth *Intel* factor in light of cases interpreting Federal Rules of Civil Procedure 26 and 45).  "[D]iscovery is limited to matters that are 'relevant' to a claim or defense and 'proportional to the needs of the case.'"  *La Belle v. Barclays Capital Inc.*, No. 19-cv-3800 (JPO) (GWG), 2020 WL 1879115, at *1 (S.D.N.Y. Apr. 15, 2020) (quoting Fed. R. Civ. P. 26(b)(1)).  Non-parties subject to a subpoena are additionally protected by Rule 45, which requires that parties "avoid imposing undue burden or expense on a person subject to the subpoena."  *Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 492 (S.D.N.Y. 2014)).  The Proposed Subpoena is unduly burdensome and intrusive in multiple ways.

First, the Proposed Subpoena's document requests are vastly overbroad.  The Proposed Subpoena purports to require K2 to produce "every document that is in [its] possession, custody, or control, or that is in the possession, custody, or control of [its] principals, agents, employees, attorneys, representatives, insurers, and any other persons or entities acting on [its] behalf."  Proposed Subpoena Instruction No. 1.  Mr. Batbold requests "all documents and communications" concerning *twenty* persons or subjects.  *Id.* Document Request Nos. 1–12, 14–16, and 19–23.  The requests "are not limited in any way by geography."  *Id.* Instruction No. 11.  They are also not meaningfully limited in time, extending "from January 1, 2000 through present."  *Id.*  Courts in this District have repeatedly held requests of similar scope to be

22

overbroad, particularly in the context of a non-party subpoena.  *See, e.g.*, *Morelli v. Alters*, No.

19-cv-10707 (GHW), 2020 WL 6508858, at *6 (S.D.N.Y. Nov. 5, 2020) (quashing subpoenas

asking for "any and all documents and communications" because the subpoenas make

"substantially overbroad" requests that are "disproportionate to the needs of the case" and are

therefore the "epitome of the classic 'fishing expedition'"); *Henry v. Morgan's Hotel Grp., Inc.*,

No. 15-cv-789 (ER) (JLC), 2016 WL 303114, at *2 (S.D.N.Y. Jan. 25, 2016) (quashing a

nonparty subpoena because "[b]lanket requests" for "all documents and communications . . . are

plainly overbroad and impermissible") (collecting cases); *Stinson v. City of New York*, No. 10-

cv-4228 (RWS), 2015 WL 4610422, at *5 (S.D.N.Y. July 23, 2015) ("[R]equiring a search of

every email or electronic file kept by each custodian over the entire time period at issue—more

than ten years . . . —would be unreasonably burdensome.").

         More fundamentally, the information Mr. Batbold seeks is of little, if any,

relevance to the Mongolian Proceedings, the only foreign action that meets the requirements of

the statute.  *Supra* at I(A).  Notably, Mr. Batbold does not identify any specific facts that he

needs to discover from K2 that pertain to the corruption allegations against him.  Rather, as he

openly admits, Mr. Batbold seeks information from K2 for to support his unfounded argument

that K2's Mongolia Investigation is a "politically motivated sham." Doc. 2 at 4.  Such a fishing

expedition—one whose primary purpose appears to be political rather than legal—is improper in

a section 1782 application.  *See In re Tiberius Grp. AG*, No. 19-mc-467 (VSB), 2020 WL

5535272 at *5 (S.D.N.Y. Sept. 14, 2020) (collecting cases where section 1782 applications were

denied as "fishing expeditions" because the requests for discovery were "attenuated from the

merits of the foreign litigation").

23

Finally, as discussed above, much of the information Mr. Batbold seeks is
protected by a legally applicable privilege.  *See supra* at I(B).  A section 1782 application is
unduly intrusive or burdensome when it seeks information that is privileged. *See  In re Shervin
Pishevar*, 439 F. Supp. 3d 290, 305–06 (S.D.N.Y. 2020).  Notably, even where requests include
some non-privileged information, the need to conduct a massive privilege review weighs against
granting the application.  *In re Okean B.V. & Logistic Sol. Int'l*, 60 F. Supp. 3d 419, 432–33
(S.D.N.Y. 2014) (finding that the burden associated with translating and reviewing tens of
thousands of documents for privilege "easily outweighs the other *Intel* factors" and "compels
denial of [the] § 1782 application").  That is emphatically the case here.

### D.    Mr. Batbold Should Be Required to Provide Reciprocal Discovery

By pursuing discovery through this Application rather than in any of the actions
to which he is party, Mr. Batbold is attempting to gain asymmetrical access to information in the
foreign litigations; to obtain American-style discovery "for me but not for thee."  The Court
should not grant Mr. Batbold this unfair advantage.  As the Supreme Court has noted, it is often
appropriate to "condition [1782] relief upon [the applicant's] reciprocal exchange of
information."  *Intel*, 542 U.S. at 262;  *Sampedro v. Silver Point Capital, L.P.*, 958 F.3d 140, 144–
45 (2d Cir. 2020) (holding that it is within a district court's "broad discretion to grant or deny
reciprocal discovery" when considering a section 1782 application); *Minatec Fin. S.A.R.L. v. SI
Group, Inc.*, No. 08-cv-269 (LEK) (RFT), 2008 WL 3884374, at *9 (N.D.N.Y. Aug. 18, 2008)
("Consistently, the Second Circuit and the Supreme Court, have suggested that a district court
could condition relief [under 28 U.S.C. § 1782] upon a reciprocal exchange of information, as
such would lend parity to the disclosure mix.").  Although the Application should be denied for
the reasons given above, any grant should be conditioned on Mr. Batbold's agreement to provide

24

reciprocal discovery regarding the allegations against him.  *See, e.g, Minatec*, 2008 WL 3884374 at *9 (ordering reciprocal discovery of a Luxembourg corporation that applied for discovery of a New York corporation under section 1782); *Consorcio Minero, S.A. v. Renco Grp., Inc.*, No. 11-mc-354, 2012 WL 1059916, at *4 (S.D.N.Y. Mar. 29, 2012) (ordering reciprocal discovery because the fact that the target of a section 1782 action "cannot initiate its own Section 1782 action [against the applicant] because [the applicant] is a Peruvian company and not found in any district in the United States" is a factor that "favors granting a condition of reciprocal discovery").

K2 suspects that a condition of reciprocity would be tantamount to denying the Application, since Mr. Batbold is unlikely to submit to document discovery and depositions in the United States.  If Mr. Batbold is unwilling to agree to reciprocal discovery, however, that would only further demonstrate that the Application should be denied.  If Mr. Batbold believes that discovery of him should take place in Mongolia, so too should his discovery of the Mongolian prosecutors' case against him.  The parties to the Mongolian Proceedings should not be subject to two different sets of discovery rules.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Mr. Batbold's Application.

Dated:  May 3, 2021

Respectfully submitted,

 _/s/ Geoffrey Potter_____
Geoffrey Potter
Aron Fischer
Jake Walter-Warner
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

25

12656358

Telephone: 212-336-2000
Facsimile: 212-336-2222
gpotter@pbwt.com
afischer@pbwt.com

*Counsel for K2 Integrity*