UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| IN RE APPLICATION OF SUKHBAATAR BATBOLD FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 | : | |
| | : | 21-mc-000218-RA-OTW |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - X

**DECLARATION OF CHUA SUI TONG IN SUPPORT OF
K2 INTEGRITY'S MEMORANDUM OF LAW IN OPPOSITION TO SUKHBAATAR
BATBOLD'S APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

I, Chua Sui Tong, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

### INTRODUCTION

1. I am a solicitor duly admitted to practice in Singapore and a partner at REV Law LLC. I am counsel for the Agency for Policy Coordination on State Property (the "Agency"), Erdenet Mining Corporation ("Erdenet"), and Erdenes Oyu Tolgoi LLC ("EOT") ("Mongolian Claimants") in respect of proceedings in the High Court of the Republic of Singapore ("Singapore Proceedings"). I submit this Declaration in support of K2 Intelligence's ("K2") memorandum of law in opposition to Sukhbaatar Batbold's application for an order pursuant to 28 U.S.C. § 1782 (the "Application").

### THE SINGAPORE PROCEEDINGS

2. On November 26, 2020, the Mongolian Claimants filed an action in the High Court of the Republic of Singapore against Mr. Batbold, a former Mongolian prime minister, and certain individuals and entities affiliated to him, seeking (among other things) a freezing injunction over certain assets in Singapore which are legally held by Mr. Batbold's proxies, it is

believed, for Mr. Batbold's benefit and on Mr. Batbold's behalf. The Mongolian Claimants allege that Mr. Batbold corruptly misappropriated for his personal benefit significant funds rightfully belonging to them in connection with transactions concerning two of the most valuable and prized natural resources in Mongolia, the Erdenet and Oyu Tolgoi mines. The Mongolian Claimants seek damages, by reference to either the actual loss suffered as a result of any secret profits paid and received, or the loss of opportunity caused by the defendants' conduct (alternatively, equitable compensation). The freezing injunction sought and obtained in the Singapore Proceedings is (broadly speaking) comparable to a pre-judgment attachment of assets in Singapore in support of a future judgment in the Singapore Proceedings.

3.  In support of their allegations in the Singapore Proceedings, the Mongolian Claimants submitted affidavits from Jules B. Kroll, the chairman and co-founder of K2 (the "K2 Affidavits"). The K2 Affidavits, which were accompanied by extensive supporting documentation and contained over 1,000 citations to documentary evidence, lay out in great detail evidence establishing that the Mongolian defendants (including Mr. Batbold), through a series of illegal and fraudulent transactions related to the Erdenet and Oyu Tolgoi mines have caused harm to the Mongolian Claimants, and by extension, to the people of Mongolia. After executing these transactions and diverting assets belonging to the Mongolian Claimants to accounts within their own control, the Mongolian defendants further transferred, disguised, and concealed the ownership of their ill-gotten gains, including through the use of a complex network of offshore and onshore corporate structures and proxies across numerous jurisdictions, ultimately for the personal benefit of Mr. Batbold and his family members.

4.  On November 27, 2020, the Singapore court issued a freezing injunction against Mr. Batbold, three of his proxies, and several shell companies up to a value of $1 million (the

"Freezing Injunction"). A true and correct copy of the order relating to the Freezing Injunction is attached hereto as Exhibit A.

5. Once the Singapore Court issued the Freezing Injunction, and Mr. Batbold and his proxies were given notice of the Singapore Proceedings, Mr. Batbold and his proxies appeared in the proceedings through counsel. Mr Batbold is represented by the Singapore law firm WongPartnership LLP. Mr. Batbold is and has been entitled to apply to set aside the Freezing Injunction, including on the basis that information contained in the K2 Affidavits (and their supporting evidence) do not establish a good arguable case against him, and - if so minded - to apply to cross-examine Mr. Kroll of K2 at the appropriate time. However, Mr. Batbold has not availed himself of either opportunity. Instead, on February 17, 2021, Mr. Batbold applied to stay the Singapore Proceedings pending the final outcome of the Mongolian Proceedings. On March 5, 2021, Mr. Batbold and the Mongolian Claimants entered into a Consent Order providing that the Freezing Injunction should continue in place until further order of the Singapore Court or either party successfully applies to the Singapore Court for it to be lifted. A true and correct copy of the Consent Order is attached hereto as Exhibit B.

6. One of Mr. Batbold's proxies and one of his shell companies, Eoin Barry Saadien ("Mr Saadien") and Everest VC Pte Ltd ("Everest"), are defendants in the Singapore Proceedings. They filed an application to discharge the Freezing Order against them on January 22, 2021. One of their primary arguments was that the Singapore Proceeding had been filed without authorization. The Singapore Court rejected that argument. The Singapore Court determined — based on documentary evidence, the testimony of both King & Spalding ("K&S") and the Prosecutor General of Mongolia, and as a matter of Mongolian law — that K&S has been duly authorized by the Prosecutor General of Mongolia to act on behalf of each of the

Mongolian Claimants (all of which are state-owned entities) in connection with this dispute. A true and correct copy of the Singapore Court's February 26, 2021 decision is attached hereto as Exhibit C.

7. The Singapore Court found that K&S had been expressly authorized to act on behalf and in the name of the Petitioners in connection with this dispute by engagement letter issued by the Deputy General Prosecutor and Vice Counsel on Legal Matters of the Metropolitan Prosecutor's Office of Mongolia ("MPOM"), and that Article 20 of the Mongolian Law on Prosecutor authorizes the Prosecutor General of MPOM to bring claims on behalf of a state organization "on his/her own initiative" "if he/she deems that the public interest has been violated" and may do so "without a power of attorney." Ex. C, ¶¶ 8–9, 26-31. Accordingly, the Singapore Court found that "MPOM is empowered under the Mongolian Law of Prosecutor to instruct K&S to bring proceedings outside Mongolia, including Singapore, in support of the Mongolian Claim and otherwise." *Id*. ¶ 36.

8. The Singapore Court later discharged the Freezing Injunction <u>only</u> as against Mr Saadien and Everest (i.e. it remains in place as against the other defendants, including Mr Batbold). The judge found that there was a "good arguable case" on the merits against Mr Saadien. However, he determined that there was insufficient risk that Mr Saadien himself would dissipate his assets (such that a freezing injunction was required). The grounds for the discharge are entirely specific to Mr Saadien, and cannot be applied to Mr Batbold or the defendants, against whom the Freezing Injunction remains in full force and effect. A true and correct copy of the Singapore Court's April 16, 2021 decision is attached hereto as Exhibit D.

4

**MR. BATBOLD'S APPLICATION**

9. I have reviewed the declaration of Yufei Wang of WongPartnership LLP in support of Mr. Batbold's Application. In her declaration, Ms. Wang asserts that Mr. Batbold has reserved the right to apply to the High Court of Singapore to lift the Freezing Injunction and Consent Order and that, as a result, the discovery sought from K2 in the present Application would be relevant to the Singapore Proceedings. But while it is true that Mr. Batbold has reserved the right to make such an application in the future, no such application is pending. Rather, no further proceedings in relation to Mr. Batbold are contemplated in the Singapore Court prior to the resolution of the Mongolian Proceedings. Accordingly, the discovery sought by Mr. Batbold here is not of any present relevance to the Singapore Proceedings.

10. The purported defences that Ms. Wang states that Mr. Batbold would make based on the requested evidence have in fact always been available to Mr. Batbold, yet he has thus far declined to pursue them in the Singapore Proceedings. For example, Mr. Batbold could have applied to the Singapore Court to set aside the Freezing Injunction and to cross-examine Mr. Kroll on the funding and authorization of his investigation in the Singapore Proceedings. Indeed, as noted above, Mr. Batbold's co-defendants did attempt to bring a similar challenge to the Mongolian Claimants' authority and were unsuccessful. Mr. Batbold has made no such application. This is not surprising, since it is unlikely that the Singapore Court would consider K2's funding or source of authority to be material given the very significant volume of documentary evidence that has been submitted on the question of Mr. Batbold's wrongdoing.

11. Furthermore, although Ms. Wang speculates that K2 may be in possession of exculpatory information regarding the transactions at issue in the Singapore Proceedings, Mr. Batbold is surely in possession of information concerning his and his family's own control, use

5

and/or ultimate beneficial ownership (or lack thereof) of the assets in question. Mr. Batbold did not and does not require document discovery from K2 to challenge K2's allegations about his own affairs. Yet, some 5 months after injunctive relief was secured against him, Mr. Batbold and his proxies have chosen not to challenge K2's allegations in the Singapore Proceedings.

12. If Mr. Batbold were to apply to set aside the Freezing Injunction, I am not aware of any jurisdictional impediments to his obtaining disclosure from K2 in connection with the Singapore Proceedings. Mr. Kroll of K2 has subjected himself to the jurisdiction of the Singapore courts by submitting an affidavit in the Singapore Proceedings and may be subject to cross-examination in Singapore, upon application. Whatever limitations may exist on Mr. Batbold's ability to obtain discovery from K2 in Singapore result from the rules of Singapore civil procedure, not from any geographical or jurisdictional constraints.

13. Notably, Singapore civil procedure affords the same level of discovery to claimants and defendants. While civil disclosure is generally more limited in Singapore than I understand civil discovery is in the United States, such limitations apply equally to the Mongolian Claimants and to Mr. Batbold. Permitting Mr. Batbold to have American-style discovery of K2 without subjecting himself to a similar level of discovery would result in asymmetrical access to information among the parties to the Singapore Proceedings.

Executed on 28 April 2021 in Singapore.

_____
Chua Sui Tong