# Tong Exhibit D

**IN THE GENERAL DIVISION OF
THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

**[2021] SGHC 91**

Suit No 1145 of 2020 (Summons No 5541 of 2020)

Between

(1) The Agency for Policy
    Coordination on State Property
    of Mongolia
(2) Erdenet Mining Corporation
    LLC
(3) Erdenes Oyu Tolgoi LLC

… *Plaintiffs*

And

(1) Batbold Sukhbaatar
(2) Cheong Choo Young
(3) Kim Hak Seon
(4) Cliveden Trading AG
(5) Eoin Barry Saadien
(6) Everest VC Pte Ltd
(7) Ponduver Pte Limited

… *Defendants*

# JUDGMENT

[Civil Procedure] — [Mareva injunctions]

> This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

## The Agency for Policy Coordination on State Property of Mongolia and others
v
## Batbold Sukhbaatar and others

**[2021] SGHC 91**

General Division of the High Court — Suit No 1145 of 2020 (Summons No 5541 of 2020)
Philip Jeyaretnam JC
22 January, 5 February, 3 March 2021

16 April 2021                                                                 Judgment reserved.

**Philip Jeyaretnam JC:**

**Introduction**

1       When a government official or a corporate controller or officer makes secret profits from contracts let by that government or corporation, there are likely to be efforts to conceal what is being done. Such efforts may well involve others, whose degree of complicity and knowledge will vary. The effective interdiction of such a fraudulent scheme necessarily requires proceedings not only against the principal wrongdoer but also against those who have assisted in the scheme and who may continue to hold assets or funds into which the defrauded organisation may seek to trace. Funds may well flow across borders, so as to be better concealed. For this reason, proceedings brought by that organisation are likely to happen in more than one jurisdiction, and against multiple persons. The causes of action invoked in a common law jurisdiction

*The Agency for Policy Coordination on State* [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

would typically include breach of fiduciary duty, dishonest assistance in those breaches and knowing receipt of the proceeds of such breaches, as well as the tort of unlawful means conspiracy.

2       When freezing orders are sought in Singapore in support of proceedings which are brought elsewhere, additional parties may be added. The court must scrutinise whether there exists a good arguable case against such additional parties, or alternatively whether they are properly joined as entities holding assets of the alleged wrongdoer into which the plaintiff seeks to trace. While a plaintiff may consider it necessary to cast the net wide, the court must guard against hapless bycatch. The effect of a freezing order is potentially crippling, with rippling reputational impact.

3       On 26 February 2021, in *The Agency for Policy Coordination on State Property of Mongolia and others v Batbold Sukhbaatar and others* [2021] SGHC 50, I ruled that the solicitors on record for the plaintiffs had authority to act. Thus, the summons filed on 18 December 2020 by the fifth and sixth defendants for discharge of the freezing order granted against them on 27 November 2020 proceeded for hearing before me on 3 March 2020.

4       At the hearing, the main argument pressed by counsel for the fifth and sixth defendants was that no good arguable case had been established against the fifth defendant, and so the injunction should be discharged against both him and the company in which he holds shares, the sixth defendant. In addition, in his written submissions, he challenged the claim that there was any real risk of dissipation and asserted that there had been material non-disclosure that tainted the original grant of the freezing order. He also contended that the net had been cast so as to include his clients only in order to construct jurisdiction over the

*The Agency for Policy Coordination on State*          [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

other defendants. He argued that this was a collateral purpose that rendered the proceedings against the fifth and sixth defendants an abuse of process. Lastly, he contended that the undertaking as to damages was illusory.

**Brief procedural history**

5       The first plaintiff is an agency of the Government of Mongolia, the Agency for Policy Coordination on State Property (the "Agency"). The Agency owns 100% of Erdenet Mining Corporation LLC ("Erdenet Mining"), a company incorporated in Mongolia, which is the second plaintiff. The second plaintiff holds the Mongolian State's interest in the Erdenet copper mine. The third plaintiff, Erdenes Oyu Tolgoi LLC, is also owned by the Government of Mongolia. It holds the Mongolian State's interest in a copper and gold mine, known as Oyu Tolgoi.[1]

6       The Metropolitan Prosecutor's Office of Mongolia ("MPOM") filed a civil case on behalf of the plaintiffs against the first defendant and others before the Bayanzurkh District Civil Court of First Instance in Mongolia, initiated on 14 October 2020, with the case being opened on 28 October 2020 by Judicial Decree No. 101/SHZ2020/20219 (the "Mongolian Claim").[2] This has been followed by proceedings elsewhere, including in New York and Hong Kong on behalf of and in the name of the plaintiffs.

7       MPOM's core complaint alleges that the first defendant, who was Prime Minister of Mongolia from October 2009 to August 2012, has made substantial secret profits from contracts awarded in relation to each of the Erdenet and Oyu

---

[1]    Statement of Claim ("SOC") at paras 1–2.

[2]    Affidavit of Nyamdorj Sharavdorj dated 28 January 2021 at para 38.

3

*The Agency for Policy Coordination on State*        [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

Tolgoi mines. On 27 November 2020 the plaintiffs obtained a freezing order in these proceedings in support of the Mongolian Claim against the defendants. The fifth defendant, one Eoin Barry Saadien, is a director and one-third shareholder of the sixth defendant, Everest VC Pte Ltd, a company incorporated in Singapore. The remainder of the shareholding in the sixth defendant was owned by the second defendant until 20 February 2020, when he was replaced by another alleged proxy of the first defendant.[3] Neither of the fifth and sixth defendants is a defendant to the Mongolian Claim.

8     These proceedings have been stayed by consent against the first, second, third and seventh defendants with the freezing order to remain in force against them until further order. This is because the merits of the claims against those defendants will be determined in the Mongolian Claim. In relation to the fifth and sixth defendants, however, the merits of the claim against them will be determined in these proceedings.

**The case against the fifth and sixth defendants**

9     The case against the fifth defendant arises from his involvement with the fourth defendant, Cliveden Trading AG ("Cliveden"), as well as his relationship with the second and third defendants. The pleaded case against the fifth defendant is for damages or equitable compensation to be assessed by reference to the secret profits said to have been earned by the first defendant from contracts between Cliveden and Erdenet Mining, or the loss of opportunity allegedly resulting from the Agency and Erdenet Mining having been deprived

---

[3]     Affidavit of Jules B. Kroll dated 26 November 2020 ("Kroll 1") at para 108.1, n 178.

4

*The Agency for Policy Coordination on State*     [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

of the right to sell on the open market.[4] The causes of action are in unlawful means conspiracy[5] and dishonest assistance.[6]

10      Cliveden was incorporated on 9 December 2011. Less than a week later, it secured the first of two contracts with Erdenet Mining. The second was in September 2016. These contracts were for the purchase of copper concentrates. Between 2012 and 2019, Erdenet Mining made deliveries totalling 131,517.47 wet metric tonnes, at a cost of approximately US$164 million.[7] The plaintiffs invited the court to infer that that these copper concentrates were then resold at a profit. This was what the plaintiffs referred to as the "Erdenet Mine Scheme", by which the first defendant and his proxies were allegedly enriched in contravention of Mongolian law.[8] However, the plaintiffs did not tender evidence of what Cliveden did with the copper concentrates it had purchased, nor any evidence which showed that the contracts were at an undervalue.

11      The fifth defendant only became a director of Cliveden on 14 February 2013. He was appointed a day after the third defendant resigned as its director. He served as a director until 28 June 2018. He has also been a director of a Hong Kong company called Ever Global Trading Limited ("Ever Global") since 1 January 2013.[9] The third defendant is the sole shareholder of Ever Global, and has been since 13 December 2011. On 26 January 2012, Ever Global purchased

---

[4]     SOC at paras 20–23, 36–37.
[5]     SOC at para 30.
[6]     SOC at para 34.
[7]     Kroll 1 at paras 56–61.
[8]     SOC at paras 16–26.
[9]     Kroll 1 at para 110.3, n 188, and Appendix E.

*The Agency for Policy Coordination on State*                  [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

56% of the shares in Cliveden. At some point in 2016, Ever Global divested those shares.

12    During the time that the fifth defendant was a director of Cliveden, Erdenet Mining delivered just under US$50 million in copper concentrates to Cliveden.[10] He was a director of Cliveden when the second contract between Cliveden and Erdenet Mining was made.

13    In addition, the plaintiffs produced evidence that the fifth defendant's email addresses had been in contact with those of the first defendant, the first defendant's son, the second defendant and the third defendant.[11] The method of analysis adopted does not pinpoint dates or contents of email communications.

14    The plaintiffs do not assert a substantive cause of action against the sixth defendant. Instead, it is joined on the ground that it is a corporate vehicle used to conceal or disguise the proceeds of the fraudulent scheme, and that the assets in its name are held for and on behalf of one or more of the first to fifth defendants.

**The fifth defendant's response**

15    The fifth defendant has made two affidavits in support of his and the sixth defendant's applications to discharge. They are suffused with considerable indignation at having been drawn into these proceedings, and, in addition to responding to the specific allegations of his involvement as an alleged proxy of the first defendant, they also paint a picture of his good standing in the

---

[10]    Affidavit of Sarah Yasmin Walker dated 8 January 2021 at para 28.1.

[11]    Kroll 1 at pp 938, 940–942.

*The Agency for Policy Coordination on State*            [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

community, his respectable career as a banker, his status as a family man and his having put down roots in Singapore. He asserts that he "had absolutely no involvement in the *'Cliveden Contracts'* other than by reason of being a director" [emphasis in original].[12] He describes the second defendant as a business partner and friend, whom he first met sometime in 2009 in Mongolia, and their business relationship as limited to his directorship in Ever Global and Cliveden, and the formation of the sixth defendant.[13] In relation to the formation of the sixth defendant he notes that it was originally set up for a *bona fide* business in emerging stem cell therapies initially involving a third shareholder and director who subsequently divested.[14] He says that since then, there has been no business activity, and it has not been struck off only because he and the second defendant thought that they might consider other business opportunities using it.[15] He admits to a cordial, arm's-length relationship with the eldest son of the first defendant[16] and to having met the first defendant once.[17]

16    To put it simply, everything the fifth defendant says is potentially consistent with his just being in the wrong place at the wrong time. At the same time, it is equally clear that he has played certain roles at the request of the second defendant that make it plausible that his involvement is not merely as an innocent bystander.

---

[12]    Affidavit of Eoin Barry Saadien dated 18 December 2020 ("Saadien 3") at para 8.

[13]    Saadien 3 at para 8(d).

[14]    Saadien 3 at paras 44, 47.

[15]    Saadien 3 at para 48.

[16]    Saadien 3 at para 62.

[17]    Saadien 3 at paras 55–56.

*The Agency for Policy Coordination on State*                  [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

**The test of a good arguable case**

17    A good arguable case has to be "more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent chance of success": *Ninemia Maritime Corporation v Trave Schiffahrtgesellschaft mbH und Co KG (The Niedersachsen)* [1983] 2 Lloyd's Rep 600 at 605 *per* Mustill J, cited by Menon CJ in *Bouvier, Yves Charles Edgar and another v Accent Delight International Ltd and another and another appeal* [2015] 5 SLR 558 ("*Bouvier*"), at [36].

18    In assessing whether there is a good arguable case, the characteristics of the cause of action invoked are important. It is in the nature of some claims, such as those in conspiracy, that they will ultimately be proved by circumstantial rather than direct evidence. The Court of Appeal in *Asian Corporate Services (SEA) Pte Ltd v Eastwest Management Ltd (Singapore Branch)* [2006] 1 SLR(R) 901, at [19], noted:

> 19    It is not often that the victim of a conspiracy will be able to obtain direct evidence to prove the allegation. Proof of conspiracy is normally to be inferred from other objective facts. As the English Court of Appeal said in *R v Siracusa* (1990) 90 Cr App R 340 at 349:
>
>> [T]he origins of all conspiracies are concealed and it is usually quite impossible to establish when or where the initial agreement was made, or when or where other conspirators were recruited. The very existence of the agreement can only be inferred from overt acts. Participation in a conspiracy is infinitely variable …

19    Whether there is a good arguable case is to be determined at the initial application for the freezing order and again at the hearing of the discharge application. By the time of the latter, the defendant will have had an opportunity to file explanatory or rebuttal evidence. While the burden remains on the plaintiff to establish that there is a good arguable case, the quality and

8

*The Agency for Policy Coordination on State*            [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

completeness of the defendant's explanation is important. A failure to explain or rebut some aspect of the plaintiff's evidence may strengthen the inference to be drawn against the defendant.

**Assessment of good arguable case**

20     The plaintiffs contend that there is a good arguable case because circumstantial evidence points to the fifth defendant's involvement in the Erdenet Mine Scheme as a proxy of the first defendant. They rely on a pattern of conduct involving three companies linked to the second and third defendants that were allegedly set up for the purpose of entering into contracts with Erdenet Mining as a means to divert profits from Erdenet Mining.[18] Only one of the three involved the fifth defendant, but the plaintiffs say that the apparent overall pattern strengthens the inferences against the fifth defendant.

21     The other defendants have consented, without admission of liability, to the continuance of the freezing orders against them. Thus, at this stage, they have chosen not to contest that there is a good arguable case against them. I have reviewed the evidence showing the pattern of conduct involving the three companies trading with Erdenet Mining, and accept that there is much to answer and explain. However, if the first defendant is allegedly at the centre of the conspiracy, and the second and third defendants in his inner circle, the fifth defendant is only in an outer circle of potential responsibility.

22     Nonetheless, there is sufficient evidence implicating the fifth defendant to establish a good arguable case. It may indeed turn out that his involvement has been entirely innocent, but at this stage of proceedings the plaintiffs have

---

[18]    Plaintiffs' written submissions dated 19 January 2021 at paras 27–28, 57.

9

*The Agency for Policy Coordination on State*      [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

crossed the threshold of a case that is more than barely capable of serious argument.

23    The sixth defendant is in a different position. It appears to be dormant, having initially been set up for what appears to have been an unrelated and *bona fide* business purpose. There is no evidence of its having been used to hold or conceal assets deriving from the Erdenet Mine Scheme. There is insufficient evidence to find a good arguable case that it is a proxy of the second and fifth defendants in connection with the claim of secret profits against the first defendant.

**Real risk of dissipation**

24    The plaintiffs essentially rely on the existence of a good arguable case that the fifth defendant is involved in the Erdenet Mine Scheme, and so potentially liable in conspiracy or dishonest assistance. They refer to the Court of Appeal decision in *Bouvier* for the proposition that one may legitimately infer a real risk of dissipation from a good arguable case of dishonesty on the merits where the alleged dishonesty is of such a nature that it has a real and material bearing on the risk of dissipation. The plaintiffs do not appear to have any evidence other than the inference one might draw from the alleged dishonesty.

25    The Court of Appeal in *Bouvier* gave guidance at [94] concerning the relationship between an allegation of dishonesty and the existence of a real risk of dissipation:

> 94    In our judgment, a well-substantiated allegation that a defendant has acted dishonestly can and often *will*, as we have said, be relevant to whether there is a real risk that the defendant may dissipate his assets. But, we reiterate that in each case, it is incumbent on the court to examine the precise nature of the dishonesty alleged and the strength of the

*The Agency for Policy Coordination on State*     [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

> evidence relied on in support of the allegation, keeping fully in mind that the proceedings are only at an interlocutory stage … ***An allegation of dishonesty does not in itself form a substitute for an examination of the degree of risk of dissipation unless … that allegation is of a nature or characteristic that sufficiently bears upon the risk of dissipation.*** …
>
> [emphasis in original in italics; emphasis added in bold italics]

26    It is therefore critical to assess what inferences should be drawn from the nature and extent of the dishonest conduct alleged against the fifth defendant. In addition, the strength of the case against him must also be assessed. I start with the nature and extent of his alleged dishonesty. While it is true that the scheme considered as a whole appears elaborate, with multiple companies incorporated in numerous jurisdictions for the purpose of concealment, the fifth defendant's role has been simple and limited. He is not at the core of the alleged conspiracy but at its periphery. It is not his identity that has been concealed through the use of corporate vehicles. There is also no evidence that the alleged secret profits passed through either the fifth or sixth defendants.

27    Turning to the strength of the case against him, I would assess it at this stage as meeting the test of a good arguable case and not much more than that.

28    Given the limited role of the fifth defendant, and the moderate strength of the case against him, the fact that the causes of action, if successful, entail dishonesty on his part does not in itself compel an inference that there is a real risk of dissipation of assets by him, if the injunction does not continue against him.

11

*The Agency for Policy Coordination on State*                 [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

29    There is another factor to consider, which is the behaviour of a defendant upon becoming subject to a freezing order. As explained in *Bouvier* at [104], it is only in limited circumstances that arguments concerning the adequacy of the information provided under the ancillary disclosure orders will strengthen the inference of a real risk of dissipation. On the other side of the coin, candour and cooperation may help dispel concerns about a defendant's future conduct. In this case, the fifth defendant appears to have been candid and thorough in his disclosures, both for himself and for the sixth defendant. This swells the court's confidence that no real risk of dissipation should be inferred.

30    It is also important to bring into consideration the evidence given by the fifth defendant of his ties and roots in Singapore. This evidence was not substantively challenged by the plaintiffs. There is no suggestion that he will uproot from Singapore. Overall, the overwhelming likelihood is that he plans to stand his ground and contest the case against him. The court should be circumspect before continuing the strong restrictions of a freezing order.

31    As for the sixth defendant, there is likewise no evidence of risk of dissipation beyond the alleged dishonesty of the fifth defendant. While the sixth defendant is owned by both the second and the fifth defendant, there is no evidence of its having held or concealed assets traceable to the Erdenet Mine Scheme. Indeed, it currently seems to have very little money in its bank account.

32    In all the circumstances, I decline to hold that there is a real risk of dissipation on the part of the fifth and sixth defendants. Accordingly, I will discharge the freezing orders made against them.

*The Agency for Policy Coordination on State*                  [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

**Other matters raised**

33      For completeness, I add that I do not accept that there was any material non-disclosure on the part of the plaintiffs in obtaining the initial freezing order *ex parte*. There were three principal non-disclosures relied upon. The first concerned the nature and signatories of the contracts between Cliveden and Erdenet Mining.[19] I accept that these were matters of emphasis and characterisation, rather than instances of culpable non-disclosure. Nor were they truly material. The details were in the documents exhibited but not brought to the attention of the court during the *ex parte* hearing. The second concerned developments in the New York proceedings after the *ex parte* hearing.[20] While in principle, post-hearing developments that undermine the basis on which an *ex parte* order is given should be drawn to the court's attention, at least while the proceedings remain on an *ex parte* basis, I do not accept that the developments in the New York proceedings were sufficiently material or unequivocal so as to necessitate their being raised to the court. In my view, they have no bearing on whether the freezing order should be continued in Singapore. Thirdly, the fifth defendant contended that the plaintiffs had misleadingly labelled the fifth defendant as a proxy of the first defendant and a "key conspirator" for the purpose of the *ex parte* hearing, without sufficiently drawing to the court's attention that the fifth defendant was not even mentioned in pleadings for the Hong Kong proceedings or in the Mongolian Claim.[21] Again, this does not rise to the level of a culpable or material non-disclosure.

---

[19]    Fifth and sixth defendant's written submissions dated 19 January 2021 ("DWS") at paras 238–242.

[20]    DWS at paras 243–245.

[21]    DWS at paras 246–249.

13

*The Agency for Policy Coordination on State*            [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

34     I also do not accept that the plaintiffs have acted in abuse of process. The fifth defendant has contended that he and the sixth defendant were sued for the collateral purpose of founding jurisdiction against the non-Singapore entities, by virtue of their being necessary and proper parties.[22] There was no direct evidence of any such collateral purpose, and the argument depended on drawing an inference from the asserted weakness of the claim against the fifth defendant. Given my finding that the plaintiffs do have a good arguable case against the fifth defendant, I would not draw any such inference. The plaintiffs were entitled in good faith to commence proceedings against the fifth defendant in Singapore; there was no abuse of process.

35     Lastly, had I not decided as I have on the question of risk of dissipation, I would have ordered fortification of the undertaking in the sum sought. This would have been for two cumulative reasons. First, the plaintiffs do not appear to have assets within the jurisdiction. Secondly, enforcing a judgment in respect of the undertaking on damages might not be straightforward in Mongolia.

**Conclusion**

36     I therefore discharge the freezing order as against the fifth and sixth defendants only.

---

[22]    DWS at paras 73–84.

14

*The Agency for Policy Coordination on State*     [2021] SGHC 91
*Property of Mongolia v Batbold Sukhbaatar*

37    I will hear parties both on whether there should be an inquiry into damages and on costs. The plaintiffs and the fifth and sixth defendants are to file submissions limited to 20 pages each as a combined page limit for both these matters within 14 days, and thereafter appear before me.

*Philip Jeyaretnam*
Philip Jeyaretnam
Judicial Commissioner

Chua Sui Tong, Abigail Tang En-Ping and Wong Wan Chee (Rev Law LLC) for the plaintiffs;
Wang Yufei (WongPartnership LLP) for the first defendant (watching brief);
Yap Zhe You, Ryo (Rajah & Tann Singapore LLP) for the second, third and seventh defendants (watching brief);
The fourth defendant absent and unrepresented;
Quahe Cheng Ann Lawrence and Joel Raj Moosa (Quahe Woo & Palmer LLC) for the fifth and sixth defendants.

Certified True Copy
Manager, Judge's Chambers
Supreme Court Singapore

15