# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF SUKHBAATAR BATBOLD FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:21-MC-00218-RA-OTW |

## SECOND DECLARATION OF SARAH YASMIN WALKER

I, SARAH YASMIN WALKER, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a solicitor duly admitted to practice in England & Wales and a partner at King & Spalding International LLP ("King & Spalding"). My firm has been retained to act for the Agency for Policy Coordination on State Property (the "Agency"), Erdenet Mining Corporation ("Erdenet"), and Erdenes Oyu Tolgoi LLC ("EOT") ("Mongolian Claimants") in respect of injunctive proceedings in the English High Court in London, England ("English Proceedings"). My firm has served throughout as coordinating counsel for the Mongolian Claimants in connection with related litigation proceedings pending in several other jurisdictions.

2. This is my second declaration in this proceeding. I am the same Sarah Yasmin Walker who gave a declaration in this proceeding on May 3, 2021 ("Walker 1"). Since my first declaration, I understand that this Court has granted Petitioner Sukhbaatar Batbold ("Mr. Batbold")'s application pursuant to 28 U.S.C. Section 1782, and has recently ordered K2 Integrity ("K2") to produce or log various documents. I make this second declaration to address the court on matters of English privilege law that protect the disclosure of several classes of documents that Mr. Batbold seeks.

3. In this declaration, among other things, I provide background about King & Spalding's representation of the Prosecutor General of Mongolia ("PGOM") and the Independent

Authority Against Corruption ("IAAC") in order to explain why the documents sought are privileged. However, nothing in this declaration is intended to waive privilege or in fact does so.

I. THE BACKGROUND TO THE UNDERLYING PROCEEDINGS

4. In or around September 2018, my firm began assisting the PGOM and the IAAC in their efforts to trace and recover assets misappropriated from Mongolia by entities and individuals in connection with transactions involving key mining assets in Mongolia. This assistance was memorialised in the Asset Recovery Services Agreement that was concluded on behalf of the PGOM by the former Prosecutor General of Mongolia on September 17, 2018.

5. From the outset, the very purpose of involving King & Spalding was to assist the PGOM and the IAAC with the recovery of assets via litigation. In other words, from the very beginning of King & Spalding's involvement in this matter, we have worked with the PGOM, the IAAC and K2 in anticipation of litigation. Indeed, on August 6, 2019, the current Prosecutor General of Mongolia signed and executed (on the PGOM's behalf) an amendment to the ARSA, thereby agreeing to advance USD 1 million to assist with the payment of local counsel.

6. After an initial review of several public officials in Mongolia who were believed to have been involved in wrongdoing relating to Mongolia's mining assets, a focus was placed on wrongdoing committed by Mr. Batbold, among other things, because of the sheer apparent scale of the value of assets he appeared to have wrongfully accumulated – but not disclosed – while he was Prime Minister of Mongolia. During this time, and in light of the evidence that we reviewed, King & Spalding worked closely with the PGOM, the IAAC and K2 to devise a legal strategy that would lead to the recovery of these stolen assets for the Mongolian people.

7. In October 2020, with King & Spalding's support, the PGOM prepared and filed a civil claim on behalf of the Mongolian Claimants before the First Instance Court of Bayanzurkh District in Mongolia (the "Mongolian Proceedings"). As I explained in Walker 1, in the

    Mongolian Proceedings, the Mongolian Claimants alleged that Mr. Batbold corruptly misappropriated for his personal benefit significant funds rightfully belonging to the Mongolian Claimants in connection with transactions concerning two of the most valuable and prized natural resources in Mongolia: the Erdenet and Oyu Tolgoi mines. ECF 35, ¶ 2.

8. On November 6, 2020, the PGOM provided King & Spalding with clear written confirmation of its standing instruction to seek to freeze assets beneficially owned by Mr. Batbold. Those instructions were confirmed by the PGOM, among other things, through letters, e-mails and other correspondence with Ts. Nasanbat (former Deputy Prosecutor General of the Metropolitan Prosecutor's Office ("**MPO**")), and Sh. Nyamdorj (former Prosecutor General of the MPO), as well as in sworn affidavits that were filed in courts in Singapore, Hong Kong, and New York. ECF 32B, 34.

9. Between late 2020 and early 2021, and in accordance with the PGOM's instructions, King & Spalding proceeded to secure on behalf of the Claimants and against Mr. Batbold and various of his proxies (i) injunctive relief/undertakings to hold assets in excess of USD 70 million that Mr. Batbold beneficially owns around the world, and (ii) a disclosure order from the BVI Court against various corporate service providers that managed assets on behalf of Mr. Batbold and/ or his proxies.

10. Throughout this process – and, once again, without intending to waive privilege or in fact doing so – K2 has played a central and indispensable role in the PGOM and IAAC's asset recovery efforts. In particular, King & Spalding has worked closely with K2 to gather information in connection with Mr. Batbold's wrongdoing and the sophisticated web of proxies and shell companies that Mr. Batbold has deployed to hide the fruits of his wrongdoing. That information has been central to the legal advice that King & Spalding has provided to the PGOM and the IAAC, and in shaping the legal strategy that King & Spalding has put in place and executed on.

## II. ENGLISH LEGAL PROFESSIONAL PRIVILEGE PROTECTS THE DISCLOSURE OF DOCUMENTS SOUGHT BY MR. BATBOLD

11. King & Spalding, on behalf of the PGOM and the IAAC and (insofar as is relevant) on its own behalf, asserts to the fullest permissible extent all applicable privileges and protections, including without limitation English legal advice privilege, English litigation privilege, English common interest privilege, and the attorney work product protection as applicable under the United States Federal Rules of Civil Procedure. King & Spalding has instructed K2 accordingly.

12. We understood, and the PGOM and the IAAC would have understood, at all material times that communications with K2 and K2's work was undertaken for the sole or dominant purpose of litigation. Litigation was in contemplation at all material times in K2's investigation into corrupt wrongdoing in Mongolia, including that of Mr. Batbold, and materials and communications were created for the dominant purpose of bringing proceedings against Mr. Batbold. K2 has worked closely with King & Spalding, in our capacity as litigation counsel, since 2018. ECF 35 ¶ 12.

13. By way of background, "legal professional privilege," is recognized as a fundamental human right granted by the English common law.[1] The corollary of this right of the client is the duty of the lawyer to keep confidential and not to disclose to others information that is covered by legal professional privilege. Generally speaking, information that is covered by legal professional privilege cannot be subject to any order for compulsory production to another at all, unless there is an express statutory power, or one by implication, that requires it.[2]

14. There are two types of legal professional privilege in English law: (i) legal advice and (ii) litigation privilege.

    a. The purpose of the English legal advice privilege is to enable a client to place unrestricted confidence in their lawyer.[3] Legal advice privilege applies to

---

[1] *Winterthur Swiss Insurance Co v AG (Manchester) Ltd (in liquidation)* [2006] EWHC 839 (Comm), ¶ 65.
[2] *Winterthur Swiss Insurance Co v AG (Manchester) Ltd (in liquidation)* [2006] EWHC 839 (Comm), ¶ 65.
[3] *Three Rivers DC v Bank of England* [2004] UKHL 48.

        communications between lawyer and client, and which come into existence for the dominant purpose of giving or receiving legal advice about what should be done in a relevant legal context.

   b. The English litigation privilege is based on the principle that a litigant or potential litigant should be free to seek evidence without being obliged to disclose the result of their research to their opponent.[4] The rationale for this privilege rests on the principles of access to justice, the proper administration of justice, a fair trial and equality of arms.[5] As I explained in Walker 1, English litigation privilege applies to all communications (including documents) between parties (or their lawyers) and third parties made at a time when litigation was in reasonable contemplation and for the dominant purpose of obtaining advice or information.[6] ECF 35 ¶ 12.

15. The English legal advice and litigation privileges protect both communications and documents, including underlying source documents of the sort that Mr. Batbold seeks in this case.

16. First, while privilege would be lost over any source documents that are attached to, or relied on in, an affidavit provided in court proceedings,[7] as a matter of English law,[8] other source documents would remain privileged, even if they are copies of otherwise public documents. Allowing discovery into these matters would undermine the principles of access to justice and equality of arms that underpin the English litigation privilege; discovery of such materials would have a significant chilling effect on a client's ability to gather evidence, build its case and communicate freely with its counsel about the information that it has gathered.

---

[4] *Winterthur Insurance Company v AG (Manchester) Limited (in liquidation)* [2006] EWHC 839 (Comm), ¶ 68.
[5] *Winterthur Swiss Insurance Co v AG (Manchester) Ltd (in liquidation)* [2006] EWHC 839 (Comm), ¶ 68.
[6] *Starbev GP Ltd v Interbrew Central European Holding BV* [2013] EWHC 4038 (Comm), ¶ 11.
[7] *See* Colin Passmore, *Privilege* (4th edn, Sweet & Maxwell 2020), ¶ 7-223. Among other things, English Civil Procedure Rule 31.14 gives the opposing the party the right to inspect such documents, and so they can no longer be privileged.
[8] *The "Palermo"* (1883) 9 PD 6; *Watson v Cammell Laird & Co (Shipbuilders and Engineers) Ltd* [1959] 1 W.L.R. 702.

17. In any event, even if the documents themselves would not ordinarily be privileged, K2's disclosure of those documents would betray the trend of legal advice.[9] For the same reason, the organization of K2's files would likewise be privileged to the extent it would betray the trend of legal advice.

18. As has been evidenced in the injunctive proceedings in the English and other courts, Mr. Batbold's *modus operandi* is to work in the shadows: to use proxies, offshore shell companies, and Swiss bank accounts to perpetrate fraud, hide his assets, and flout the provisions of Mongolia's anti-corruption laws. In his November 2020 judgment, Judge Pelling QC of the English High Court observed that Mr. Batbold's conduct points to a "*dishonest concealment of assets*" and a "*propensity to disguise*" luxury foreign property from the Mongolian State. Likewise, having seen evidence submitted there, the Singapore High Court has observed out that "*there is much to answer and explain*" about Mr. Batbold's pattern of conduct in relation to the Erdenet Mining Corporation. Among other things, access to the underlying documents of the PGOM and IAAC's asset recovery efforts would open up privileged research, potentially enabling Mr. Batbold to understand the breadth of the knowledge of the PGOM and the IAAC concerning his asset position – in particular, highlighting any gaps in their knowledge that may enable him quickly and easily to dissipate any as yet uncovered assets.

19. In addition, the English legal advice privilege would protect the disclosure of information relating to the funding of a case if such information would betray the trend of legal advice.[10] It would equally protect against disclosure of the identity of the person giving instructions, if that would give a clue as to contents of instructions.[11] Notwithstanding the application of this privilege, I understand that the Court has ordered K2 Integrity to provide information about funding arrangements and the signatories of relevant engagement documents, and that K2 will unredact the relevant portions of the engagement agreements.

---

[9] *Lyell v Kennedy (No.3)* (1884) 27 Ch D 1.
[10] *See, e.g., Re Edwardian Group Limited* [2017] EWHC 2805 (Ch); *Arroyo v BP Exploration Company (Colombia) Ltd* [2010] EWHC 1643 (QB).
[11] *Loreley Financing (Jersey) No 30 Ltd v Credit Suisse Securities (Europe) Ltd* [2022] EWHC 1136 (Comm).

  King & Spalding and its clients, however, will continue to assert all relevant privileges with regard to any further disclosure.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 1st day of June, 2022.

_____
Sarah Yasmin Walker