UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF SUKHBAATAR
BATBOLD FOR AN ORDER PURSUANT
TO 28 U.S.C. § 1782

Case No. 1:21-MC-00218-RA-OTW

**MEMORANDUM OF LAW IN
FURTHER SUPPORT OF RESPONDENT K2'S MOTION TO
QUASH RULE 45 SUBPOENAS AND MOTION FOR PROTECTIVE ORDER
AND IN OPPOSITION TO BATBOLD'S MOTION TO COMPEL DISCOVERY**

KOBRE & KIM LLP

800 Third Avenue
New York, New York 10022
Tel:  +1 212 488 1200
Fax: +1 212 488 1220

*Counsel for*
*Respondent K2 Integrity*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT .......................................................................................... 1

RECENT FACTUAL BACKGROUND AND PROCEDURAL HISTORY ......................... 2

CHOICE OF LAW ............................................................................................................. 3

ARGUMENT ...................................................................................................................... 3

    I.    The Court should abstain from wading into disputed issues of fact and foreign law under the present circumstances and deny Batbold's Motion to Compel in its entirety. .................................................................................... 3

    II.    The additional discovery sought by Batbold poses an undue burden on K2. ........ 6

    III.    K2's work with counsel in anticipation of litigation is protected by privilege and the attorney work product doctrine. ................................................. 9

        A.    Foley Hoag engaged K2 in anticipation of litigation. ............................... 10

        B.    The Mongolian Prosecutor engaged King & Spalding and K2 in anticipation of litigation. ......................................................................... 11

        C.    Batbold's attacks on the Mongolian Prosecutor's privileges do not pass muster. ............................................................................................ 12

    IV.    K2 has produced the documents relied upon in the Jules Kroll affidavits, and Batbold's fishing expedition for further source documents should be denied on work product, privilege, relevance, and burden grounds. ................... 14

        A.    Batbold's request for all facts uncovered in K2's investigation contravenes Second Circuit law on work product. ................................... 15

        B.    English privilege law also applies, and it prohibits disclosure. ................ 17

        C.    The protection of non-Batbold investigations and the undue burden of reviewing Mongolian-language documents favor quashing the subpoenas. ............................................................................................. 20

    V.    The Court should deny Batbold's demands to pry into privileged email communications. ...................................................................................... 21

        A.    Batbold's blanket objections to *all* privileges asserted over *every* email document should be rejected. ........................................................ 21

B.    K2 should not be required to undertake any further review of its emails. ................................................................................................ 24

VI.    No deposition should be taken of a K2 corporate representative. ........................ 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abdell v. City of New York*,
  05 Civ. 8453 KMK JCF, 2006 WL 2664313 (S.D.N.Y. Sep. 14, 2006) .................................. 13

*Application of Sarrio, S.A.*,
  119 F.3d 143 (2d Cir. 1997) ............................................................................... 10, 11

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
  262 F.R.D. 293 (S.D.N.Y. 2009) ............................................................................... 8

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  208 F.R.D. 92 (S.D.N.Y. 2002) ................................................................................. 3

*Citizens Union of City of New York v. Att'y Gen. of New York*,
  269 F. Supp. 3d 124 (S.D.N.Y. 2017) ....................................................................... 24

*Est. of Ungar v. Palestinian Auth.*,
  332 F. App'x ........................................................................................................ 21

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ........................................................................... 4, 5, 6

*Gould Inc. v. Mitsui Mining & Smelting Co.*,
  825 F.2d 676 (2d Cir. 1987) ......................................................................... 15, 16

*Gucci Am., Inc. v. Guess?, Inc.*,
  271 F.R.D. 58 (S.D.N.Y. 2010) ................................................................................. 3

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ..................................................................................... 13, 15

*In re China Med. Techs., Inc.*,
  539 B.R. 643 (S.D.N.Y. 2015) ................................................................................ 11

*In re Elysium Health-ChromaDex Litig.*,
  17-cv-7394 (LJL), 2021 WL 194994 (S.D.N.Y. Jan. 19, 2021) ..................................... 8

*In re Friedman*,
  350 F.3d 65 (2d Cir. 2003) ......................................................................... 15, 25

*In re Furstenberg Fin. SAS*,
  785 F. App'x 882 (2d Cir. 2019) ............................................................................... 4

*In re Grand Jury Subpoenas Dated Mar. 19, 2002, and Aug. 2, 2002*,
  318 F.3d 379 (2d Cir. 2003) .................................................................................. 17

*In re Klein*,
  20-mc-203 (PKC), 2022 WL 1567584 (S.D.N.Y. May 18, 2022) ........................................... 21

*In re Polygon Glob. Partners LLP*,
  21 Misc. 2021 WL 5042733 (S.D.N.Y. Oct. 29, 2021) ........................................................... 4, 5

*In re Six Grand Jury Witnesses*,
  979 F.2d 939 (2d Cir. 1992) ....................................................................................................... 17

*In re von Bulow*,
  828 F.2d 94 (2d Cir. 1987) ......................................................................................................... 10

*Intel Corp. v. Advanced Micro Devices, Inc.*
  542 U.S. 241 (2004) ....................................................................................................................... 3

*Lemanik, S.A. v. McKinley Allsopp, Inc.*,
  125 F.R.D. 602 (S.D.N.Y. 1989) ................................................................................................. 20

*Matter of Grand Jury Subpoenas Dated Oct. 22 1991, and Nov. 1, 1991*,
  959 F.2d 1158 (2d Cir. 1992) ...................................................................................................... 16

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  229 F.R.D. 441 (S.D.N.Y. 2004) ................................................................................................. 23

*Robertson v. People Mag.*,
  14 Civ. 6759 (PAC), 2015 WL 9077111 (S.D.N.Y. Dec. 16, 2015) ............................................ 9

*SEC v. TheStreet.com*,
  273 F.3d 222 (2d Cir. 2001) .......................................................................................................... 8

*Sporck v. Peil*,
  759 F.2d 312 (3d Cir. 1985) ........................................................................................................ 16

*Swidler & Berlin v. United States*,
  524 U.S. 399 (1998) ..................................................................................................................... 14

*United States v. Nobles*,
  422 U.S. 225 (1975) ......................................................................................................... 15, 16, 17

*United States ex rel. Rubar v. Hayner Hoyt Corp.*,
  5:14-cv-830 (GLS/CFH), 2018 WL 5811427 (N.D.N.Y. Nov. 5, 2018) ................................... 10

**Rules**

Fed R. Civ. P. 15 .............................................................................................................................. 8

Fed R. Civ. P. 26 .......................................................................................................... 8, 9, 13, 20

Fed R. Civ. P. 45 ....................................................................................................................*passim*

Fed. R. Evid. 801 ............................................................................................................. 5, 14

Fed. R. Evid. 901 ............................................................................................................. 5, 13

**Other Authorities**

Wright & Miller 9A Fed. Prac. & Proc. Civ. § 2024 (3d ed.) ...................................... 13

Wright & Miller 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.) ...................................... 13

## PRELIMINARY STATEMENT

Recent developments show that this Section 1782[1] proceeding is no longer about a U.S. court providing assistance to *any* foreign tribunal, if it ever was.  It is a vehicle for a foreign politician to smear, burden, and impose retribution and expense on his political enemies and his litigation adversaries.  The aims of Section 1782 and Rule 45 are not being served; they are being weaponized.

Against this backdrop, Batbold asks the Court to wade into disputed issues of fact and foreign law to compel *further* discovery from a U.S. investigatory firm whose English affiliate was engaged by a foreign prosecutor and English counsel in anticipation of litigation.  The Court now has before it more than a dozen declarations from Mongolian and English lawyers alone, demonstrating the complexity of the foreign law issues presented by this Application and these Motions.  The Second Circuit admonishes against such forays into foreign law in Section 1782 applications, and recent district court authority applying this principle confirms that the Court should abstain entirely from Batbold's invitation to inject itself into these matters.  Likewise, it is not for this Court to entertain the fiction advanced by Batbold: that foreign litigation counsel was not actually engaged under foreign law by its foreign client—neither of whom is a party here—in the Foreign Proceedings.

Still, if the Court indulges Batbold's dubious factual allegations and foreign law disputes, his Motion is substantively meritless.  K2 has *already produced* the discovery contemplated by the Section 1782 and Discovery Orders:  K2's funding arrangements, its engagement agreements

---

[1] Capitalized terms not defined herein have the same meaning as in K2's opening Memorandum of Law in Support of its Motion to Quash Rule 45 Subpoenas.  ECF 115 ("K2 Br.").  All citations to Stein 2 are to the Second Declaration of Darryl G. Stein, submitted herewith.  All citations to ECF-filed documents refer to ECF-stamped page numbers.

and signatories, non-privileged emails returned by the search for four names, and the non-privileged source documents, which were relied on in the Jules Kroll affidavits.

Additional discovery sought by Batbold is protected by privilege and, moreover, would impose an extreme burden on K2 that is contrary to Rule 45 and not at all proportionate to the needs of the dormant, and likely soon-to-be-dismissed, Foreign Proceedings.  Batbold's Motion to Compel should be denied and K2's Motion to Quash and for a Protective Order should be granted.

## RECENT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court's Section 1782 Order authorized discovery in aid of the Foreign Proceedings, but the Mongolian Prosecutor's counsel of record have now withdrawn, or applied to withdraw, from the Foreign Proceedings, and those cases thus may soon be terminated.  On July 5, 2022, K2 informed the Court that the Mongolian Prosecutor's global coordinating counsel, King & Spalding International LLP ("King & Spalding") would "no longer be acting" on its behalf (ECF 118 at 1), and the English court soon granted their withdrawal (ECF 120-1 at 2).   In Singapore, the Mongolian Prosecutor's counsel withdrew as of July 15, 2022, and a hearing on certain defendants' application to strike (*i.e.,* dismiss) that action was scheduled for July 29, 2022.  *See* Stein 2 ¶ 4.  In the BVI, the Mongolian Prosecutor's counsel withdrew as of July 8, 2022, and a hearing is scheduled for September 28, 2022 on certain defendants' applications to extend time to file a defense and, likely, to serve claimants out of jurisdiction.  See Stein 2 ¶ 5.  The Mongolian Prosecutor's counsel has also now withdrawn in Jersey and applied to withdraw in Hong Kong SAR.  ECF 138-1 at 4-5.

Batbold has not provided any further updates on the status of the Foreign Proceedings, but he disclosed on July 25, 2022 that he had filed two actions in Mongolia *nearly three months ago* (the "May 2022 Mongolia Litigation"):  a defamation action against a website that reported on the

BVI Statement of Claim also filed in this District (ECF 139-1 ¶ 6, n.2, citing docket number), and an injunction application against the Mongolian Claimants (ECF 139-1 ¶ 8).  Batbold has not provided any pleadings from these actions nor disclosed the amount of damages (if any) sought.

## CHOICE OF LAW

Batbold moves to compel production of emails and attachments withheld as privileged on K2's log of withheld email communications.  ECF 132-18 ("Email Privilege Log").  Because different emails require different choice of law analyses, they are discussed as they arise in Point V.  As a general matter, however, English privilege law is implicated by the Motions:  the Court recognized that, under *Intel*, Section 1782 discovery should not seek documents protected by privileges in the Foreign Proceedings.  Section 1782 Order at 8-9.  Batbold does not dispute that the English court would apply English privilege law if Batbold sought this discovery in that forum.

The U.S. attorney work-product doctrine also applies.  Unlike privileges governed by choice-of-law principles, attorney work product protection applies as a procedural rule.  *See Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 73 (S.D.N.Y. 2010).[2]

## ARGUMENT

**I.    The Court should abstain from wading into disputed issues of fact and foreign law under the present circumstances and deny Batbold's Motion to Compel in its entirety.**

When the Court originally granted Batbold's Application in October 2021, it relied significantly on the Mongolian proceeding against Batbold, finding that the "attachment proceedings [] arise out of [that] indisputably adjudicative action."  Section 1782 Order at 6.  In December 2021, however, that Mongolian proceeding was strangely terminated on the apparent

---

[2] Batbold asserts that K2 cannot "double count" work product protection, a U.S. procedural rule, with English litigation privilege, a legal doctrine that applies under the "touch base" doctrine.  Batbold Br. at 17.  But *Gucci* and cases it relies upon apply work product protection and privilege separately, evaluating work product *and* privilege claims over the same documents.  *See, e.g.*, *Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 106 (S.D.N.Y. 2002).

basis that "one or more defendants' addresses on the form was not sufficiently clear." ECF 71 at 1. Not coincidentally, this dismissal came shortly after Batbold's political party regained power. Stein 2, Ex. Q. Now, in July 2022, the Mongolian Prosecutor's counsel withdrew from the only two remaining Foreign Proceedings seeking substantive relief (Singapore and BVI) and have withdrawn or applied to withdraw from the other attachment proceedings. ECF 138-1.

The extant circumstances—which are markedly different now than they were in October 2021, or even June 2022—thus militate strongly against this Court adjudicating complex issues of foreign law to supposedly assist Foreign Proceedings nearing termination. Batbold's Motion asks this Court not only to decide the meaning and application of English law—as his Motion disputes for the first time the English law principles in the Second Walker declaration ("Walker 2") (Stein 2 ¶ 28)—but also to make an evidentiary finding on the attorney-client relationship between a foreign law firm and its former foreign client under English and Mongolian law.

The Second Circuit has "repeatedly admonished" speculative forays into issues that "require the Court to resort to analysis of foreign law" in the Section 1782 context. *In re Polygon Glob. Partners LLP*, No. 21 Misc. 364 (ER), 2021 WL 5042733 at *6 (S.D.N.Y. Oct. 29, 2021) (citing *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1099-1100 (2d Cir. 1995)). Although this arises most often in assessing a foreign court's receptivity to evidence at the threshold of a Section 1782 application, the Second Circuit instructs that "it is unwise . . . for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting, and perhaps, biased interpretations of foreign law." *Euromepa*, 51 F.3d at 1099. Particularly in light of these recent developments, this "battle-by-affidavit" that Batbold invites is "beyond the scope of a Section 1782 inquiry." *In re Furstenberg Fin. SAS*, 785 F. App'x 882, 885 (2d Cir. 2019).

Judge Ramos' recent application of *Euromepa* in *Polygon* is on point, though abstention on foreign law is *more* compelling here because Batbold's requests also raise factual disputes and seek documents squarely within the jurisdictional reach of the foreign courts.[3]  In *Polygon*, the Court initially ordered discovery to proceed under Section 1782 for use in English litigation, and respondent withheld and logged documents on the basis of Spanish privilege and secrecy laws. The court found it would be improper for it to wade into determining foreign law and thus denied the Section 1782 applicant's motion to compel.  *Polygon*, 2021 WL 5042733 at *6.  The Court should do the same here.

In arguing that the Court should upend the very existence of an attorney-client relationship between a foreign lawyer and foreign client, Batbold asks the Court to credit his interpretation of unauthenticated hearsay letters and his interpretation of foreign law.  As a factual matter, the attorney-client relationship between King & Spalding and the Mongolian Prosecutor is established by signed engagement agreements (ECF 132-5, 132-24, Stein 2, Ex. G); sworn declarations from King & Spalding and the Mongolian Prosecutor (ECF 34, 35, 39-1, 132-10, 132-11); and the reality that King & Spalding, a reputable global law firm, was in fact counsel of record in England (ECF 120-1 at 2).  As an evidentiary matter, he asks the Court to accept two out-of-court letters for the truth of the matters asserted therein.  These dubious letters are unauthenticated and hearsay.  Fed. R. Evid. 901 & 80; *see also* Stein 2, Ex. B.  Batbold's reliance on such thin support for such an extreme position reveals this argument for what it is: political spin, not evidence, and certainly not a proper subject for Section 1782 proceedings.  Moreover, Batbold's argument asks the Court to

---

[3] Unlike *Polygon*, which applied Spanish law to documents sought from a U.S. entity that was not a party to the predicate English proceedings, these Motions apply *English* law to documents sought for an *English* proceeding in which the privilege holder is a party.  Indeed, the executive chairman of the subpoena respondent here is before the *English* court.  The English court can, of course, address these issues.

accept his interpretation of Mongolian and English law. Batbold Br. at 19; *see also* Thanki Decl. ¶ 19.

Consistent with the "twin aims" of the Section 1782, the Court should abstain altogether from broaching foreign law issues of privilege and attorney-client relationships. *Euromepa*, 51 F.3d at 1097 (explaining the aims of providing efficient means of assistance to international litigants and encouraging foreign countries to provide similar assistance). The statute empowers U.S. courts to assist foreign tribunals, but Batbold would have this Court flip that assistance on its head by making evidentiary findings against his litigation adversary and counsel in the Foreign Proceedings, when neither is before the Court. If Batbold wishes to press his false assertions in any one of the Foreign Proceedings, where he would be susceptible to adverse costs, perhaps he can, but it is certainly not an appropriate matter for this Court to decide here.

## II.    The additional discovery sought by Batbold poses an undue burden on K2.

Under Rule 45(d)(1), the party serving a subpoena "*must* take reasonable steps to avoid imposing undue burden or expense" on the respondent. Fed. R. Civ. P. 45(d)(1) (emphasis added). The Rule further requires that courts "*must* enforce this duty and impose an appropriate sanction . . . on a party or attorney who fails to comply." *Id.* (emphasis added).[4] Yet, Batbold now concedes that he imposed an undue burden on K2 by his premature request that the Court compel K2 to review nearly 100 gigabytes in its Electronic Files to identify and then produce or log "underlying source documents." *See* ECF 59 at 3. While Batbold feigns surprise at this burden (ECF 131 ("Batbold Br.") at 22), K2 explained to Batbold *beginning in November 2021* the enormous volume of data, and that there was no single folder that K2 could easily reference to log its underlying source documents. ECF 116 ("Stein 1") ¶ 17.

---

[4] Consistent with this Rule, K2 plans to seek costs from Batbold to the extent applicable.

Batbold belatedly and disingenuously suggests that he would have agreed to pause K2's review pending resolution of the threshold privilege issues. Batbold Br. at 14. That is plainly false: K2 sought a threshold determination of its privilege concerns (ECF 59 at 2), but Batbold insisted that they be addressed by a privilege log (ECF 62 at 2). And while K2 continued to propose this approach (ECF 92 at 5-6), Batbold instead sought to compel K2 to produce or log all underlying source documents, before the parties completed conferring about burden and privilege as to these documents. *See* ECF 94 at 3. Batbold continues to seek to compel the production of *all* underlying source documents, despite the considerable burden already incurred by K2 in complying with the Discovery Order. *See* K2 Br. at 22 (detailing discovery already undertaken). K2 has now produced all the discovery specifically contemplated by the Section 1782 Order, yet Batbold continues to seek more. *See* Section 1782 Order at 7 (contemplating discovery of "non-privileged information about the K2 investigation, including the identity of the parties funding the investigation and foreign proceedings, and the non-privileged documents underlying K2's investigation").

The burden and expense imposed on K2 has been further magnified by Batbold's galling lack of candor with the Court and K2. On July 25, 2022—once it became clear that the Foreign Proceedings were at or near termination—Batbold for the first time identified affirmative litigation he filed in Mongolia *on May 5,* 2022, nearly *three months earlier*. ECF 129 at 1. This was no oversight. It was a conscious and material omission by Batbold that was highly prejudicial to K2.

For months, K2 has expended enormous resources debating, as it turns out, a strawman. To illustrate, *first*, when the parties submitted their joint status letter to this Court on May 17, 2022 in which Batbold sought to compel K2 to log or produce tens of thousands of documents (ECF 92), which prompted the Discovery Order requiring that K2 do so in just two weeks (ECF 95),

Batbold had already filed but not disclosed those proceedings. *Second*, when Batbold agreed to a stipulated protective order the next day, on May 20 (ECF 96), and to a proposed briefing schedule for this motion practice two weeks later, on June 3 (ECF 103), he continued to omit those material facts. *Third*, after K2 already had moved to quash and for a protective order on June 30—and during the Court's subsequent stay of briefing and after directing Batbold to provide a status update on the international litigations (ECF 114 at 1)—he urged the Court for permission to file his Motion to Compel but *still* did not disclose the proceedings (ECF 124). And, *finally*, even when Batbold moved to compel on July 15, he omitted the proceedings from his motion and his litigation status chart. ECF 130.

Only when it appeared that the Foreign Proceedings were likely to end, and with them the pretext for this Application, Batbold wrote to the Court on July 25, 2022 to disclose the May 2022 Mongolia Litigation and to assert that it "provides an additional reason this Court should lift the briefing stay on the parties' cross-motions." ECF 139 at 1. Not only has Batbold's duplicity substantially increased the burden on K2, but his it demonstrates that this Application is not a legitimate means of assisting the Foreign Proceedings but a vehicle for spin and gamesmanship.[5]

Although Batbold purports that the burden here is immaterial (Batbold Br. at 28-31), he relies primarily on cases addressing party discovery under Rule 26, rather than non-party subpoenas under Rule 45(d)(3)(A), which must be quashed when they impose an undue burden. *See also Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 300

---

[5] Batbold has not properly sought, or been granted, leave to amend or supplement his original Application under Rule 15 with these previously undisclosed proceedings, or to modify the Protective Order under Rule 26(c), and therefore they should not be considered in support of his Motion. If the Court were to entertain those new proceedings for any purpose, it should first require a full motion record with briefing and declarations, not a letter purporting to explain why the elements of Section 1782 are satisfied. *See* Fed R. Civ. P. 15 (specifying procedure for changes to pleadings); *see also SEC v. TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001) (noting "strong presumption against the modification of a protective order" where a party, like K2, has relied on one); *In re Elysium Health-ChromaDex Litig.*, 17-cv-7394 (LJL), 2021 WL 194994, at *5 (S.D.N.Y. Jan. 19, 2021) (finding belated request to supplement pleading "inexplicable in a case where the end of discovery is rapidly approaching").

(S.D.N.Y. 2009) (third-party subpoenas that impose an undue burden must be quashed or modified).  But even under the Rule 26 standard—which is a baseline, but more permissive than Rule 45—Batbold cannot show any benefit to further discovery that would make his demands proportionate.  *See Robertson v. People Mag.*, 14 Civ. 6759 (PAC), 2015 WL 9077111, at *2 (S.D.N.Y. Dec. 16, 2015) (close judicial involvement needed to ensure proportionality in discovery).  He does not identify *any* documents that Jules Kroll relied upon that have not been disclosed, or *any* specific facts in those affidavits that he has reason to believe are inaccurate.  Indeed, whether or not he has used the discovery here in the Foreign Proceedings, he used his Motion to Compel filing—which attached extensive information produced pursuant to the Protective Order—to solicit a Reuters article (Stein 2, Ex. H), further evincing Batbold's true motive here: political spin.  While Batbold previously relied on the amount of damages sought in the Foreign Proceedings to argue for broad discovery, those proceedings are now near termination.

Given the discovery already produced, the burden already incurred, the further burden Batbold would impose, and the minimal if any benefit to the Foreign Proceedings (which may in any event soon be terminated), the Motion to Compel should be denied even under Rule 26, but certainly under Rule 45.

### III.    K2's work with counsel in anticipation of litigation is protected by privilege and the attorney work product doctrine.

Batbold's central argument—that *none* of K2's files are protected by *any* privileges—is flatly contradicted by the numerous engagement letters, sworn declarations, and privilege logs before the Court.  This evidence proves the relationships between K2, its clients, and its clients' counsel exist and are protected and privileged under both American and English law given the work done in anticipation of litigation.

### A.  Foley Hoag engaged K2 in anticipation of litigation.

Foley Hoag was engaged by its clients for legal advice concerning their "efforts to trace and recover assets misappropriated from Mongolia by entities and individuals in connection with transactions involving key mining assets in Mongolia," (Smith 2 ¶ 4), and Foley Hoag in turn engaged K2 to assist in the firm's provision of "legal advice to [its] client(s) regarding the matters *in which [its] client(s) anticipated litigation.*"  Smith 1 ¶ 4 (emphasis added).  The engagement agreement between Foley Hoag and K2, moreover, specifically provides that information is "*protected by the Attorney-Client Privilege and Attorney Work-Product Doctrine.*"  ECF 132-23 at 4 (emphasis added).  Foley Hoag invoked these privileges on behalf of its clients and itself, and these privileges cannot be waived except by the client's consent.  *See Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997) (privilege belongs solely to the client); *In re von Bulow*, 828 F.2d 94, 100-01 (2d Cir. 1987) (client must consent to attorney's disclosure).

Against this irrefutable evidence of the existence, invocation, and absence of waiver of the attorney-client privilege, Batbold purports that Foley Hoag's clients were not reasonably contemplating litigation.  This absurd contention is belied by the overwhelming evidence cited above.[6]  A letter engaging an investigator is sufficient to establish the work product protection where it reflects the possibility of future litigation, as this one did by reference to work product protection.  *See United States ex rel. Rubar v. Hayner Hoyt Corp.*, 5:14-cv-830 (GLS/CFH), 2018 WL 5811427, at *4 (N.D.N.Y. Nov. 5, 2018).  Gare Smith of Foley Hoag moreover confirms that the firm engaged K2 *because* its clients anticipated litigation, and the subject of legal advice

implies litigation. Smith 2 ¶ 4.[7] Whether or not Foley Hoag's clients *did* commence litigation, the attorney work product doctrine applies given their substantial work in *anticipation* of litigation.

## B. The Mongolian Prosecutor engaged King & Spalding and K2 in anticipation of litigation.

The Mongolian Prosecutor signed engagement agreements with K2 and King & Spalding including the Asset Recovery Services Agreement in September 2018 (ECF 132-5 at 6, 10); the Memorandum of Understanding in December 2018 (ECF 132-24 at 3); and the Amendment to the Asset Recovery Services Agreement in June 2019 (Stein 2, Ex. G at 2). The IAAC also signed two of those agreements and provided $1 million to pay local litigation counsel fees. Walker 2 ¶ 5. The Mongolian Prosecutor then "instructed" King & Spalding to seek "courts orders to freeze or injunct . . . assets." ECF 39-2 at 31. King & Spalding, in turn, developed evidence with K2's assistance and commenced litigation in England as counsel of record. ECF 128-1 at 1.

King & Spalding's engagement is confirmed not only by the documents but also by sworn declarations of two individuals at the Mongolian Prosecutor's Office (ECF 34 (Nasanbat Tseepil); ECF 39-1 (Nyamdorj Sharavdorj)) and Sarah Walker, a King & Spalding partner duly admitted to practice law in England for more than twenty-five years. Stein 2, Exs. D & E.

Neither the Mongolian Prosecutor nor the IAAC has waived its privileges, and King & Spalding has invoked privilege on their behalf, as obligated by English law. *Compare* Asif Decl. ¶ 25 (counsel obligated to maintain client's privilege) *with* Thanki Decl. ¶ 29 ("preferable" for client to invoke privilege).[8] In any event, King & Spalding has asserted the attorney work product doctrine on its own behalf. *In re China Med. Techs., Inc*., 539 B.R. 643, 658 (S.D.N.Y. 2015)

---

[7] Despite having received Smith 1 on May 16, 2022, Batbold questions for the first time whether Gare Smith can speak to his clients' intentions. To address this issue, K2 submits a declaration from one of Foley Hoag's clients providing further factual support for this point. Chuluunkhuu Decl. ¶ 11.

[8] Batbold's reliance on *Sarrio* to contest this invocation of privilege is entirely inapposite: a company's representative (apparently a lawyer) wrote to the Second Circuit to waive privilege, and the court addressed whether that company's counsel could nonetheless still assert privilege, not whether that counsel could invoke it. *See Sarrio*, 119 F.3d at 147.

(work product protection belongs to both client and counsel).  King & Spalding, acting as counsel

of record to the Mongolian Prosecutor, invoked these privileges, Walker 2 ¶ 11 (instructing K2),

and this Court should give effect to those privileges.

### C. Batbold's attacks on the Mongolian Prosecutor's privileges do not pass muster.

*First*, Batbold again disingenuously contends that the Mongolian Prosecutor did not

contemplate litigation.  But the Mongolian Prosecutor, through King & Spalding, in fact

*commenced* litigation in 2020, so clearly it was contemplated.  Sarah Walker's sworn declarations

confirm that was so at least as of September 2018, which is supported by the December 2018

Memorandum of Understanding's provision that communications "are in *anticipation of legal*

*proceedings*."  ECF 132-24 at 2; ECF 132-5 at 7 (emphasis added).

When a foreign prosecutor (the Mongolian Prosecutor) and anti-corruption agency (IAAC)

engage global litigation counsel (King & Spalding) along with global investigations firm (K2) to

investigate and recover stolen state assets, litigation is *by definition* contemplated.  Mr. Thanki

conspicuously does not address—and appears to not have reviewed—*any* of the underlying

evidence regarding King & Spalding's or K2's engagements in anticipation of litigation.  Thanki

Decl. ¶¶ 5-13.  And, while he suggests that the Mongolian Prosecutor may have been

contemplating a "state-sanctioned asset repatriation effort," he does not explain what this is, why

it would not entail litigation, or why an English lawyer would sign agreements on behalf of King

& Spalding as a party if not for contemplated litigation.  *See* Stein 2, Ex. C (identifying signatory

as London partner in "Disputes Group" admitted in England).[9]  The attorney work product doctrine

and English litigation privilege clearly apply from the start of King & Spalding's work.

---

[9] Even if Mr. Thanki had before him the complete evidentiary record, which he did not, his role is "to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case."  Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.).  This applies to all his conclusions.  Asif Decl. ¶ 16 n.1.

*Second,* Batbold implies that King & Spalding's retention by the Mongolian Prosecutor does not establish a privilege because the foreign proceedings are brought in the name of other Mongolian entities.  To start, this argument does not bear on the privilege between Mongolian Prosecutor and King & Spalding but rather on whether the Foreign Proceedings have been properly commenced, which is a merits issue not for this Court.  This also asks the Court to assess Mongolian law (Batbold Br. at 12, citing ECF 132-2 ¶¶ 4-9), but the Court should not foray into this issue, as discussed in Point I.[10]  In any event, litigants often appear in legal proceedings on behalf of others, and Batbold offers no credible argument why such a litigant cannot maintain privilege.  A relator or derivative shareholder may hold privilege and would not lose it if later found to lack standing.  And while Rule 26(b)(3) may be limited to parties, the common law work product doctrine under *Hickman v. Taylor,* 329 U.S. 495 (1947), applies more broadly, as confirmed by the authorities Batbold cites.[11]

*Third*, King & Spalding "will no longer be acting" for Mongolian Prosecutor (ECF 118 at 1) but that does not mean that King & Spalding *never* represented the prosecutor, as Batbold asserts.  In support of this brazen allegation against a reputable law firm, Batbold relies on two letters that the Court should view skeptically, if not reject entirely.  To start, Batbold offers no competent evidence "sufficient to support a finding that the" letters are "what the proponent claims" they are.  *See* Fed. R. Evid. 901.  Instead he offers only a declaration from a U.S. lawyer that each letter is "a true and correct copy of" letters "from Deputy Prosecutor General of Mongolia M. Chinbat, dated" January 31, 2022 and March 10, 2022.  *See* Crain Decl. ¶¶ 9 & 12.  The

---

[10] To the extent the Court finds the issue relevant and appropriate to resolve, the Singapore court already held that Mongolian Prosecutor stands in the claimants' shoes under Mongolian law.  ECF 36-3 ¶¶ 8–9, 26-31, 36; *see also* ECF 39-1 ¶¶ 8-9, 14-18, 22-25, 29-30 (setting forth Mongolian Prosecutor's interpretation).

[11] *See* Wright & Miller § 2024 (work product protections can and should be extended to non-named parties to "vindicate the purposes of the work-product rule by the issuance of a protective order"); *Abdell v. City of New York*, 05 Civ. 8453 KMK JCF, 2006 WL 2664313 (S.D.N.Y. Sep. 14, 2006) at *3 (applying work-product protection to non-party).

declarant offers no factual basis for these assertions. Moreover, these out-of-court statements would not be admissible for the truth of the matter, even if authenticated. *See* Fed. R. Evid. 801.

Even assuming that these letters were admissible, they at most purport to end an attorney-client relationship, not to waive privilege. *See* Asif Decl. ¶ 21. The end of an attorney-client relationship does not extinguish the privilege, which survives even after the death of a client. *See Swidler & Berlin v. United States*, 524 U.S. 399, 410 (1998).

Batbold goes further, however, asking the Court to wade into the disputed issue of the Mongolian Prosecutor's power to act on behalf of the claimants, as discussed above, to assess these letters. Batbold Br. at 19. While the Court need not reach this issue at all (*see* Point I), and even if these letters are admissible, the documentary evidence and sworn statements of multiple lawyers shows that Mongolian Prosecutor and King & Spalding entered into an attorney-client relationship, that the Memorandum of Understanding specifically provided for privileged communications, and that King & Spalding appeared as counsel of record in England pursuant to that understanding. Moreover, as King & Spalding has previously explained, the Court ought not to take these letters at face value, as they "appear to have been prompted by" Batbold. Stein 2, Ex. B at 2.

Finally, if the Court were to indulge Batbold and find, contrary to evidence, that King & Spalding's clients' privileges have been waived (or not been invoked), King & Spalding has asserted the attorney work product doctrine on its own behalf. Walker 2 ¶ 11. The work product protection belongs to both the client and the attorney and *cannot* be waived by the client alone.

IV.    **K2 has produced the documents relied upon in the Jules Kroll affidavits, and Batbold's fishing expedition for further source documents should be denied on work product, privilege, relevance, and burden grounds.**

Batbold's demand for *all* underlying source documents is not just a fishing expedition, but one that he seeks from the privileged agent of his litigation adversary in direct contravention of Second Circuit precedent and English law. Having failed to identify any specific further

information needed for the Foreign Proceedings, Batbold instead asks to sift through documents K2 assembled with counsel—half of which do not hit for *any* of his overboard search terms—on the mere hope of finding something relevant. While underlying source documents are not generally privileged, both U.S. and English law guard against such disclosure when sought from a privileged agent that compiled and organized them to provide legal advice and in anticipation of litigation, and where it appears disclosure is sought to gain improper insight into an adversary's litigation strategy and legal advice.[12] These may be narrow exceptions, but they apply precisely to stop this sort of abusive discovery.

### A. Batbold's request for all facts uncovered in K2's investigation contravenes Second Circuit law on work product.

The attorney work product doctrine circumscribes discovery sought from privileged agents by creating a zone of privacy to prepare for litigation. *See Hickman v. Taylor*, 329 U.S. 495 (1947). The Second Circuit thus "resist[s] the idea that lawyers should routinely be subject to broad discovery." *In re Friedman*, 350 F.3d 65, 70 (2d Cir. 2003); *see also United States v. Nobles*, 422 U.S. 225 (1975) (applying work product doctrine to investigators). While non-privileged documents do not become privileged simply because they are given to counsel, that is not the issue here. Rather, the Court should deny discovery of non-privileged information *from* counsel and their agents because it would reveal legal strategy.

For instance, the Second Circuit in *Gould* instructed the trial court on remand that non-privileged documents may be protected under the attorney work product doctrine when sought from an attorney who selected and compiled those documents for litigation. *Gould Inc. v. Mitsui Mining & Smelting Co.*, 825 F.2d 676, 680 n.2 (2d Cir. 1987) (noting "disfavor in which the tactic

---

[12] While K2 maintains that the English litigation privilege applies *in addition to* the U.S. attorney work product doctrine, as discussed above, Batbold agrees that at minimum the work product protection applies.

of seeking discovery from adversary counsel is generally regarded"). In that case, the plaintiff sought discovery from his adversary's counsel, rather than from the party, and those documents could be sought from other sources. The choice to seek the documents from counsel, when they were available elsewhere, belied the improper motive. So too here, where the categories of underlying source documents show that they are—by definition—copies of documents not originally created by K2 or even its clients. *See also Sporck v. Peil*, 759 F.2d 312 (3d Cir. 1985).

Batbold could seek original documents from original sources, and seeking discovery from K2 serves no reasonable purpose except to gain insight into his adversary's litigation strategy and to burden K2. Such disclosure presents real and significant risk that the Mongolian Prosecutor's legal strategy will be revealed: K2's files contain information about subjects not at issue in the Foreign Proceedings against Batbold. Moreover, revealing these as-yet-undisclosed subjects will undermine the recovery of stolen assets, whether by Batbold or others. *See* Walker 2 ¶ 18. This risk of dissipation is firmly supported by freezing orders entered in the Foreign Proceedings based on findings of such a risk. ECF 35 ¶¶ 2, 5; ECF 36 ¶¶ 2, 5; ECF 37 ¶¶ 2, 5; ECF 40 ¶¶ 3-6, 10–15. Unlike the cases Batbold cites where courts have declined to apply this principle, the record here establishes a strong risk of revealing litigation strategy given the nature of the documents and the information that they will reveal about specific, undisclosed investigation subjects.[13]

To escape the limitations of *Gould* and *Friedman*, Batbold argues that Mongolian Prosecutor waived work product protection, but his broad theory of waiver is directly contradicted by the primary authority he cites: *United States v. Nobles*, 422 U.S. 225 (1975). The *Nobles* Court found that an investigator's testimony waived work product protection over *only* a portion of a

---

[13] *See* Batbold Br. at 25 (citing *Matter of Grand Jury Subpoenas Dated Oct. 22 1991, and Nov. 1, 1991*, 959 F.2d 1158, 1166 (2d Cir. 1992), regarding phone records, and *In re Grand Jury Subpoenas Dated Mar. 19, 2002, and Aug. 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003), regarding bank records).

report prepared for litigation. But the Court specifically distinguished the order unredacting a passage of that report from a "general 'fishing expedition' into the defense files or indeed even into the defense investigator's report." *Nobles*, 422 U.S. at 240.[14] Batbold's argument that an investigator's testimony broadly "waives privilege over the methodology and integrity of the underlying investigation," (Batbold Br. at 28), distorts *Nobles* to endorse the very fishing expedition that it distinguished.[15]

The subpoenas should thus be quashed under U.S. law.

### B. English privilege law also applies, and it prohibits disclosure.

Under English law, otherwise non-privileged source documents sought from counsel or their agents who collected, copied, and collated them for litigation and to provide legal advice are protected from disclosure by two privilege doctrines, which apply to (1) copies of non-privileged documents (the "*Palermo* Rule"), and (2) non-privileged documents that would betray the trend of legal advice (the "*Lyell* Rule").

Batbold seeks five categories of underlying source documents, which is to say, the factual support K2 gathered in its investigation. Such documents are, by their nature, created by someone other than K2. Batbold described these categories in detail (ECF 94-2 at 7-8), and K2 explained that all documents on its privilege log of underlying source documents ("Source Documents Privilege Log") are from those categories (ECF 116-8 at 3). As previously explained, K2 logged these documents by reviewing 26,006 documents from its secure file transfer folders and two network drive folders for this matter (the "Electronic Files") to determine if documents were in

---

[14] Although Batbold quotes from an incomplete description of the *Nobles* made in passing by *In re Six Grand Jury Witnesses*, 979 F.2d 939, 944 (2d Cir. 1992), that passage does not purport to alter the holding of *Nobles*.

[15] Batbold asserts that he needs to test a "veneer of independence," but the Jules Kroll affidavits state plainly that the claimants retained K2 "to investigate, trace and recover assets that have been misappropriated from the State of Mongolia by individuals and entities in connection with transactions involving key mining assets." ECF 39-3 ¶ 2.

one of the five categories: "financial records, corporate documents, database search results, public sources, or communications between third parties." Stein 1 ¶ 23. Any work product prepared by K2 or its clients would not be "underlying source documents" for the investigation, and thus, they were not responsive to the Court's order and were not logged. Stein 1, Ex. H at 3.

Batbold knows what documents fall in these categories; he based them on documents "filed publicly with respect to K2's investigation." ECF 94-2 at 4. K2 also produced 1,269 documents from its Electronic Files that include numerous examples from each category. For instance, K2 produced "financial records" and "corporate documents," none of which are records of K2, King & Spalding, Foley Hoag, Mongolian Prosecutor, or IAAC but rather copies of records created by third parties that K2 obtained during the investigation.[16] Likewise, "database search results" and "public sources" are, by definition, third-party sources that K2 obtained copies of during the investigation.[17] Finally, the last category of "communications between *third parties*," definitionally excludes K2's own documents. ECF 95 at 3 (emphasis added). These are typical of the withheld documents.[18]

The application of the *Palermo* and *Lyell* Rules are thus confirmed by Batbold's own definition of "underlying source documents," as well as the documents that Batbold used to craft these categories and which K2 produced.

First, under the *Palermo* Rule, K2 had none of these documents before it began to work on the investigation that, as anticipated, led to litigation. None of these categories of documents were originally created by K2, King & Spalding, Foley Hoag, Mongolian Prosecutor, or IAAC. Indeed,

---

[16] *E.g.*, Stein 2, Ex. I (Financial Statement, K2_0004796); Stein 2, Ex. J (Bank Account Statement, K2_0001319); Stein 2, Ex. K (Companies Registry Form, K2_0000091).
[17] *E.g.*, Stein 2, Ex. L (Register of Companies Search Report, K2_0000430); Stein 2, Ex. M (TraceIQ Search Results, K2_0007784); Stein 2, Ex. N (LexisNexis Person Investigation Results, K2_0004388); Stein 2, Ex. O (land registries and property deeds, K2_0005673).
[18] The examples above are similar in form to many documents withheld in the Source Documents Privilege Log. *See* Stein 2 ¶ 23 (4,387 of the 18,370 withheld underlying source documents are similar in form to Exhibits I-O).

Batbold has not disputed that he can seek these documents (i.e., the originals) from other sources. But here, K2 collected, copied, and collated them in its Electronic Files to prepare for litigation. While Mr. Thanki contends that it is "doubtful that an English Court today would uphold a claim to privilege on the basis of The Palermo Exception"—even though it is undoubtedly binding law in England (Asif Decl. ¶ 30)—he appears to concede that privilege attaches to "copies of pre-existing documents obtained by a solicitor from a third party for privileged purposes are privileged, even though the originals were not." Thanki Decl. ¶¶ 37, 39. When this principle is considered alongside Batbold's definition of "underlying source documents," the documents that K2 has produced, and the context of K2's Electronic Files—which it compiled while working with counsel in anticipation of litigation—the *Palermo* Rule applies.

Second, under the *Lyell* Rule, privilege applies to otherwise non-privileged documents where the "collection of documents selected or copied by a lawyer would betray the trend of advice or give an insight as to the content of the advice being provided to the client." Thanki Decl. ¶ 41. While Mr. Thanki may again disagree with this rule, it remains the law in England. Asif Decl. ¶ 36. The question is whether disclosure of the withheld documents would lead to an inference as to the legal advice. Thanki Decl. ¶ 43(1). As Walker 2 explains, it does here because disclosure of these documents would reveal "the knowledge of the [Mongolian Prosecutor] and the IAAC concerning [Batbold's] asset position" Walker 2 ¶ 18. K2 provided further examples of how disclosure would reveal the trend of legal advice in its June 29, 2022 letter: unredacted file names of underlying source documents would disclose, for instance, "the name of a company," "the address of a property," and "bank accounts" that have not been disclosed to Batbold, which would thus reveal advice given by King & Spalding regarding its investigation of these subjects. ECF 116-9 at 3-4. Because disclosure will reveal privileged information, *Lyell* applies.

Batbold also argues that the Jules Kroll affidavits waived privilege under English law, but privilege is waived only over the documents relied upon. Walker 2 ¶ 16. Here, Batbold does not argue that anything relied upon by the extensively footnoted affidavits has not been disclosed, nor does he offer the Court an alternative scope of waiver under English law.

All of the withheld underlying source documents were compiled in K2's Electronic Files during the investigation, and thus the assertion of privilege is the same for each document. While Batbold now quibbles with the Source Documents Privilege Log, the parties conferred repeatedly about the log under Local Civil Rule 26.2(c), and Batbold requested no additional information except the "subject" of the documents. Stein 2, Ex. F at 2. But as K2 explained, disclosing subjects, such as file names, would disclose information privileged under *Lyell*, and redacting 18,000 file names would be unduly burdensome. ECF 116-9 at 4. In any event, K2 provided information about applicable categories and which logged documents hit for Batbold's search terms.[19] To the extent Mr. Thanki now contends that K2's privilege log requires further information to address issues Batbold did not address when meeting and conferring (Stein 2 ¶ 28), he should not be heard to do so now.[20]

### C. The protection of non-Batbold investigations and the undue burden of reviewing Mongolian-language documents favor quashing the subpoenas.

As shown by the substantial number of documents that do not hit for any of Batbold's search terms, many of the underlying source documents are irrelevant to the Foreign Proceedings. Consistent with Second Circuit precedent, the Court should deny Batbold's request to "roam in

---

[19] Batbold also now complains that the privilege log does not include senders and recipients, but these are *stand-alone documents* found in K2's Electronic Files, so they have no sender or recipient metadata, although K2 produced author metadata to the extent available. In any event, Batbold expressly agreed that K2 could "strip source documents of certain metadata" to avoid disclosing privileged information (ECF 95 at 3).

[20] *See* Stein ¶ 28; *see also* Crain Decl., Ex. 13 (making no mention of *Palermo* or *Lyell*). While the parties discussed U.S. law, Batbold never responded to K2's questions for English authority, referring only to the Patrick Doris declarations that do not address these issues. *Id.* at 5; *see* ECF 18 ("Doris 1"); ECF 48 ("Doris 2").

shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Lemanik, S.A. v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 608 (S.D.N.Y. 1989). This is particularly true as to privileged agents, and this subpoena asking "for essentially every document" in a client's privileged files should be quashed as "overly broad and burdensome." *Est. of Ungar v. Palestinian Auth.*, 332 F. App'x at 645.

Not only are these documents irrelevant, (*see* K2 Br. at 24), they relate to undisclosed investigative subjects. Whether those investigations and litigations are carried forward by the Mongolian Prosecutor and the IAAC directly, or by other counsel, they should not be undermined by these expansive discovery demands. Indeed, even under Batbold's expansive search terms, approximately half do not contain any of the search terms (ECF 116-9 at 4), in addition to the 1,269 documents that K2 has already produced.[21] These documents would also "sweep private personal information with no apparent nexus" to Batbold, which favors limiting discovery. *See In re Klein*, 20-mc-203 (PKC), 2022 WL 1567584, at *10 (S.D.N.Y. May 18, 2022).

K2 should also not be required to complete its review of the Mongolian-language documents, particularly given that they are available from other sources. K2 Br. at 21. Any minimal benefit is disproportionate to the substantial burden. *See* Point II.

**V. The Court should deny Batbold's demands to pry into privileged email communications.**

### A. Batbold's blanket objections to *all* privileges asserted over *every* email document should be rejected.

Batbold argues that *all* documents on K2's Email Privilege Log should be produced, but his scattershot arguments fail against the record. K2 has produced 238 non-privileged emails and

---

[21] This number drops to 7,454 documents when using the search terms that omit these overbroad terms such as financial institutions and corporate service providers, as reflected in K2's July 14, 2022 search term list, which K2 provided when Batbold asked about the June 29, 2022 letter's reference to overbroad search terms. Stein 2 ¶ 32.

attachments that were returned by K2's searches for the names provided by Batbold (Stein 2 ¶¶ 20, 24), but production of the remaining withheld documents should not be compelled.[22]

All communications on the log include at least K2 and Ganbat Chuluunkhuu ("Chuluunkhuu"), who were in privileged relationships regarding the Mongolian investigation. First, K2's client Foley Hoag represented Chuluunkhuu and others. Then, Chuluunkhuu assisted K2 (and King & Spalding, via K2) and the Mongolian Prosecutor with the investigation regarding anticipated litigation. The privileges here thus follow naturally from these relationships and the work in anticipation of litigation. *See* Point III. K2 assisted counsel in providing legal advice and preparing for litigation, and the withheld communications, including with Chuluunkhuu, were undertaken for that purpose. The logged communications occurred *after* Chuluunkhuu retained Foley Hoag and *after* K2 was approached to assist Foley Hoag's clients in anticipation of litigation. Moreover, Chuluunkhuu "understood that any information and documents exchanged" with K2 were "confidential" and "for the purposes of a highly sensitive investigation in furtherance of litigation." Smith 2 ¶ 7; Chuluunkhuu Decl. ¶ 11. The Email Privilege Log reflects that the withheld communications related to these topics, apart from twenty-nine documents thar are unrelated to the Mongolia investigation and thus also irrelevant. Stein 2 ¶ 24.

*Foley Hoag Phase*: Chuluunkhuu had an attorney-client relationship with Foley Hoag, who advised him and the other clients at issue, and thus communications with K2 and the other Foley Hoag clients would not waive privilege. *See* Chuluunkhuu ¶¶ 4-5, 7, 10[23] Instead, Batbold primarily argues that the work product protection does not apply, but Chuluunkhuu's anticipation

---

[22] Batbold's brief addresses only eight specific entries on the privilege log. Batbold Br. at 20 (referring to Ex. 18 at lines 66, 85, 212, 221, 252, 318, 319, 332). And Batbold did not confer with K2 about *any* specific entries on the privilege log before moving to compel. Stein Decl. ¶ 27.

[23] Before May 2018, these communications touch base with Washington D.C., where Gare Smith practices, and K2's privilege log does not assert English privileges during this time.

of litigation regarding asset recovery led Foley Hoag to approach K2 in the first place. *See* Point III.A; Chuluunkhuu Decl. ¶ 6. The privilege log reflects communications related to this work. *See, e.g.*, Email Privilege Log at Row 188 (regarding K2_0011453).

Because the attorney work product protection attaches to these communications, they remain protected from disclosure as long as they are kept confidential from one's litigation adversary. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 445-46 (S.D.N.Y. 2004) (no waiver unless disclosure increases likelihood of disclosure to adversaries). Chuluunkhuu and Foley Hoag's other clients "understood" that information was confidential and for use in the investigation in anticipation of litigation. Smith 2 ¶ 7; Chuluunkhuu Decl. ¶ 11. This protection extends to communications with other third parties that Chuluunkhuu and Foley Hoag expected to be confidential. For instance, Richard Messick provided information to assist with the effort to identify, seize and repatriate stolen assets. Chuluunkhuu Decl. ¶¶ 15, 16.[24]

*King & Spalding Phase*: As an initial matter, the U.S. attorney work product doctrine applies to all communications on the log, even after K2 started working with King & Spalding. King & Spalding's clients anticipated litigation, just as Foley Hoag's clients did. Point III.B. Chuluunkhuu understood that communications would be kept confidential, "after K2 began working with King & Spalding." Smith 2 ¶ 7; *see also* Chuluunkhuu Decl. ¶ 11.

Beginning in May 2018, the discussions that led to the Asset Recovery Services Agreement began, and thus K2's Email Privilege Log also asserts applicable English privileges from that date. These communications, which relate to an engagement led by English lawyers, under an agreement governed by English law, that culminated in English litigation, the privileged relationship touches base with England, regardless of K2's work, which in any event was led from London. Stein 1 ¶

---

[24] Batbold did not confer about Mr. Messick before filing his Motion. Stein 2 ¶ 24.

28.  While Batbold again relies on the inclusion of third parties to argue that any English privileges were waived, the communications at issue were intended to remain confidential and thus, the English limited waiver doctrine applies.[25]  Batbold concedes that this doctrine applies in "circumstances where, whether expressly or impliedly, the confidentiality of that document as against the rest of the world is preserved," (Batbold Br. at 22 n.13), which is precisely what Smith's and Chuluunkhuu's declarations confirm.  Smith 2 ¶ 7; *see also* Chuluunkhuu Decl. ¶ 11.[26]

### B.  K2 should not be required to undertake any further review of its emails.

Beyond the emails included on the privilege log, and even though the Foreign Proceedings appear to be ending, Batbold asks K2 to undertake a further and even more burdensome review of its emails.  As an initial matter, this review presents the same issues as the underlying source documents, insofar as Batbold is seeking discovery from a privileged agent of his litigation adversary.  *See* Point IV.  But apart from the privilege issues, Batbold concedes that he requested, and the Court ordered, K2 to run these searches *as an alternative* to the review of the underlying source documents, which K2 has already completed.  This duplicative discovery establishes undue burden under Rule 45.  *See Citizens Union of City of New York v. Att'y Gen. of New York,* 269 F. Supp. 3d 124, 148 (S.D.N.Y. 2017) (the fact that a third-party subpoena target had already reviewed the documents sought is relevant to an undue burden analysis).

This email review is also vastly disproportionate:  there are more than 100,000 responsive documents, of which only 6,070 are file types that may likely be underlying source documents that

---

[25] The Email Privilege Log does not assert the limited waiver or the common interest privilege before May 2018 or under U.S. law.  K2 would have clarified this if Batbold conferred about the issue before moving to compel.

[26] Likewise, the common interest privilege applies because Chuluunkhuu occupies the same "ambit of confidence" as King & Spalding, the Mongolian Prosecutor, and IAAC, and K2.  Walker 3 ¶ 7 (Chuluunkhuu and K2 understood their communications to be within the "ambit of confidence").

K2 has not already reviewed in its Electronic Files.[27]   Moreover, many emails are likely to be solely between K2, counsel, and their clients, and thus privileged or protected.   Particularly because Batbold asks K2 to search recent emails—rather than limiting to the origin of the investigation per the Section 1782 Order—the burden of the privilege review will be significant.

Batbold's Motion argues for the first time that K2 should produce documents without reviewing for privilege.   This would be wholly improper.   Even if Batbold established that no privileges applied to K2's work with King & Spalding, the Mongolian Prosecutor, and IAAC, K2 is a leading investigations firm that works with hundreds of clients on privileged and highly sensitive matters.   ECF 33 ¶¶ 2-3.   Such an order would jeopardize privileges held by countless other clients, and the Court should thus deny this request.

## VI.  No deposition should be taken of a K2 corporate representative.

Batbold fails to identify a single topic on which a K2 corporate representative deposition would be relevant, let alone satisfy the Second Circuit factors for depositions of privileged agents. *See In re Friedman*, 350 F.3d at 72.   Such a deposition would not be proportionate to the needs of the case in light of the discovery already conducted and the significant risk of encountering privilege and work product issues, and thus the deposition subpoena should be quashed.[28]

## CONCLUSION

For the reasons stated above, K2 respectfully requests that the Court deny Batbold's Motion to Compel, quash the subpoenas, and/or enter a protective order.

---

[27] As K2 previously explained, this is the number of PDF and JPEG files, which are the file types most likely to correspond to underlying source documents.  ECF 115 at 16.  Even these 6,070 documents, however, likely include privileged documents and documents unrelated to the Mongolia investigation, given the overbreadth of search terms.

[28] The *Friedman* analysis applies regardless of Jules Kroll's submission of evidence in the Foreign Proceeding, as the deposition of K2's corporate representative will still raise significant privilege issues.

Dated:       New York, New York
             August 2, 2022

                                        Respectfully submitted,

                                        **KOBRE & KIM LLP**

                                         /s/ Darryl G. Stein
                                        Darryl G. Stein
                                        darryl.stein@kobrekim.com
                                        Zachary D. Rosenbaum
                                        zachary.rosenbaum@kobrekim.com
                                        Kobre & Kim LLP
                                        800 Third Avenue
                                        New York, New York 10022
                                        Telephone: +1 212 488 1200

                                        *Attorneys for Respondent K2 Integrity*